# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
### GREEN BAY DIVISION

IRON WORKERS LOCAL
NO. 25 PENSION FUNDS, *et al.*,

      Plaintiffs,

      v.

OSHKOSH CORPORATION, ROBERT G.
BOHN, CHARLES L. SZEWS, DAVID M.
SAGEHORN, and DELOITTE & TOUCHE,

      Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. 2:08-CV-0797
(Consolidated)

## DEFENDANTS OSHKOSH CORPORATION, ROBERT G. BOHN, CHARLES L. SZEWS AND DAVID M. SAGEHORN'S BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

Edward P. Welch
Robert S. Saunders
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: 302-651-3000
Fax: 302-651-3001
edward.welch@skadden.com
rob.saunders@skadden.com

Daniel T. Flaherty, Bar No. 1011357
GODFREY & KAHN, S.C.
100 West Lawrence Street
Appleton, Wisconsin 54911
Telephone: 920-830-2800
Fax: 920-830-3530
dflahert@gklaw.com

Attorneys for Defendants
Oshkosh Corporation, Robert G. Bohn, Charles L. Szews and David M. Sagehorn

DATED: July 24, 2009

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i
TABLE OF CASES AND AUTHORITIES ................................................................... iii
PRELIMINARY STATEMENT ........................................................................................1
STATEMENT OF FACTS .................................................................................................9
    1.     The Parties. .............................................................................................9
    2.     Oshkosh Acquires Geesink in July 2001. .............................................10
    3.     In Fiscal 2004, Geesink Suffers Losses And Oshkosh Announces Efforts To Improve Geesink's Performance. ...........................................................12
    4.     Geesink's Problems Continue Into Fiscal 2005. ...................................14
    5.     In Fiscal 2006, Geesink's Performance Improves. ...............................21
    6.     In Fiscal 2007, Geesink Suffers Another Downturn And Oshkosh Announces A More Aggressive Restructuring Of Geesink. ...................25
    7.     Geesink's Problems Continue Into Fiscal 2008. ...................................32
    8.     JLG's Sales Miss Expectations. ............................................................36
    9.     Oshkosh Determines That Weakening Markets Have Impaired Geesink's Goodwill And Publicly Announces An Impairment Charge And Downward Revisions To Earnings Estimates. ......................................37
    10.    Several Small Stockholders File Suit. ...................................................40
ARGUMENT ...................................................................................................................41
I.    COUNT I MUST BE DISMISSED BECAUSE THE COMPLAINT DOES NOT SATISFY THE REFORM ACT'S HEIGHTENED PLEADING STANDARDS FOR FRAUD CLAIMS. ...............................................................................41
    A.    The Complaint Does Not Adequately Allege A Material Misrepresentation Or Omission. ...................................................................................42
        1.     The Complaint is impermissibly vague. ..................................43
        2.     The Complaint does not adequately allege a material misrepresentation or omission in connection with Geesink. ....................45
        3.     The Complaint does not adequately allege a material misrepresentation or omission in connection with the integration of Oshkosh's subsidiaries. ...........................................................51
        4.     The Complaint does not adequately allege a material misrepresentation or omission in connection with Oshkosh's forward-looking statements. ..........................................................55
    B.    The Complaint Does Not Adequately Allege Scienter. .........................57
        1.     Plaintiffs' allegations regarding confidential witnesses do not support an inference of scienter. .............................................59
            (a)    The confidential witness allegations do not support an inference of scienter. ..............................................60
            (b)    Confidential witness allegations are steeply discounted. ..............61
            (c)    Plaintiffs fail to identify the confidential witnesses with particularity. ......................................................................62

i

2. Plaintiffs fail to allege facts sufficient to support a strong inference of scienter against the Individual Defendants. ........................................... 66
    (a) Plaintiffs' group-pled allegations must be disregarded. ................. 66
    (b) A motive to increase the stock price does not support a strong inference of scienter. .......................................................... 67
    (c) A "hands on" management style does not support a strong inference of scienter. ................................................................. 68
    (d) Bohn's and Szews' stock sales and option exercises do not support a strong inference of scienter. .......................................... 70
    (e) Oshkosh's disclosures refute any implication of scienter. ............ 75
3. Plaintiffs have failed to plead scienter as to Oshkosh. ............................... 76
C. The Complaint Does Not Adequately Allege Loss Causation. .............................. 77

II. COUNT II MUST BE DISMISSED BECAUSE THE COMPLAINT DOES NOT STATE A SECTION 10(B) CLAIM FOR A FRAUDULENT SCHEME OR COURSE OF BUSINESS. ................................................................................. 80

III. COUNT III MUST BE DISMISSED BECAUSE THE COMPLAINT DOES NOT STATE A SECTION 20(A) CLAIM. ..................................................... 82

CONCLUSION. ................................................................................................... 82

Case 2:08-cv-00797-WCG   Filed 07/24/09   Page 3 of 92   Document 91

# TABLE OF CASES AND AUTHORITIES

## CASES

PAGE(S)

*In re 2007 Novastar Fin., Inc. Sec. Litig.,*
    No. 07-0139-CV-W-ODS, 2008 WL 2354367 (W.D. Mo. June 4, 2008)........................43

*In re Acterna Corp. Sec. Litig.,*
    378 F. Supp. 2d 561 (D. Md. 2005)..............................................................76

*In re Advanta Corp. Sec. Litig.,*
    180 F.3d 525 (3d Cir. 1999)....................................................................71

*In re Alcatel Sec. Litig.,*
    382 F. Supp. 2d 513 (S.D.N.Y. 2005)......................................................44, 45

*In re Allscripts Inc. Sec. Litig.,*
    No. 00 C 6796, 2001 WL 743411 (N.D. Ill. June 29, 2001) .......................67, 68

*Amalgamated Bank v. Coca-Cola Co.,*
    No. Civ. A. 1:05-CV-1226, 2006 WL 2818973 (N.D. Ga. Sept. 29, 2006),
    *aff'd sub nom., Selbst v. Coca-Cola Co.*, 262 Fed. Appx. 177 (11th Cir. 2008).........47, 49

*Arazie v. Mullane,*
    2 F.3d 1456 (7th Cir. 1993) .................................................................42, 56

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007)....................................................................80

*In re Autodesk, Inc., Sec. Litig.,*
    132 F. Supp. 2d 833 (N.D. Cal. 2000).....................................................68

*In re Bally Total Fitness Sec. Litig.,*
    Nos. 04 C 3530, 04 C 3634, 04 C 3713, 04 C 3783, 04 C 3844, 06 C 3936,
    04 C 4697, 04 C 1437, 2006 WL 3714708 (N.D. Ill. July 12, 2006) ..................67, 70, 77

*In re Bally Total Fitness Sec. Litig.,*
    Nos. 04 C 3530, 04 C 3634, 04C 3713, 04 C 3783, 04 C 3844, 04 C 3936,
    04 C 4697, 06 C 1437, 2007 WL 551574 (N.D. Ill. Feb. 20, 2007) ......................55, 62, 66

*In re BearingPoint, Inc. Sec. Litig.,*
    525 F. Supp. 2d 759 (E.D. Va. 2007) ......................................................70

*In re Burlington Coat Factory Sec. Litig.,*
    114 F.3d 1410 (3d Cir. 1997)..............................................................16, 74

iii

*Caiafa v. Sea Containers Ltd.*,
    525 F. Supp. 2d 398 (S.D.N.Y. 2007)...................................................................47, 49

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004)................................................................ 63, 65-66

*In re Career Educ. Corp. Sec. Litig.*,
    No. 03 C 8884, 2006 WL 999988 (N.D. Ill. Mar. 28, 2006) ...........................62

*In re Career Educ. Corp. Sec. Litig.*,
    No. 03 C 8884, 2007 WL 1029092 (N.D. Ill. Mar. 29, 2007) ....................... 62-63

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*,
    388 F. Supp. 2d 932 (S.D. Ind. 2005)................................................................63

*Congregation of Ezra Sholom v. Blockbuster, Inc.*,
    504 F. Supp. 2d 151 (N.D. Tex. 2007) ..............................................................56

*In re Copper Mountain Sec. Litig.*,
    311 F. Supp. 2d 857 (N.D. Cal. 2004) ...............................................................72

*In re Cross Media Mktg. Corp. Sec. Litig.*,
    314 F. Supp. 2d 256 (S.D.N.Y. 2004)................................................................68

*Davis v. SPSS, Inc.*,
    385 F. Supp. 2d 697 (N.D. Ill. 2005) .................................................................68

*Davis v. SPSS, Inc.*,
    431 F. Supp. 2d 823 (N.D. Ill. 2006) .................................................................66

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)............................................................................................77

*In re Federal-Mogul Corp. Sec. Litig.*,
    166 F. Supp. 2d 559 (E.D. Mich. 2001).............................................................52

*Fener v. Belo Corp.*,
    560 F. Supp. 2d 502 (N.D. Tex. 2008) ..............................................................78

*In re Ferro Corp. Sec. Litig.*,
    Nos. 1:04CV1440, 1:04CV1589,
    2007 WL 1691358 (N.D. Ohio June 11, 2007)............................................ *passim*

*Friedman v. Rayovac Corp.*,
    291 F. Supp. 2d 845 (W.D. Wis. 2003) ........................................................71, 82

iv

*In re FVC.COM Sec. Litig.*,
   136 F. Supp. 2d 1031 (N.D. Cal. 2000),
   *aff'd*, 32 Fed. Appx. 338 (9th Cir. 2002)..................................................................74

*In re FVC.COM Sec. Litig.*,
   32 Fed. Appx. 338 (9th Cir. 2002)..........................................................................72

*Gaines v. Guidant Corp.*,
   No. 1:03CV00892-SEB-WTL, 2004 WL 2538374 (S.D. Ind. Nov. 8, 2004) .......... *passim*

*Garfield v. NDC Health Corp.*,
   466 F.3d 1255 (11th Cir. 2006) ............................................................................69

*In re Goodyear Tire & Rubber Co. Sec. Litig.*,
   436 F. Supp. 2d 873 (N.D. Ohio Mar. 22, 2006) ..............................................44, 45

*In re Guidant Corp. Sec. Litig.*,
   536 F. Supp. 2d 913 (S.D. Ind. 2008) ............................................................. *passim*

*Harris v. IVAX Corp.*,
   182 F.3d 799 (11th Cir. 1999) ...............................................................................56

*Head v. NetManage Inc.*,
   No. C 97-4385-CRB, 1998 U.S. Dist. LEXIS 20433 (N.D. Cal. Dec. 30, 1998)............74

*In re Healthcare Compare Corp. Sec. Litig.*,
   75 F.3d 276 (7th Cir. 1996) ...................................................................................55

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) .......................................................................... *passim*

*Higginbotham v. Baxter Int'l, Inc.*,
   Nos. 04C4909, 04C7096, 2005 WL 1272271 (N.D. Ill. May 25, 2005) ..........................77

*In re Hutchinson Tech., Inc. Sec. Litig.*,
   536 F.3d 952 (8th Cir. 2008) .................................................................................63

*In re Int'l Rectifier Corp. Sec. Litig.*,
   No. CV07-02544-JFWVBKX, 2008 WL 4555794 (C.D. Cal. May 23, 2008) ................60

*In re Keyspan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) .....................................................................73

*In re Kindred Healthcare, Inc. Sec. Litig.*,
   299 F. Supp. 2d 724 (W.D. Ky. 2004).....................................................................70

v

*Lentell v. Merrill Lynch & Co.,*
   396 F.3d 161 (2d Cir. 2005)..............................................................................77, 80

*Lipton v. Pathogenesis Corp.,*
   284 F.3d 1027 (9th Cir. 2002) ...........................................................................69, 74

*In re Loral Space & Commc'ns Ltd. Sec. Litig.,*
   No. 01 Civ. 4388 (JGK), 2004 WL 376442 (S.D.N.Y. Feb. 27, 2004) ......................47, 49

*Maiden v. Merger Techs., Inc.,*
   No. 06-C-349, 2008 WL 4643538 (E.D. Wis. Oct. 20, 2008)....................................51, 75

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
   437 F.3d 588 (7th Cir. 2006),
   *overruled on other grounds*, 127 S. Ct. 2499 (2007)........................................41, 43, 58, 62

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
   513 F.3d 702 (7th Cir. 2008) ..............................................................................58

*May v. Borick,*
   No. CV-95-8407-LGB (EX), 1997 WL 314166 (C.D. Cal. Mar. 3, 1997) ......................44

*In re Metawave Commc'ns Corp. Sec. Litig.,*
   298 F. Supp. 2d 1056 (W.D. Wash. 2003)..............................................................66

*Miller v. Champion Enters., Inc.,*
   346 F.3d 660 (6th Cir. 2003) ..............................................................................56

*In re Mirant Corp. Sec. Litig.,*
   No. 1:02-CV-1467-RWS, 2009 WL 48188 (N.D. Ga. Jan. 7, 2009)....................46-47, 48

*Nursing Home Pension Fund, Ltd. v. Oracle Corp.,*
   242 F. Supp. 2d 671 (N.D. Cal. 2002) ...................................................................74

*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.,*
   487 F.3d 261 (5th Cir. 2007) ..............................................................................78

*In re Party City Sec. Litig.,*
   147 F. Supp. 2d 282 (D.N.J. 2001) .......................................................................73

*In re PEC Solutions, Inc. Sec. Litig.,*
   418 F.3d 379 (4th Cir. 2005) ..............................................................................72

*In re PETsMART Inc. Sec. Litig.,*
   61 F. Supp. 2d 982 (D. Ariz. 1999) ...................................................................70-71

Case 2:08-cv-00797-WCG    Filed 07/24/09    Page 7 of 92    Document 91

*PR Diamonds, Inc. v. Chandler,*
364 F.3d 671 (6th Cir. 2004) .......................................................................... 69

*Pugh v. Tribune Co.,*
521 F.3d 686 (7th Cir. 2008) ................................................................. *passim*

*Ray v. Citigroup Global Markets, Inc.,*
482 F.3d 991 (7th Cir. 2007) ......................................................................... 77

*In re Recoton Corp. Sec. Litig.,*
358 F. Supp. 2d 1130 (M.D. Fla. 2005) ...................................................... 80-81

*In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.,*
No. 06 Civ. 643 (GEL), 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007) ........................ 80

*Rombach v. Chang,*
355 F.3d 164 (2d Cir. 2004) ........................................................................... 67

*Rosenzweig v. Azuriz Corp.,*
332 F.3d 854 (5th Cir. 2003) .................................................................. 55-56, 67

*Roth v. OfficeMax, Inc.,*
527 F. Supp. 2d 791 (N.D. Ill. 2007) ...................................................... *passim*

*Selbst v. McDonald's Corp.,*
432 F. Supp. 2d 777 (N.D. Ill. 2006) ......................................................... 62, 64

*In re Serologicals Sec. Litig.,*
No. Civ. A. 1:00-CV1025CAP, 2003 WL 24033694 (N.D. Ga. Feb. 20, 2003)...46, 47, 48

*In re Shopko Sec. Litig.,*
No. 01-C-1034, 2002 WL 32003318 (E.D. Wis. Nov. 5, 2002).......................... 42, 45, 55

*Shuster v. Symmetricon, Inc.,*
No. 94-20024 RMW, 1997 WL 269490 (N.D. Cal. Feb. 25, 1997) ................................ 44

*Sneed v. Rybicki,*
146 F.3d 478 (7th Cir. 1998) ............................................................................. 9

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,*
365 F.3d 353 (5th Cir. 2004) ..................................................................... 69, 82

*Stark Trading & Shepherd Invs. Int'l Ltd. v. Falconbridge Ltd.,*
No. 05-C-1167, 2008 WL 153542 (E.D. Wis. Jan. 14, 2008),
*aff'd,* 552 F.3d 568 (7th Cir. 2009)........................................................... *passim*

vii

*TCS Capital Mgmt., LLC v. Apax Partners, L.P.,*
No. 06-CV-13447, 2008 WL 650385 (S.D.N.Y. Mar. 7, 2008) ...................................80, 81

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
127 S. Ct. 2499 (2007) ................................................................................. *passim*

*In re Tibco Software, Inc. Sec. Litig.,*
No. C 05-2146, 2006 U.S. Dist. LEXIS 36666 (N.D. Cal. May 24, 2006) .......................74

*In re Vantive Corp. Sec. Litig.,*
283 F.3d 1079 (9th Cir. 2002) ..................................................................... *passim*

*In re Washington Mutual, Inc. Sec., Derivative & ERISA Litig.,*
Nos. 2:08-MD-1919 MJP, C08-387 MJP,
2009 WL 1393679 (W.D. Wash. May 15, 2009)...................................................... 43-45

*Wenger v. Lumisys, Inc.,*
2 F. Supp. 2d 1231 (N.D. Cal. 1998) ..........................................................44, 74

*Werner v. Werner,*
267 F.3d 288 (3d Cir. 2001)..................................................................................52

*Western Pa. Elec. Employees Pension Trust v. Plexus Corp.,*
No. 07C0582, 2009 WL 604276 (E.D. Wis. Mar. 6, 2009)...................................... *passim*

*In re Wet Seal, Inc. Sec. Litig.,*
518 F. Supp. 2d 1148 (C.D. Cal. 2007) ...................................................................47, 76

*Williams v. WMX Techs., Inc.,*
112 F.3d 175 (5th Cir. 1997) ...............................................................................43

*In re Winn-Dixie Stores Inc. Sec. Litig.,*
531 F. Supp. 2d 1334 (M.D. Fla. 2007)..................................................................52

*In re Worlds of Wonder Sec. Litig.,*
35 F.3d 1407 (9th Cir. 1994) ..............................................................72-73, 75-76

## AUTHORITIES

15 U.S.C. § 78u-4(b)(1) ............................................................................... 41-42

15 U.S.C. § 78u-4(b)(2) ...............................................................................42, 57

15 U.S.C. § 78u-4(b)(4) ...................................................................................77

Case 2:08-cv-00797-WCG   Filed 07/24/09   Page 9 of 92   Document 91

15 U.S.C. § 78u-5(c)........................................................................................................12, 56

15 U.S.C. § 78u-5(c)(1)(B)......................................................................................................58

15 U.S.C. § 78u-5(i)(1)............................................................................................................56

H.R. Conf. Rep. No. 104-369, 104th Cong. (1995), reprinted in 1995 U.S.C.C.A.N. 730.............4

David M. Brodsky & Daniel J. Kramer, *Federal Securities Litigation: Commentary and Forms*, 2-1 (2008)............................................................................................................................55

# PRELIMINARY STATEMENT

Oshkosh Corporation ("Oshkosh" or the "Company") is a Wisconsin corporation headquartered in Oshkosh. Since 1917, Oshkosh has been a leading designer and builder of specialty vehicles and vehicle bodies. Since 1996, Oshkosh has grown significantly by acquiring carefully selected global companies in related industries. Oshkosh pursued its growth strategy conservatively and successfully, repaying acquisition-related debt ahead of schedule, and rewarding its investors with substantial dividends and stock price growth. These acquisitions increased Oshkosh's sales from $413 million in fiscal 1996 to $7.1 billion in fiscal 2008, and its earnings from a loss of $0.01 per share in fiscal 1996 to earnings of $1.07 per share in fiscal 2008 (down from $3.58 in fiscal 2007). (Oshkosh's fiscal year ends September 30.) Throughout this period of acquisition, Oshkosh met or exceeded Wall Street's earnings expectations in all but two quarters, both of which marked the beginning of economic recessions.

One of Oshkosh's acquisitions was the Geesink Norba Group ("Geesink"), a European maker of refuse collection vehicle bodies that represented approximately 3% of Oshkosh's fiscal 2008 sales. Oshkosh bought Geesink in July 2001 for $137.6 million. At first, Geesink performed well. By the beginning of fiscal 2004, however, a recession and industry-wide price decline in the European refuse market led Oshkosh to warn that Geesink's sales might stagnate. Later in the year, Oshkosh announced new management and cost-saving measures to try to "return [Geesink] to modest profitability."

Consistent with generally accepted accounting principles ("GAAP"), at least annually, Oshkosh tests the intangible assets (such as goodwill) of all of its business units for impairment. Under GAAP, "goodwill" is an intangible asset that represents the amount by which the price paid to acquire a business exceeds the net book value of the assets and liabilities acquired. In

1

general, the goodwill impairment test compares the "fair value" of a business (based on projected future cash flows) to the book value of the business, including goodwill. If the fair value of the business is less than its book value, and the implied fair value of the goodwill is less than the book value of the goodwill, then the goodwill is impaired and the company must report a loss in the amount of the difference. An impairment charge does not mean that prior accounting was wrong, but that the projected value of the assets has decreased.

While it sought to turn Geesink around, Oshkosh regularly tested Geesink's intangible assets for impairment and disclosed the results. Those tests consistently showed no impairment. Nevertheless, Oshkosh repeatedly warned the market that its efforts to fix Geesink might fail, and that an impairment charge might become necessary. By the fourth quarter of fiscal 2005, Geesink appeared to have turned the corner. It showed a modest profit for most of fiscal 2006. But the resurgence was short-lived. Although Oshkosh was enjoying record-breaking success, decline in U.K. demand and problems at a key supplier drove Geesink back into the red at the end of fiscal 2006. In fiscal 2007, Oshkosh announced a more aggressive restructuring of Geesink, involving substantial workforce reductions, closing multiple facilities, and relocating some manufacturing to a lower-cost factory in Romania. Part of the restructuring involved using Geesink's Romanian facility as a European supplier to JLG Industries, Inc. ("JLG") – an access equipment manufacturer that Oshkosh bought in December 2006. Oshkosh warned that positive results of the restructuring might not be seen until fiscal 2009 and that, in the meantime, continued losses should be expected. Oshkosh's projections for Geesink still supported its intangible asset value based on the expected benefits from the restructuring, and thus no impairment charge was necessary at the end of fiscal 2007. But, again, Oshkosh warned that these more aggressive restructuring efforts might fail and require an impairment charge.

2

Following its acquisition by Oshkosh, JLG became Oshkosh's largest and most profitable segment. In June 2008, Oshkosh saw lower than expected orders for JLG in Europe, order cancellations from larger customers and indications from larger customers that they would be reducing their spending. This indicated to Oshkosh that the recession, already present in the United States, had hit Europe. Recognizing that lower orders for JLG equipment might lead to lower orders from JLG to Geesink's Romanian factory, Oshkosh accelerated its regularly scheduled impairment analysis. As Oshkosh updated its Geesink projections to address lower forecasts for JLG demand and the impact of the spreading global recession on likely future demand at Geesink, it concluded that the revised projections did not support Geesink's goodwill value and an impairment charge was necessary. On June 26, 2008, Oshkosh immediately announced its lowered expectations for JLG and the European market generally, and pre-announced the Geesink impairment charge.

Oshkosh stock fell 33% on the day of the pre-announcement reacting to Oshkosh's warning about the outlook for JLG's access equipment business (its most profitable segment) and the European economy. In the conference call with analysts following the Company's announcement, not one single question was asked about the Geesink impairment. The focus was squarely on JLG.

Oshkosh was among the first to recognize and announce the consequences of the economic downturn.[1] The Dow Jones Industrial Average lost 355 points on the day Oshkosh

---

[1] Another Wisconsin company, Rockwell Automation, Inc., issued a similar profit warning on June 25, 2008 (one day before Oshkosh's announcement), announcing that it was reducing earnings projections "[g]iven the expected third quarter earnings, *and what appear*[ed] *to be less favorable market conditions in the U.S. and Europe . . . .*" *See* Ex. 44, 6/25/08 Rockwell Press Release (emphasis added). Rockwell's stock dropped more than 10% the next day.

3

made its announcement (dropping from an opening of 11,808.57 to 11,453.43), and the stock market generally lost 30% of its value over the next four months.[2]  Moreover, as Oshkosh predicted, in time, the downturn proved to be an industry-wide phenomenon.  Throughout 2008 and 2009, numerous industry peers, including direct competitors, announced similar reductions in the outlooks for their equipment businesses, and were ultimately required to impair the assets of these businesses.[3]  Because Oshkosh was one of the first to alert the market to the weakness facing its industry and the global economy generally, and did so before the stock market made its most dramatic swoons in the fall of 2008, its stock fell the sharpest in June 2008.

Predictably, the drop in Oshkosh's stock price attracted class action lawsuits.  But Congress enacted the Private Securities Litigation Reform Act (the "Reform Act") in 1995 in response to just this kind of "abuse in private securities lawsuits," and, in particular, "the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action." H.R. Conf. Rep. No. 104-369, 104th Cong., at 31 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730. To curtail this abuse, the Reform Act established heightened pleading standards and required

---

[2]  Shares of The Tanfield Group Plc, a maker of power access systems and electric vehicles, also plunged on Oshkosh's announcement. *See* Ex. 46, Graeme Davies, *Tanfield tanks after rival's warning*, INVESTORS CHRONICLE, June 27, 2008 ("[T]he catalyst for the latest [40%] plunge has been a statement from New York-listed Oshkosh Corporation, which owns JLG, a US powered-access provider.").

[3]  *See, e.g.*, Ex. 45, 9/30/08 The Tanfield Group Plc News Report, *Tanfield writes off £75 million* (announcing £75 million write-down of assets); Ex. 47, 2/3/09 Terex Corporation Press Release (announcing an approximate $600 million impairment charge in response to "the rapid change in global economic conditions" and "present economic environment"); Ex. 42, 4/30/09 Manitowoc Company, Inc. Press Release (announcing a $700 million impairment charge "driven by the current economic environment").

4

dismissal of complaints that do not meet them. Here, the Reform Act requires dismissal of Plaintiffs' claims for each of the following reasons:

**_No Material Misrepresentation or Omission_**. Plaintiffs' Consolidated Class Action Complaint (the "Complaint" or "Compl.", D.I. 83), spanning 582 paragraphs and 192 pages, is devoted largely to mind-numbing reprints of excerpts from almost every filing[4] Oshkosh made since 2003, with no attempt at all to identify for Defendants or the Court *which* of those public statements are alleged to have been false or misleading. Then, every sixty paragraphs or so (corresponding to an Oshkosh fiscal year), Plaintiffs break into a refrain of virtually the same twenty-odd unsupported conclusory assertions purportedly showing that "the statements made by the Oshkosh Defendants set forth above" were supposedly false and misleading.

This is the paradigmatic "puzzle pleading" that federal courts have consistently dismissed under Federal Rule of Civil Procedure 8 and the Reform Act because it fails to put Defendants on notice of the claims against them and the grounds therefor. The Reform Act does not permit Plaintiffs to simply make vague allegations about pages and pages of statements and leave it to Defendants and the Court to try to sort out the puzzle. That is a sufficient ground by itself to dismiss the Complaint. But, here, the Complaint is even worse than an impermissible "puzzle pleading" because it is readily apparent that key pieces of a securities fraud claim are completely missing. In particular, the Complaint makes no specific allegation of fact contradicting *any* statement Defendants ever made. Plaintiffs do not allege the existence of a single document

---

[4] Federal law requires issuers of securities like Oshkosh to file publicly with the U.S. Securities and Exchange Commission (the "SEC") an annual report on Form 10-K, a quarterly report on Form 10-Q and, upon the occurrence of certain specified events, a report on Form 8-K. Oshkosh regularly filed on Form 8-K copies of press releases announcing its quarterly earnings as well as scripts of its conference calls with analysts discussing those earnings.

suggesting that Defendants ever said anything that was false or misleading when it was said. Instead, to try to carry their burden of pleading specific facts establishing falsity, Plaintiffs rely entirely on the statements of sixteen unidentified "confidential witnesses," all purportedly former employees of Oshkosh or its subsidiaries at unspecified points in time. But the confidential witnesses give Plaintiffs nothing but water cooler gossip and the petty grievances of mid-level managers who (unsurprisingly) believed their bosses asked too much of them and sometimes made bad decisions. Not one witness says that any Defendant committed fraud; not one witness says that any Defendant ever said anything false or misleading; not one witness says that any of the Geesink impairment analyses were not performed in accordance with GAAP; not one witness says that the Company's projections for Geesink were unrealistic or unreasonable at any point in time. In short, not a single confidential witness actually supports Plaintiffs' claims. With no specific allegation of fact contradicting any of Defendants' statements, the Complaint wholly fails to meet the Reform Act's pleading standard.

*__No Scienter__*. The Complaint must also be dismissed because Plaintiffs have not carried their burden of pleading scienter. Under the Reform Act's heightened pleading requirements, a securities fraud plaintiff is not entitled to the benefit of inferences that are merely reasonable. Rather, a securities fraud plaintiff must plead specific facts creating a "strong inference" of scienter. For the inference of scienter to be "strong," it must be "cogent and at least as compelling as any opposing inference . . . ." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007). Here, the "opposing inference" is straightforward and obvious from the face of the Complaint – after warning the market for years about its difficulties with Geesink and that an impairment charge might be necessary if Oshkosh's efforts to restructure Geesink did not succeed, the leading edge of the worst global economic collapse in 70 years made that warning a

6

reality. Not only is the "opposing inference" powerful here, but the inference of scienter Plaintiff must support is inherently implausible – that Defendants intended to defraud the market through a nearly five-year conspiracy to hide the impairment of a minor subsidiary. Plaintiffs fall far short of carrying their heavy burden. There simply was no conspiracy and, accordingly, no scienter.

To begin with, the fact that Plaintiffs took months to investigate their claims, interviewed _at least_ sixteen former employees, and found _not a single witness_ who could voice even the slightest suspicion of fraud at Oshkosh is itself compelling evidence _against_ an inference of scienter. Other facts alleged in the Complaint are also inconsistent with an inference of scienter. If Defendants were engaged in a nearly five-year scheme to increase Oshkosh's already growing stock price even further by failing to take an impairment charge at Geesink, why did they constantly volunteer the warning to investors that an impairment charge might be necessary in the near future? If Defendants were trying to inflate Oshkosh's stock price, why did they reduce current earnings through costly efforts to restructure Geesink?

In the absence of any allegations suggesting direct evidence of scienter, Plaintiffs fall back on the weak circumstantial evidence of executive stock sales. But stock sales by corporate executives are a common occurrence, particularly for companies such as Oshkosh, where stock options form a significant part of executive compensation. As a result, the law provides that stock sales do not support a strong inference of scienter unless their size and timing are unusual and suspicious. Here, however, the Complaint alleges nothing but cherry-picked (yet still insignificant and ordinary) stock sales and option exercises as to Bohn and Szews, mostly occurring _years_ prior to June 2008. These facts are completely inconsistent with conspiratorial

7

conduct. Moreover, without a cogent and compelling inference of scienter as to Bohn, Szews or Sagehorn, Plaintiffs also fail to allege scienter as to Oshkosh itself.

*__No Loss Causation__*. Plaintiffs have pled only that Oshkosh's stock price dropped after the June 26, 2008 impairment pre-announcement. On June 26, however, Oshkosh announced several warnings – including its perception of weakness in the global economy and the related impact on JLG (its fastest growing segment) and downward revisions to its earnings estimates for the third quarter and full fiscal year 2008. Plaintiffs have not sufficiently pled that Oshkosh's stock price dropped as a result of any of the allegedly fraudulent statements regarding Geesink's impairment as opposed to any other warnings issued that day.

*__No Market Manipulation Claim__*. Where, as here, the sole basis for a market manipulation claim is alleged misrepresentations or omissions, a plaintiff has not pled a market manipulation claim.

*__No Control Person Liability__*. Plaintiffs' failure to state any primary claim against Defendants mandates dismissal of their claim for "control person" liability.

8

1.     **The Parties.**

Plymouth County Retirement System and Boston Retirement Board (collectively, "Plaintiffs" or "Massachusetts Public Pension Funds") are sophisticated institutional investors based in Massachusetts. *See* Compl. ¶ 16. Both funds purport to own shares in Oshkosh and to have held shares during the relevant time period. *Id.* Plaintiffs allege that they suffered losses of approximately $3.52 million. Memorandum of Law at 4, D.I. 18. Plaintiffs purport to bring this action on behalf of a class of investors who purchased Oshkosh common stock during the period of November 26, 2003 through June 25, 2008 (the proposed "Class Period").[6] Compl. ¶¶ 1, 29.

Defendant Oshkosh is a leading designer, manufacturer and marketer of a broad range of specialty access equipment, commercial, fire & emergency and military vehicles and vehicle bodies. Compl. ¶ 17. *See also* Ex. 33, 11/21/07 10-K at 2. Oshkosh's stock is publicly traded.

---

[5] Solely for the purpose of the Motion, the Statement of Facts assumes the truth of the factual allegations made in the Complaint, but not Plaintiffs' unsupported conclusions of law or fact. *Sneed v. Rybicki*, 146 F.3d 478, 480 (7th Cir. 1998).

Exhibits cited herein are attached to the Declaration of Anthony S. Baish, Esq. filed contemporaneously herewith. For purposes of a motion to dismiss, courts consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 127 S. Ct. at 2509. *Accord Stark Trading & Shepherd Invs. Int'l Ltd. v. Falconbridge Ltd.*, No. 05-C-1167, 2008 WL 153542, at *3 (E.D. Wis. Jan. 14, 2008), *aff'd*, 552 F.3d 568 (7th Cir. 2009). The Court may take judicial notice of public records, including stock prices, SEC filings and the undisputed facts contained in those reports. *Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008). Plaintiffs admit that they rely on Oshkosh's SEC filings, "as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, including newspaper articles, online publications, stock price charts, and Bloomberg reports . . . ." Compl. at 1.

[6] This brief does not address the question of whether this action should proceed as a class action, including the adequacy of Plaintiffs to act as class representatives or the propriety of the purported Class Period.

Compl. ¶ 18. Defendant Robert G. Bohn ("Bohn") is Oshkosh's Chairman and Chief Executive Officer. *Id.* ¶ 19. Defendant Charles L. Szews ("Szews") was Oshkosh's Chief Financial Officer ("CFO"), and is now President and Chief Operating Officer ("COO"). *Id.* ¶ 20. Defendant David M. Sagehorn ("Sagehorn," and collectively with Bohn and Szews, the "Individual Defendants")[7] was Oshkosh's Vice President and Treasurer before becoming Oshkosh's CFO in October 2007. *Id.* ¶ 21; Ex. 33, 11/21/07 10-K at 22.

Oshkosh has four segments: defense, fire & emergency, commercial, and (after the acquisition of JLG at the end of 2006) access equipment. Compl. ¶ 17. Each segment (other than defense) is operated through wholly owned subsidiaries. Ex. 33, 11/21/07 10-K at 1-2. Geesink comprises Oshkosh's European refuse operations and is part of the commercial segment. Compl. ¶ 17. Geesink makes refuse collection vehicle bodies, mobile and stationary compactors and transfer stations for the waste services industry. Ex. 38, 6/26/08 8-K at 1.

## 2. Oshkosh Acquires Geesink in July 2001.

Oshkosh acquired Geesink in July 2001 to expand the Company's refuse collection vehicle business into Europe. Ex. 1, 11/26/03 10-K at 25, 55.[8] The acquisition was part of the Company's plan to pursue acquisitions focusing "on opportunities that provide or enhance a full range of products to customers in specialty truck and truck body markets that are growing and

---

[7] As used herein, "Defendants" collectively refers to Oshkosh and the Individual Defendants.

[8] Oshkosh's fiscal year ends September 30. Accordingly, its 10-K annual filings were generally filed in November. Its 10-Q quarterly filings were generally filed a few weeks after the close of a fiscal quarter, in late January, April, and July. Immediately after receiving the financial data for a quarter, Oshkosh would file an 8-K announcing its projected earnings and the preliminary results from the prior quarter. Concurrent with those 8-Ks, Oshkosh would file a press release and a conference call script (cited herein as "Scr."). Other interim disclosures would be made via 8-Ks as well.

where the Company can enhance its strong market positions and achieve significant acquisition synergies." *See, e.g.*, Ex. 9, 11/23/04 10-K at 7, 23, 24; Ex. 17, 11/22/05 10-K at 5, 23; Ex. 25, 11/16/06 10-K at 2, 4, 26. Oshkosh bought Geesink for $137.6 million. Geesink was one of a number of companies in Oshkosh's commercial segment, including McNeilus, London, CON-E-CO and IMT. *See* Ex. 25, 11/16/06 10-K at 26-27; Ex. 33, 11/21/07 10-K at 7. Though it contained a number of companies, the commercial segment was not a significant driver of Oshkosh's financial results, comprising less than 10% of Oshkosh's operating income in 2005 and 2007. *See* Ex. 33, 11/21/07 10-K at 30.

Oshkosh's acquisition strategy has largely succeeded. Since 1996, the Company negotiated and integrated fifteen acquisitions that, taken as a whole, significantly increased the Company's sales and earnings. *Id.* at 4. *See* Ex. 33, 11/21/07 10-K at 2 ("[T]he result of [the] acquisition initiative . . . has been an increase in sales from $413 million in fiscal 1996 to $6.3 billion in fiscal 2007, with earnings . . . increasing from a loss of $.01 per share in fiscal 1996 to earnings of $3.58 per share for fiscal 2007."). While the Company has enjoyed significant growth, it has grown conservatively and consistently paid back acquisition-related debt; indeed as of the end of the third quarter of 2006, Oshkosh had no net debt (interest-bearing debt less cash and cash equivalents). *See* Ex. 23, 8/1/06 10-Q at 4; Ex. 19, 2/2/06 10-Q at 4; Ex. 17, 11/22/05 10-K at 47; Ex. 15, 8/3/05 10-Q at 4. In addition to disclosing the acquisition strategy, Oshkosh repeatedly warned investors about the integration risks arising from its strategy. *See, e.g.*, Ex. 17, 11/22/05 10-K at 1 (identifying "the challenges of . . . integrating acquired businesses" as a risk factor that could affect the accuracy of Oshkosh's forward-looking statements); Ex. 9, 11/23/04 10-K at 4 (same). *See also* Ex. 25, 11/16/06 10-K at 16 (warning "[*w*]*e may not be able to complete or successfully integrate the acquisition of JLG, which may*

11

*have a material adverse impact on our future growth and operating performance*"); Ex. 33, 11/21/07 10-K at 16.

### 3. In Fiscal 2004, Geesink Suffers Losses And Oshkosh Announces Efforts To Improve Geesink's Performance.

The European refuse markets served by Geesink have been in a recession since 2001. Oshkosh consistently disclosed this fact. *See, e.g.*, Ex. 17, 11/22/05 10-K at 37; Ex. 9, 11/23/04 10-K at 35; Ex. 2, 1/22/04 Scr. at 4 ("In Europe, the economy remains the primary driver behind a flat refuse market . . . ."). Economic difficulties led to significant "[p]ricing pressure" throughout Europe as well. *See* Ex. 4, 4/27/04 Scr. at 5. As a result, pricing was "adversely impacted in most European countries." Ex. 7, 7/28/04 10-Q at 30.

*First Quarter of Fiscal 2004*. On January 22, 2004, Oshkosh announced its financial results for the first quarter of fiscal 2004. Despite the flagging European economy, Geesink "had [a] solid performance." Ex. 2, 1/22/04 Scr. at 4. Nonetheless, Oshkosh cautiously projected that Geesink's refuse sales would "be flat in fiscal 2004 due to no projected recovery in European markets." *Id.* at 8.

*Second Quarter of Fiscal 2004*. In the second quarter of fiscal 2004, Oshkosh's commercial business underperformed, and Geesink did not fare as well. Ex. 4, 4/27/04 Scr. at 8-9. On April 27, 2004, Oshkosh announced financial results for the second quarter, showing that the commercial business' operating income was down 17.1%. *Id.* at 8. Oshkosh continued to "*estimate*[]"[9] that "Geesink Norba Group refuse sales [would] be roughly flat in fiscal 2004."

---

[9] As discussed below, the Reform Act provides a safe-harbor for "forward-looking statements" that are either accompanied by appropriate cautionary statements or are made without actual knowledge of falsity. 15 U.S.C. § 78u-5(c). "Forward-looking statements" include statements about projections, estimates, plans, objectives, future performance, or the assumptions underlying such statements.

12

*Id.* at 10 (emphasis added). Oshkosh identified the flagging European economy as "the primary driver" behind the flat refuse market. Ex. 2, 1/22/04 Scr. at 4.

**_Third Quarter of Fiscal 2004_**. In the third quarter of fiscal 2004, performance again lagged in Oshkosh's commercial business. Ex. 6, 7/27/04 Scr. at 5. Because Oshkosh was not counting on short-term improvement in European market conditions, it "initiated significant measures to improve Geesink Norba Group's performance, including a work force reduction and introduction of a new line of value-priced refuse bodies." Ex. 6, 7/27/04 Press Release; Ex. 6, 7/27/04 Scr. at 5, 6; Ex. 7, 7/28/04 10-Q at 26. As part of its improvement efforts, in late October 2004, Oshkosh installed new executive leadership at Geesink and began bringing in personnel experienced in "lean" implementation. Ex. 10, 1/25/05 Scr. at 4.

Based on these measures, Oshkosh "*project[ed]* that the Geesink Norba Group returns to modest profitability on flat sales in fiscal 2005 due to manufacturing efficiencies anticipated following the re-layout of manufacturing processes in fiscal 2004." Ex. 6, 7/27/04 Scr. at 14 (emphasis added). Oshkosh cautioned that "the weak European economy, among other things, has continued to have a material adverse effect on refuse sales by Geesink Norba Group. *The Company cannot provide any assurance that its restructuring of the Geesink Norba Group will be effective.*" Ex. 6, 7/27/04 8-K at 3 (emphasis added).

**_Fourth Quarter and Year End of Fiscal 2004_**. As anticipated, Geesink underperformed through the end of the fourth quarter. *See* 10/28/04 Ex. 8, Trans. at 9 ("operating loss in European refuse more than offset slightly improved concrete placement and domestic refuse operating income. We anticipated the loss in European refuse . . . ."). Nonetheless, Oshkosh as a whole was successful in fiscal 2004, showing growth of 17.5% in consolidated sales and 49.2% growth in net income, driven largely by gains in Oshkosh's defense segment. Ex. 9, 11/23/04

Case 2:08-cv-00797-WCG   Filed 07/24/09   Page 23 of 92   Document 91

10-K at 25. On the fourth quarter earnings call, Bohn warned that Oshkosh did not "see recovery in the refuse market across Europe as a whole." Ex. 8, 10/28/04 Scr. at 5. In the year-end 10-K, Oshkosh advised that it "expect[ed]" Geesink to "be modestly profitable as a result of the restructuring of that business in fiscal 2004." Ex. 9, 11/23/04 10-K at 34. Although Oshkosh was hopeful that it could improve Geesink, Oshkosh again cautioned investors that its efforts might not be effective. *See* Ex. 8, 10/28/04 8-K at 3.

**_Oshkosh's Fiscal 2004 Goodwill Assessment_**. Consistent with Company policy and GAAP, Oshkosh tested the goodwill of all its business units, including Geesink, for impairment at least annually. In its fiscal 2004 annual assessment, Oshkosh concluded that Geesink's goodwill was not impaired. This conclusion was reviewed by its independent auditors Deloitte & Touche ("Deloitte"). The Company based this conclusion on projected benefits of the restructuring begun in fiscal 2004, including a reduction in workforce, and investments planned for fiscal 2005, including the installation of "[l]ean principles," and the Company's forecast of "improving European refuse market conditions beginning in fiscal 2006 . . . ." Ex. 9, 11/23/04 10-K at 35. The impairment analysis showed that Geesink's fair value exceeded its carrying value by more than $20 million at fiscal year end. *Id.* The Company, however, disclosed its intent "to continue to review the results of its fiscal 2004 and fiscal 2005 initiatives and to monitor the valuation of its investment in the Geesink Norba Group as appropriate during fiscal 2005." *Id.*

### 4. Geesink's Problems Continue Into Fiscal 2005.

In fiscal 2005, Oshkosh continued its efforts to improve Geesink, and kept the market informed. Oshkosh implemented lean initiatives and price increases to reduce Geesink's cost structure and deliver margin enhancement. Ex. 10, 1/25/05 Press Release. During the first quarter, Oshkosh named a new managing director for Geesink and implemented lean

14

manufacturing disciplines at facilities in The Netherlands. Ex. 10, 1/25/05 Scr. at 10. In January

2005, Oshkosh assigned a team of Company representatives to support Geesink's turnaround

activities full-time. Ex. 11, 2/1/05 10-Q at 13. *See* Ex. 10, 1/25/05 Scr. at 4. Oshkosh continued

its initiatives throughout the fiscal year.

 **_First Quarter of Fiscal 2005_**. As Oshkosh had warned, the initiatives did not show

immediate results. On the earnings call for the first quarter of fiscal 2005, Bohn reiterated

Geesink's problems and Oshkosh's commitment to improving Geesink: "[W]e need to fix

operations at the Geesink Norba Group to turn performance around in this segment. We are

aggressively working on [this] front[]." Ex. 10, 1/25/05 Scr. at 3. Oshkosh warned that Geesink

would "*still lose money in the second quarter, and probably for the fiscal year*," but noted "the

*potential* to return this business to solid profitability over the next 9 to 18 months." *Id.* at 4

(emphasis added).

 Although Oshkosh was optimistic about its ability to turn Geesink around, it gave the

market explicit and detailed warnings that its efforts might fail and an impairment charge might

result:

> Geesink Norba Group Turnaround – *The Geesink Norba Group has been
> operating at a loss for the last three quarters* due to the weak European economy,
> declines in selling prices in its markets, operational inefficiencies and increased
> material, labor and warranty costs related to the launch of a new Gesink-branded
> [*sic*] rear loader. *Although the Company has taken steps to turn around the
> business of the Geesink Norba Group*, including reducing work force, installing
> new executive leadership, implementing lean manufacturing practices and
> introducing new products, *the Company cannot provide any assurance such
> activities will be successful*. In addition, the Company may incur costs to
> implement any such turnaround beyond its current expectations for such costs. *If
> the Company is unable to turn around the business of the Geesink Norba Group,
> then the Company may be required to record a non-cash impairment charge for
> Geesink Norba Group goodwill*, and there could be other material adverse effects
> on the net sales, profitability and/or cash flows of the Company.

Ex. 10, 1/25/05 8-K at 3 (emphasis added).[10] *See id.* at 4.[11]

*__Oshkosh Updates Its Geesink Impairment Review__*. In the first quarter of fiscal 2005,

Geesink operated at a loss and the Company reduced its estimate of Geesink's fiscal year 2005

earnings from operating income of $3 million to an operating loss of $4.5 million. Ex. 11, 2/1/05

10-Q at 13. As a result, Oshkosh updated its 2004 annual analysis of Geesink's valuation (which

was reviewed by Deloitte), and determined that it was not impaired. Ex. 10, 1/25/05 Scr. at 11;

Ex. 11, 2/1/05 10-Q at 13. Oshkosh warned the market that it would continue to monitor

Geesink's turnaround and the impact it had on any possible impairment. Ex. 11, 2/1/05 10-Q at

13.

*__Second Quarter of Fiscal 2005__*. In the second quarter of fiscal 2005, Geesink, as

projected, operated at a loss. Ex. 12, 5/3/05 Scr. at 4. But the losses had "narrowed," and

Oshkosh believed that it was "headed in the right direction." *Id.* Again, Oshkosh specifically

cautioned the market that its turnaround efforts might fail and an impairment charge might result:

> Geesink Norba Group Turnaround. The Geesink Norba Group has been operating
> at a loss for the last four quarters due to the weak European economy, declines in
> selling prices in its markets, operational inefficiencies and increased material,
> labor and warranty costs related to the launch of a new Geesink-branded rear

---

[10]  While Plaintiffs quote heavily from the press releases during the proposed Class Period, Plaintiffs ignore *all* Form 8-Ks that accompanied the press releases. This willful blindness cannot prevent the Court from considering the 8-Ks. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("Plaintiff cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them.").

[11]  Throughout the Class Period, Oshkosh also cautioned investors that its forward-looking statements were subject to inherent uncertainty and were contingent on certain specific assumptions. *See, e.g.*, Ex. 6, 7/27/04 8-K at 3; Ex. 6, 7/27/04 Press Release; Ex. 7, 7/28/04 10-Q at 23, 40; Ex. 10, 1/25/05 8-K at 2-3; Ex. 10, 1/25/05 Press Release; Ex. 11, 2/1/05 10-Q at 37; Ex. 22, 8/1/06 8-K at 3; Ex. 22, 8/1/06 Press Release; Ex. 23, 8/1/06 10-Q at 21, 31; Ex. 30, 8/1/07 8-K at 3; Ex. 30, 8/1/07 Press Release; Ex. 31, 8/2/07 10-Q at 25, 39.

loader. _Although the Company has taken steps to turn around the business of the Geesink Norba Group_, including reducing work force, installing new executive leadership, implementing lean manufacturing practices and introducing new products, _the Company cannot provide any assurance such activities will be successful_. In addition, the Company may incur costs to implement any such turnaround beyond its current expectations for such costs. _If the Company is unable to turn around the business of the Geesink Norba Group, then the Company may be required to record a non-cash impairment charge for Geesink Norba Group goodwill_, and there could be other material adverse effects on the net sales, financial condition, profitability and/or cash flows of the Company.

Ex. 12, 5/3/05 8-K at 3 (emphasis added).

**_Oshkosh Again Updates Its Geesink Impairment Review_**. Based on Geesink's operating loss of $4.1 million through the first six months of fiscal 2005, Oshkosh updated its impairment analysis (which was reviewed by Deloitte) at the end of the second quarter. Ex. 13, 5/4/05 10-Q at 13. Based on its efforts during the first six months to turn around Geesink, Oshkosh stated that it:

> presently _believes_ that it will be able to return the business to acceptable profitability over a nine to eighteen month period as it seeks to reduce its Geesink-branded rear loader product costs, strengthen its European branch operations and implement price increases. The Company also _believes_ that European refuse market volumes are improving. The Company updated its valuation model for the Geesink Norba Group and _estimates_ that the fair value of the Company's interest in the business continues to exceed its carrying value. Accordingly, no impairment of the goodwill has been recorded to date. The Company will continue to monitor its turnaround activities at the Geesink Norba Group and their impact on the Company's valuation of this investment.

Ex. 13, 5/4/05 10-Q at 13 (emphasis added). _See also_ Ex. 12, 5/3/05 Scr. at 10 ("We will continue to monitor this investment, but we presently _believe_ that no impairment of recorded goodwill will be necessary.") (emphasis added).

**_Third Quarter of Fiscal 2005_**. As anticipated, Geesink again operated at a loss in the third quarter – though Oshkosh anticipated its turnaround efforts would yield positive results. Ex. 14, 8/2/05 Press Release ("In our commercial business, we are aggressively pursuing improvement and anticipate this will yield positive results for this segment beginning in fiscal

17

2006."). *See also* Ex. 14, 8/2/05 Scr. at 10 ("[W]e *anticipate* this restructuring will position the business to be profitable again beginning next quarter.") (emphasis added); *id.* at 4 ("We *believe* this workforce reduction will restore Geesink Norba Group to profitability beginning in the fourth quarter of fiscal 2005.") (emphasis added). Bohn announced that the "'lean' team [had] largely completed their work" (Ex. 14, 8/2/05 Scr. at 4), and after Oshkosh completed its turnaround efforts, Geesink would begin reporting improved earnings and profitability. Ex. 14, 8/2/05 Press Release; Ex. 14, 8/2/05 Scr. at 4, 10; Ex. 15, 8/3/05 10-Q at 23, 30.

By this time, Oshkosh had made the market well aware of Geesink's difficulties and the possibility that an impairment would occur in the future. On the third quarter earnings call, an analyst asked: "[T]he impairment on Geesink. Could you talk about what you said you don't expect any [*sic*] to happen? But on the other hand, Geesink has certainly been a disappointment quarter after quarter after quarter. When does that decision get made? And what would the implications be?" Compl. ¶ 231. Bohn responded: "Well, the decision, I guess we look at it every quarter right now, but we *believe* that we are going to be profitable in fiscal '06. And if we are profitable, more likely than not then we do not have an impairment decision next year based upon the current action plans that we have in place. *If on the other hand, we consistently lose money quarter after quarter in '06, we probably are facing an impairment charge and the amount I couldn't predict.*" *Id.* (emphasis added).

With respect to its estimates, Oshkosh cautioned: "What key risks are involved in our estimates? *We may not be able to improve Geesink Norba Group earnings as quickly as estimated, which could lead to an impairment charge* . . . ." Ex. 14, 8/2/05 Scr. at 12 (emphasis added). Again, on August 2, 2005, Oshkosh explicitly cautioned the market that an impairment charge might become necessary if it was unable to turn Geesink around:

18

Geesink Norba Group Turnaround. The Geesink Norba Group has been operating at a loss for the last five quarters due to the weak European economy, declines in selling prices in its markets, operational inefficiencies and increased material, labor and warranty costs related to the launch of a new Geesink-branded rear loader. _Although the Company has taken steps to turn around the business of the Geesink Norba Group_, including reducing its work force, installing new executive leadership, implementing lean manufacturing practices, introducing new products and outsourcing components to lower cost manufacturing sites, _the Company cannot provide any assurance such activities will be successful._ In addition, the Company may incur costs to implement any such turnaround beyond its current expectations for such costs. _If the Company is unable to turn around the business of the Geesink Norba Group, then the Company may be required to record a non-cash impairment charge for Geesink Norba Group goodwill_, and there could be other material adverse effects on the net sales, financial condition, profitability and/or cash flows of the Company.

Ex. 14, 8/2/05 8-K at 3 (emphasis added).

**_Oshkosh Again Updates Its Geesink Impairment Review_**. Through the first nine months of fiscal 2005, Geesink incurred an estimated operating loss larger than Oshkosh had projected. Ex. 15, 8/3/05 10-Q at 13. Accordingly, based on Geesink's incurred losses, Oshkosh updated its impairment review. _Id._ After reviewing its valuation model, Oshkosh announced that "no impairment of the goodwill has been recorded to date," but emphasized that it would continue to monitor Geesink's valuation. _Id._

**_Fourth Quarter and Year End of Fiscal 2005_**. In fiscal 2005, net income for Oshkosh grew by 42% and consolidated sales also increased by 30.8% from the prior year's results. Ex. 17, 11/22/05 10-K at 25. Oshkosh's progress with Geesink became evident in the fourth quarter as it returned to profitability (although the commercial segment as a whole underperformed its fiscal 2004 results). _Id._; Ex. 16, 11/1/05 Press Release. The Company projected that Geesink would remain "modestly profitable throughout fiscal 2006." _See_ Ex. 16, 11/1/05 Scr. at 4-5; Ex. 17, 11/22/05 10-K at 25; Ex. 16, 11/1/05 Press Release. Despite the improvements, Oshkosh cautioned that an impairment charge was still possible:

Case 2:08-cv-00797-WCG   Filed 07/24/09   Page 29 of 92   Document 91

<u>Geesink Norba Group Turnaround</u>. Prior to the fourth quarter of fiscal 2005, the Geesink Norba Group operated at a loss for five quarters due to the weak European economy, declines in selling prices in its markets, operational inefficiencies and increased material, labor and warranty costs related to the launch of a new Geesink-branded rear loader. *Although the Geesink Norba Group operated at a small profit in the fourth quarter of fiscal 2005 and the Company has taken steps to turn around the business of the Geesink Norba Group . . . the Company cannot provide any assurance that the Geesink Norba Group will continue to operate profitably or that such activities will be successful.* In addition, the Company may incur costs to implement any such turnaround beyond its current expectations for such costs. *If the Company is unable to turn around the business of the Geesink Norba Group, then the Company may be required to record a non-cash impairment charge for Geesink Norba Group goodwill,* and there could be other material adverse effects on the net sales, financial condition, profitability and/or cash flows of the Company.

Ex. 16, 11/1/05 8-K at 3 (emphasis added).

*Oshkosh's Fiscal 2005 Goodwill Assessment*. The Company conducted its annual review (which was reviewed by Deloitte) to determine whether Geesink's goodwill was impaired. Ex. 17, 11/22/05 10-K at 37. The Company publicly explained its conclusion that no impairment had occurred, but continued to warn that an impairment might occur in the future:

In the fourth quarter of fiscal 2005 and for the first quarter since the quarter ended June 30, 2004, the Geesink Norba Group earned a small operating profit. The Company believes that the business will be modestly profitable throughout fiscal 2006 and that the profitability of the business will improve sharply in fiscal 2007 following the completion of its outsourcing strategy, among other planned actions. Based largely on the Company's estimated benefits of its cost reduction initiatives in fiscal 2005, the Company developed long-term projections of estimated cash flows from the Geesink Norba Group to assess the fair value of the business. As a result, the Company determined that the fair value of the Geesink Norba Group exceeded its carrying value at September 30, 2005, and therefore determined that the goodwill recorded in connection with the acquisition of the Geesink Norba Group was not impaired. The Company intends to continue to review the results of its fiscal 2005 initiatives and to monitor the valuation of its investment in the Geesink Norba Group as appropriate during fiscal 2006. *To the extent that the Geesink Norba Group is not able to achieve expected sales and operating income performance in fiscal 2006 and fiscal 2007, the Company could be required to record a goodwill impairment charge.*

*Id.* (emphasis added). *See id.* at 25, 40. Oshkosh also specifically reminded investors that "assessment of goodwill is inherently a subjective process and is dependent on projections of

20

future operating results . . . ." *Id.* at 40. The Company, therefore, could not "provide any assurance that future goodwill impairment tests [would] not result in a charge to earnings." *Id.*

### 5. In Fiscal 2006, Geesink's Performance Improves.

*First Quarter of Fiscal 2006*. Fiscal 2006 began well for Geesink, which Oshkosh attributed to improved market conditions, the Geesink restructuring in fiscal 2004 and 2005, and pricing initiatives implemented in fiscal 2005. Ex. 18, 2/2/06 Press Release; Ex. 19, 2/2/06 10-Q at 25; Ex. 18, 2/2/06 Scr. at 2. But once again, although Oshkosh was pleased with Geesink's first quarter, it warned that the turnaround might stall and that an impairment charge might be required in the future:

> Geesink Norba Group Turnaround. Prior to the fourth quarter of fiscal 2005, the Geesink Norba Group operated at a loss for five quarters due to the weak European economy, declines in selling prices in its markets, operational inefficiencies and increased material, labor and warranty costs related to the launch of a new Geesink-branded rear loader. *Although the Geesink Norba Group operated at a profit in the fourth quarter of fiscal 2005 and the first quarter of fiscal 2006 and the Company has taken steps to turn around the business of the Geesink Norba Group*, . . . *the Company cannot provide any assurance that the Geesink Norba Group will continue to operate profitably or that such activities will be successful.* In addition, the Company may incur costs to continue to implement any such turnaround beyond its current expectations for such costs. *Further, if the Company is unable to continue to turnaround the business of the Geesink Norba Group, then the Company may be required to record a non-cash impairment charge for Geesink Norba Group goodwill,* and there could be other material adverse effects on the net sales, financial condition, profitability and/or cash flows of the Company.

Ex. 18, 2/2/06 8-K at 3 (emphasis added).

*Second Quarter of Fiscal 2006*. The second quarter of fiscal 2006 was also strong for Geesink. Ex. 20, 5/2/06 Press Release. *See also* Ex. 21, 5/2/06 10-Q at 22, 25. Oshkosh explained that "[w]e continue to *expect* Geesink Norba Group operating income to improve sequentially each quarter in fiscal 2006 as we execute on our cost reduction plans." Ex. 20,

21

5/2/06 Scr. at 8 (emphasis added). While Oshkosh was encouraged with Geesink's progress, it still expressed caution about a possible future impairment charge:

> Geesink Norba Group Turnaround. Prior to the fourth quarter of fiscal 2005, the Geesink Norba Group operated at a loss for five quarters due to the weak European economy, declines in selling prices in its markets, operational inefficiencies and increased material, labor and warranty costs related to the launch of a new Geesink-branded rear loader. *Although the Geesink Norba Group operated at a profit in the fourth quarter of fiscal 2005 and the first and second quarters of fiscal 2006 and the Company has taken steps to turn around the business of the Geesink Norba Group*, . . . *the Company cannot provide any assurance that the Geesink Norba Group will continue to operate profitably or that such activities will be successful.* In addition, the Company may incur costs to continue to implement any such turnaround beyond its current expectations for such costs. *Further, if the Company is unable to continue to turnaround the business of the Geesink Norba Group, then the Company may be required to record a non-cash impairment charge for Geesink Norba Group goodwill*, and there could be other material adverse effects on the net sales, financial condition, profitability and/or cash flows of the Company.

Ex. 20, 5/2/06 8-K at 3 (emphasis added).

*Third Quarter of Fiscal 2006*. Geesink remained profitable in the third fiscal quarter. On the earnings call, Bohn announced that Oshkosh was pleased with the progress made by its commercial business and by Geesink. Ex. 22, 8/1/06 Scr. at 5. Again, though Geesink had shown significantly improved results, Oshkosh specifically warned that the turnaround effort was continuing (*id.* at 11), that the fourth quarter would likely have only "break-even" results "due to seasonal factors, softness in demand in the United Kingdom and chassis availability issues in France" (*id.*), and that it was still possible that an impairment charge would be necessary in the future:

> Geesink Norba Group Turnaround. Prior to the fourth quarter of fiscal 2005, the Geesink Norba Group operated at a loss for five quarters due to the weak European economy, declines in selling prices in its markets, operational inefficiencies and increased material, labor and warranty costs related to the launch of a new Geesink-branded rear loader. *Although the Geesink Norba Group operated at a profit in the fourth quarter of fiscal 2005 and the first three quarters of fiscal 2006 and the Company has taken steps to turn around the business of the Geesink Norba Group*, . . . *the Company cannot provide any*

22

*assurance that the Geesink Norba Group will continue to operate profitably or that such activities will be successful. In the fourth quarter of fiscal 2006, the Company expects the Geesink Norba Group to have break-even results* due to seasonal factors, softness in demand in the United Kingdom and chassis availability issues in France. In addition, the Company may incur costs to continue to implement any such turnaround beyond its current expectations for such costs. *Further, if the Company is unable to continue to turnaround the business of the Geesink Norba Group, then the Company may be required to record a non-cash impairment charge for Geesink Norba Group goodwill*, and there could be other material adverse effects on the net sales, financial condition, profitability and/or cash flows of the Company.

Ex. 22, 8/1/06 8-K at 3 (emphasis added).

*Fourth Quarter and Year End of Fiscal 2006*. Oshkosh continued to grow relative to its prior year results in 2006, posting increases of 28.3% in net income and 15.8% in consolidated sales. Ex. 25, 11/16/06 10-K at 28. Meanwhile, as warned, Geesink's performance took a downturn in the fourth quarter of fiscal 2006. *Id.* at 40. In announcing year-end results, Oshkosh cautioned investors about various specific "Risk Factors," including the cyclical nature of its markets and the continuing efforts to turn Geesink around:

*Our markets are highly cyclical and a decline in these markets could have a material adverse effect on our operating performance.*[12]

Domestic and European refuse markets are also highly cyclical and impacted by the strength of the economy generally and municipal tax receipts . . . . If these markets face downturns, then there could be a material adverse effect on our net sales, financial condition, profitability and/or cash flows.

. . .

Finally, JLG operates in a highly cyclical market impacted by the strength of the economy generally, by prevailing mortgage and other interest rates, by non-residential construction spending and by other factors. In addition, JLG's business is highly seasonal . . . . If we complete the acquisition of JLG as anticipated in

---

[12] The introductory sentences were emphasized in Oshkosh's public disclosures with type that was both bolded and italicized.

December 2006 or January 2007, then we will be subject to the risk of a downturn in JLG's cyclical market.

Ex. 24, 10/31/06 8-K at 3-4. *See also* Ex. 25, 11/16/06 10-K at 15-16.

> ***If we are unable to successfully turnaround the profitability of our Geesink Norba Group, then we may be required to record a non-cash impairment charge for Geesink Norba Group goodwill.***
>
> During fiscal 2004 and 2005, the Geesink Norba Group operated at a loss due to the weak European economy, declines in selling prices in its markets, operational inefficiencies and increased material, labor and warranty costs related to the launch of a new Geesink-branded rear loader. Although the Geesink Norba Group operated at a profit in fiscal 2006 and we have taken steps to turn around the business of the Geesink Norba Group, . . . we cannot provide any assurance that the Geesink Norba Group will continue to operate profitably or that such activities will be successful . . . . *[I]f we are unable to continue to turnaround the business of the Geesink Norba Group, then we may be required to record a non-cash impairment charge for Geesink Norba Group goodwill, and there could be other material adverse effects on our net sales, financial condition, profitability and/or cash flows.*

Ex. 24, 10/31/06 8-K at 6 (emphasis added). *See also* Ex. 25, 11/16/06 10-K at 17.

***Oshkosh's Fiscal 2006 Goodwill Assessment***. In fiscal 2006, Geesink reported operating income of $2.9 million. Ex. 25, 11/16/06 10-K at 40. Nonetheless, because its fourth quarter performance resulted in a loss, the Company continued to have concerns about Geesink's goodwill. *Id.* Oshkosh projected that Geesink would post operating losses in the first two quarters of fiscal 2007, but show modest profits again for the year as a whole. *Id.* Oshkosh also believed that "profitability [would] continue to improve in fiscal 2008 following the improvement of the markets in the United Kingdom and France, additional cost reduction activities and other planned actions." *Id.* Accordingly, the Company determined that Geesink's fair value exceeded its carrying value as of September 30, 2006, and no impairment charge was required; Deloitte reviewed this determination. *Id.* Nonetheless, Oshkosh noted that it would continue to review the results of its initiatives and to monitor Geesink's valuation as appropriate.

24

*Id.* Oshkosh again cautioned that if Geesink disappointed in fiscal 2007 or 2008, Oshkosh might have to take an impairment charge:

> *To the extent that the Geesink Norba Group is not able to achieve expected sales and operating income performance in fiscal 2007 and fiscal 2008, the Company could be required to record a goodwill impairment charge* . . . . The Company cannot provide any assurance that future goodwill impairment tests will not result in a charge to earnings.

*Id.* (emphasis added).

### 6. In Fiscal 2007, Geesink Suffers Another Downturn And Oshkosh Announces A More Aggressive Restructuring Of Geesink.

***First Quarter of Fiscal 2007***. On February 2, 2007, Oshkosh announced its financial results for the first quarter of fiscal 2007, with Geesink suffering an operating loss of $4.2 million. Ex. 26, 2/2/07 Press Release. Oshkosh also announced that it acquired JLG, a world leader in aerial work platforms and telehandlers, on December 6, 2006. *Id.*; Ex. 26, 2/2/07 Scr. at 8.

Bohn warned that Geesink was "still facing some challenges with weaker demand in the UK, chassis supply issues in France and some market share losses that led [Oshkosh] to report an operating loss in this business in the first quarter." Ex. 26, 2/2/07 Scr. at 5. *See also* Ex. 27, 2/8/07 10-Q at 28. Oshkosh again cautioned the public about various "Risk Factors," including the cyclical nature of its markets and continuing difficulties at Geesink:

> ***Our markets are highly cyclical and a decline in these markets could have a material adverse effect on our operating performance.***
>
> A decline in overall customer demand in our cyclical access equipment, commercial and fire and emergency markets could have a material adverse effect on our operating performance. The access equipment market that JLG operates in is highly cyclical and impacted by the strength of the economy generally, by prevailing mortgage and other interest rates, by residential and non-residential construction spending and by other factors. In addition, JLG's business is highly seasonal with the majority of its sales occurring in the spring and summer months, which constitute the traditional construction season . . . . Domestic and European

25

refuse markets are also highly cyclical and impacted by the strength of the economy generally and municipal tax receipts.

Ex. 26, 2/2/07 8-K at 3. *See also* Ex. 27, 2/8/07 10-Q at 39.

> ***If we are unable to successfully turn around the profitability of our Geesink Norba Group, then we may be required to record a non-cash impairment charge for Geesink Norba Group goodwill.***
>
> During fiscal 2004 and 2005, the Geesink Norba Group operated at a loss . . . . *Although the Geesink Norba Group operated at a profit in fiscal 2006 and we have taken steps to turn around the business of the Geesink Norba Group . . . we cannot provide any assurance that the Geesink Norba Group will continue to operate profitably or that such activities will be successful.* In the first quarter of fiscal 2007, slowing demand in the United Kingdom, chassis supply issues in France and some market share losses delayed the Geesink Norba Group turn around, and it is possible that this trend will continue throughout fiscal 2007. In addition, we may incur costs to continue to implement any such turn around beyond our current expectations for such costs. *Further, if we are unable to continue to turn around the business of the Geesink Norba Group, then we may be required to record a non-cash impairment charge for Geesink Norba Group goodwill,* and there could be other material adverse effects on our net sales, financial condition, profitability and/or cash flows.

Ex. 26, 2/2/07 8-K at 6 (emphasis added).

> ***Second Quarter of Fiscal 2007.*** On May 3, 2007, Oshkosh announced its financial results for the second quarter of fiscal 2007, and Geesink again incurred an operating loss. Ex. 28, 5/3/07 Press Release. On the earnings call, Oshkosh announced a new, more aggressive plan to turn around Geesink involving substantial workforce reductions, closing underperforming facilities, and importantly, leveraging Geesink's Romanian factory to serve as a supplier for JLG and its aerial products. Ex. 28, 5/3/07 Scr. at 6. *See* Ex. 29, 5/3/07 10-Q at 36. Bohn said that "[w]e *believe* that these actions will result in annual savings for the Geesink Norba Group of over 7 million euro beginning in fiscal 2008 and then expect the savings to grow as we move more work [to Romania] . . . . So while we have made some tough decisions, we *believe* they are the right decisions and position our European refuse business for growth going forward." Ex. 28, 5/3/07 Scr. at 6 (emphasis added).

26

While optimistic about its efforts, Oshkosh again cautioned the public about the cyclicality of its markets and the potential for a future impairment charge:

> **Our markets are highly cyclical and a decline in these markets could have a material adverse effect on our operating performance.**
>
> A decline in overall customer demand in our cyclical access equipment, commercial and fire and emergency markets could have a material adverse effect on our operating performance. The access equipment market that JLG operates in is highly cyclical and impacted by the strength of the economy generally, by prevailing mortgage and other interest rates, by residential and non-residential construction spending and by other factors . . . . Domestic and European refuse markets are also highly cyclical and impacted by the strength of the economy generally and municipal tax receipts.

Ex. 28, 5/3/07 8-K at 3. *See also* Ex. 29, 5/3/07 10-Q at 41.

> **If we are unable to successfully turnaround the profitability of our Geesink Norba Group, then we may be required to record a non-cash impairment charge for Geesink Norba Group goodwill.**
>
> During fiscal 2004 and 2005, the Geesink Norba Group operated at a loss due to the weak European economy, declines in selling prices in its markets, operational inefficiencies and increased material, labor and warranty costs related to the launch of a new Geesink-branded rear loader. *Although the Geesink Norba Group operated at a profit in fiscal 2006, the Geesink Norba Group operated at a loss in the first six months of fiscal 2007 . . . and it is possible that this trend will continue throughout fiscal 2007. Although we have taken steps to turn around the business of the Geesink Norba Group . . . we cannot provide any assurance that the Geesink Norba Group will be able to operate profitably or that such activities will be successful.* In addition, we may incur costs to continue to implement any such turnaround beyond our current expectations for such costs. *Further, if we are unable to continue to turn around the business of the Geesink Norba Group, then we may be required to record a non-cash impairment charge for Geesink Norba Group goodwill,* and there could be other material adverse effects on our net sales, financial condition, profitability and/or cash flows.

Ex. 28, 5/3/07 8-K at 6 (emphasis added). *See also* Ex. 29, 5/3/07 10-Q at 42.

***Oshkosh Updates Its Geesink Impairment Review***. At the end of the second quarter of fiscal 2007, Oshkosh updated its Geesink impairment analysis. Based on the estimated benefits of its turnaround efforts, the Company "determined that the fair value of Geesink exceeded its carrying value at March 31, 2007, and therefore determined that the goodwill recorded in

27

connection with the acquisition of Geesink was not impaired"; Deloitte reviewed this determination. Ex. 29, 5/3/07 10-Q at 36. Nonetheless, Oshkosh again cautioned that the Company could be required to take an impairment charge if Geesink did not meet projected performance in fiscal 2007 and 2008 and emphasized again that Oshkosh could not "provide any assurance that future goodwill impairment tests will not result in a charge to earnings." *Id.* at 37.

*Third Quarter of Fiscal 2007*. On August 1, 2007, Oshkosh announced its financial results for the third quarter of fiscal 2007. Geesink incurred an operating loss of $0.5 million. Ex. 31, 8/2/07 10-Q at 31. Oshkosh increased its estimate of Geesink's operating loss for fiscal 2007 to $12.4 million. *Id.* at 36. It did not believe, however, that this significantly altered the Geesink's long-range value based on its restructuring plans, and noted that it would "continue to monitor its turnaround activities at Geesink and their impact on the Company's valuation . . . ." *Id.*

On the earnings call, Bohn forecast that the full benefits of Oshkosh's efforts at Geesink would not be realized until 2009 or 2010 – and projected an operating loss for Geesink in the fourth quarter:

> Now, our European refuse business in the third quarter, the Geesink Norba Group, incurred a small operating loss and due to seasonal factors, we expect the business to also operate at a small operating loss in the fourth quarter of fiscal 2007. *We don't expect significant improvement in earnings at this business until mid-fiscal 2008 when the initial sourcing activities of JLG fabrications in Romania become operational. And, the full benefit of the Romanian production is not expected to be realized until late fiscal 2009, or even fiscal 2010, as we re-source work there in a controlled manner.*
>
> We are continuing to take the necessary steps to turn around the Geesink Norba Group . . . . We expect this team to be taking further actions over the next several months to enhance profitability of the business over the long-term. While various options are still being considered, some of these actions may cause us to take some modest charges over the next few quarters as we rationalize facilities and spending . . . .

28

Our struggles in this business have been disappointing, but the more we dig into the issues, the more we *believe* the business can be successful with some facility rationalization and proper leadership.

Ex. 30, 8/1/07 Scr. at 6-7 (emphasis added).

While optimistic about Geesink's future, Oshkosh cautioned investors about the cyclicality of its markets and the potential for a future impairment charge, among other risks:

> *Our markets are highly cyclical and a decline in these markets could have a material adverse effect on our operating performance.*
>
> A decline in overall customer demand in our cyclical access equipment, commercial and fire and emergency markets could have a material adverse effect on our operating performance. The access equipment market that JLG operates in is highly cyclical and impacted by the strength of the economy generally, by prevailing mortgage and other interest rates, by residential and non-residential construction spending and by other factors . . . . Domestic and European refuse markets are also highly cyclical and impacted by the strength of the economy generally and municipal tax receipts . . . . If these markets face downturns, then there could be a material adverse effect on our net sales, financial condition, profitability and/or cash flows.

Ex. 30, 8/1/07 8-K at 3. *See also* Ex. 31, 8/2/07 10-Q at 42.

> *If we are unable to successfully turnaround the profitability of our Geesink Norba Group, then we may be required to record a non-cash impairment charge for Geesink Norba Group goodwill.*
>
> During fiscal 2004 and 2005, the Geesink Norba Group operated at a loss due to the weak European economy, declines in selling prices in its markets, operational inefficiencies and increased material, labor and warranty costs related to the launch of a new Geesink-branded rear loader. Although the Geesink Norba Group operated at a profit in fiscal 2006, the Geesink Norba Group operated at a loss in the first nine months of fiscal 2007 . . . and it is likely that this trend will continue throughout fiscal 2007. Although we have taken steps to turn around the business of the Geesink Norba Group, including reducing its work force, idling a facility, installing new executive leadership, integrating operations with JLG, implementing lean manufacturing practices, introducing new products and outsourcing components to lower cost manufacturing sites, *we cannot provide any assurance that the Geesink Norba Group will be able to operate profitably or that such activities will be successful.* In addition, we may incur costs to continue to implement any such turnaround beyond our current expectations for such costs. *Further, if we are unable to continue to turn around the business of the Geesink Norba Group, then we may be required to record a non-cash impairment charge*

Case 2:08-cv-00797-WCG   Filed 07/24/09   Page 39 of 92   Document 91

_for Geesink Norba Group goodwill,_ and there could be other material adverse effects on our net sales, financial condition, profitability and/or cash flows.

Ex. 30, 8/1/07 8-K at 6 (emphasis added). _See also_ Ex. 31, 8/2/07 10-Q at 36, 43.

**_Fourth Quarter and Year End of Fiscal 2007_**. Oshkosh announced its results for the fourth quarter and fiscal year end 2007 on November 21, 2007. Ex. 33, 11/21/07 10-K. Driven by its new access equipment segment, Oshkosh rocketed to an 84% increase in consolidated sales from the prior fiscal year. _Id._ at 27. The Company showed impressive growth in net income with an increase of 30.5% for the fiscal year. _Id._ Geesink, however, again suffered an expected operating loss. _Id._ at 28. Oshkosh told the market that it did not expect to see positive results from its Geesink restructuring efforts until 2009, as it "work[ed] through fiscal 2008 to complete the actions that we expect to allow the business to return to profitability." Ex. 32, 11/1/07 Scr. at 11. On the earnings call, Bohn announced "several major decisions" made in the quarter regarding Geesink:

> This is a business that has underperformed for too long and caused a decline in this segment's operating income in a year when the rest of the segment exhibited solid improvement. So, we are working through some more aggressive actions that we _expect_ to put this business on a much stronger foundation from which to grow and be profitable.
>
> We previously announced our intentions to discontinue operations at our Maarheeze, The Netherlands facility. The Maarheeze facility has been put up for sale and we have identified a potential buyer. We also initiated discussions this quarter with the Works Council at our Blomstermala, Sweden operations regarding closing that facility and transferring production of our Norba-branded refuse bodies to our facility in Emmeloord, The Netherlands. We have another facility . . . that we would like to convert to a mounting and sales and service operation. We haven't made any final decisions yet as we are evaluating all of our options . . . . Our financial results for the fourth quarter include $4.8 million of charges related to actions we have already taken and our earnings estimates for fiscal 2008 include the impact of additional actions that we are contemplating.
>
> We believe in this business and _expect_ that it can be successful with some facility rationalization and proper leadership. With the actions that I've mentioned today, we are on the road to improvement. This business simply had too much fixed overhead to support its level of business. We _intend_ to be in a much stronger

position next year at this time, when we have implemented our restructuring activities.

*Id.* at 5-6 (emphasis added).

Despite Oshkosh's hope that the restructuring would succeed, it again warned the market of the cyclicality of its markets and the potential for an impairment charge in the future:

> ***Our markets are highly cyclical and a decline in these markets could have a material adverse effect on our operating performance.***
>
> A decline in overall customer demand in our cyclical access equipment, commercial and fire & emergency markets could have a material adverse effect on our operating performance. The access equipment market that JLG operates in is highly cyclical and impacted by the strength of the economy generally, by prevailing mortgage and other interest rates, by residential and non-residential construction spending and by other factors . . . . Domestic and European refuse markets are also highly cyclical and impacted by the strength of the economy generally and municipal tax receipts . . . . If these markets face downturns, then there could be a material adverse effect on our net sales, financial condition, profitability and/or cash flows.

Ex. 32, 11/1/07 8-K at 3. *See also* Ex. 33, 11/21/07 10-K at 15-16.

> ***If we are unable to successfully turnaround the profitability of our Geesink Norba Group, then we may be required to record an impairment charge for Geesink Norba Group goodwill.***
>
> During fiscal 2004 and 2005, the Geesink Norba Group, our European refuse business, operated at a loss due to the weak European economy, declines in selling prices in its markets, operational inefficiencies and increased material, labor and warranty costs related to the launch of a new Geesink-branded rear loader. Although the Geesink Norba Group operated at a profit in fiscal 2006, the Geesink Norba Group operated at a loss again in fiscal 2007 due to soft market demand for its products in the United Kingdom, the lack of available chassis for mounting refuse packers in France and some market share losses. Although we have taken steps to turn around the business of the Geesink Norba Group, including recently announcing plans to rationalize a facility in The Netherlands and entering into discussions with the Works Council in Sweden regarding rationalizing a facility in that country, reducing its work force, installing new executive leadership, integrating operations with JLG, implementing lean manufacturing practices, introducing new products and outsourcing components to lower cost manufacturing sites, *we cannot provide any assurance that the Geesink Norba Group will be able to operate profitably or that such activities will be successful.* In addition, we may incur costs to continue to implement any such turn around beyond our current expectations for such costs as communicated in

31

our earnings release dated November 1, 2007. *Further, if we are unable to continue to turn around the business of the Geesink Norba Group, then we may be required to record an impairment charge for Geesink Norba Group goodwill,* and there could be other material adverse effects on our net sales, financial condition, profitability and/or cash flows.

Ex. 32, 11/1/07 8-K at 6 (emphasis added). *See also* Ex. 33, 11/21/07 10-K at 17.

*Oshkosh's Fiscal 2007 Goodwill Assessment.* As part of its annual assessment, Oshkosh again performed an extensive review of Geesink's goodwill (which was reviewed by Deloitte).

Ex. 33, 11/21/07 10-K at 40. Oshkosh determined that Geesink's goodwill was not impaired:

Based largely on estimated benefits of its facility rationalization initiatives started in fiscal 2007, planned facility rationalization initiatives in fiscal 2008 and the insourcing of fabrications to Geesink's Eastern European facility, the Company developed long-term projections of estimated cash flows from the Geesink Norba Group to assess the fair value of the business. As a result, the Company determined that the fair value of the Geesink Norba Group exceeded its carrying value at September 30, 2007, and therefore determined that the goodwill recorded in connection with the acquisition of the Geesink Norba Group was not impaired.

*Id.* Of course, Oshkosh again cautioned investors about Geesink's future, including the results of any future impairment tests:

To the extent that Geesink is not able to achieve expected progress on its turnaround initiatives in fiscal 2008, the Company could be required to record a goodwill impairment charge. The range of potential charge would be based on a number of factors, including the results of the Company's cost reduction activities, the timing and results of the insourcing of fabrications to Geesink's Eastern European facility, Geesink's ·operating performance, competition, required future capital expenditures, interest rates and long-term growth assumptions. *The Company cannot provide any assurance that future goodwill impairment tests will not result in a charge to future earnings.*

*Id.* (emphasis added).

### 7. Geesink's Problems Continue Into Fiscal 2008.

*First Quarter of Fiscal 2008.* On February 1, 2008, the Company announced its financial results for the first quarter of fiscal 2008, including a $5.4 million operating loss at Geesink. Ex. 34, 2/1/08 Scr. at 11. *See* Ex. 35, 2/1/08 10-Q at 25. $1.3 million of the operating

loss resulted from the Geesink rationalization activities. Ex. 34, 2/1/08 Scr. at 11 ("As we previously estimated, the commercial segment was down this quarter . . . . This, along with the on-going rationalization activities in our European refuse collection vehicle business, caused [commercial segment] operating results to decline to an operating loss of $10.2 million in the seasonally slowest quarter for this business."). *See* Ex. 35, 2/1/08 10-Q at 25.

In line with its prior announcements, Oshkosh projected that Geesink would continue to suffer operating losses in fiscal 2008 as it continued its turnaround activities:

> [T]he restructuring at the Geesink Norba Group, our European refuse collection vehicle business, is in full swing and on schedule thanks to a large, dedicated team that is committed to successfully consolidating their facilities. Construction is nearly complete in Romania to begin the first phase of production of JLG fabrications this spring. We *expect* to be out of a leased facility in Blomstermala, Sweden by mid-spring of 2008. At the time of our last call, we were still negotiating with the associated works council to close the facility. That negotiation is now complete. We also have sold the Maarheeze, Netherlands facility. Negotiations with the affected employees and their works council are ongoing. We *expect* to record most of the restructuring impact for the affected employees in the second and third quarters when the facilities close.
>
> So, fiscal 2008 will be a busy year for this business as we execute on an aggressive facilities consolidation plan. But we are taking the right actions to eliminate unnecessary overhead to get this business back to profitability and we are *encouraged* by the order flow we are experiencing and the improvements in both delivery times and product quality at this business.

Ex. 34, 2/1/08 Scr. at 7-8 (emphasis added). Oshkosh again cautioned the public about the cyclicality of its markets and the potential for an impairment charge in the future:

> ***Our markets are highly cyclical and a decline in these markets could have a material adverse effect on our operating performance.***
>
> A decline in overall customer demand in our cyclical access equipment, commercial and fire & emergency markets could have a material adverse effect on our operating performance. The access equipment market that JLG operates in is highly cyclical and impacted by the strength of the economy generally, by prevailing mortgage and other interest rates, by residential and non-residential construction spending and by other factors . . . . Domestic and European refuse collection vehicle markets are also highly cyclical and impacted by the strength of the economy generally and municipal tax receipts . . . . Concrete mixer and

33

Case 2:08-cv-00797-WCG   Filed 07/24/09   Page 43 of 92   Document 91

access equipment sales also are seasonal with the majority of such sales occurring in the spring and summer months, which constitute the traditional construction season . . . .

Ex. 34, 2/1/08 8-K at 3-4. *See also* Ex. 35, 2/1/08 10-Q at 33.

> ***If we are unable to successfully turn around the profitability of our Geesink Norba Group, then we may be required to record a non-cash impairment charge for Geesink Norba Group goodwill.***
>
> The Geesink Norba Group, our European refuse collection vehicle business, operated at a loss in fiscal 2007 due to soft market demand for its products in the United Kingdom, the lack of available chassis for mounting refuse collection vehicles in France and some market share losses. We have taken steps to turn around the Geesink Norba Group business, including selling an unprofitable facility in The Netherlands during the first quarter of fiscal 2008 and reaching an agreement with the Works Council in Sweden regarding rationalizing a facility in that country, reducing its work force, installing new executive leadership, integrating operations with JLG, implementing lean manufacturing practices, introducing new products and outsourcing components to lower cost manufacturing sites. We incurred an operating loss at this business again in the first quarter of fiscal 2008 as we executed on a number of the turnaround initiatives described above. We expect to incur additional operating losses in fiscal 2008 as we continue these turnaround activities. We may incur costs to continue to implement any such turn around beyond our current expectations for such costs. *In addition, we cannot provide any assurance that the Geesink Norba Group will be able to operate profitably after such activities have been completed. Further, if we are unable to continue to turn around the business of the Geesink Norba Group, then we may be required to record a non-cash impairment charge for Geesink Norba Group goodwill,* and there could be other material adverse effects on our net sales, financial condition, profitability and/or cash flows.

Ex. 34, 2/1/08 8-K at 6 (emphasis added). *See also* Ex. 35, 2/1/08 10-Q at 34.

    ***Second Quarter of Fiscal 2008***. On May 1, 2008, Oshkosh announced its financial

results for the second quarter of fiscal 2008. Geesink sustained an operating loss of $8.6 million,

primarily stemming from charges associated with shifting production of Norba products to The

Netherlands and an unfavorable currency exchange rate for the U.S. Dollar. Ex. 36, 5/1/08 Press

Release at 3. *See* Ex. 37, 5/1/08 10-Q at 30; Ex. 36, 5/1/08 8-K at 6. Oshkosh stated that it did

"not believe that the issues experienced in the second quarter of fiscal 2008 at Geesink are

indicators requiring goodwill impairment testing," but advised that it would "monitor Geesink

34

for indicators of impairment and perform the annual impairment test early in the fourth quarter as required by its policy." Ex. 37, 5/1/08 10-K at 30.

Oshkosh was hopeful that strong performances in access equipment and defense segments would allow it to maintain its full-year outlook for the Company as a whole, despite weak economic conditions. Ex. 36, 5/1/08 Press Release at 2. On the earnings call, Bohn stated: "[W]e are in the midst of some challenging times including a weak U.S. economy . . . . [W]e are . . . increasing or considering price increases in all of our markets during what appears to be a U.S. recession . . . . It will take a lot of planning, hard work and execution, but we have a superb senior operating team that will continue to pursue smart growth." Ex. 36, 5/1/08 Scr. at 2. Sagehorn added, "At this time, we do not *believe* that the issues being experienced at Geesink are indicators of goodwill impairment. We will continue to monitor this business and perform our annual impairment test early in the fourth quarter as required by our policy." *Id.* at 11 (emphasis added).

Oshkosh again warned the public of a variety of Risk Factors, including the cyclicality of its markets and the possibility of future impairments:

> ***Our markets are highly cyclical and a decline in these markets could have a material adverse effect on our operating performance.***
>
> A decline in overall customer demand in our cyclical access equipment, commercial and fire & emergency markets could have a material adverse effect on our operating performance. The access equipment market that JLG operates in is highly cyclical and impacted by the strength of the economy generally, by prevailing mortgage and other interest rates, by residential and non-residential construction spending and by other factors . . . . Domestic and European refuse collection vehicle markets are modestly cyclical and impacted by the strength of the economy generally and municipal tax receipts . . . . Concrete mixer and access equipment sales also are seasonal with the majority of such sales occurring in the spring and summer months . . . .

Ex. 36, 5/1/08 8-K at 3-4. *See* Ex. 37, 5/1/08 10-Q at 37.

35

***If we are unable to successfully turn around the profitability of our Geesink
Norba Group, then we may be required to record a non-cash impairment
charge for Geesink Norba Group goodwill.***

The Geesink Norba Group, our European refuse collection vehicle business,
operated at a loss in fiscal 2007 due to soft market demand for its products in the
United Kingdom, the lack of available chassis for mounting refuse collection
vehicles in France and some market share losses. We have taken steps to turn
around the Geesink Norba Group business, including selling an unprofitable
facility in The Netherlands during the first quarter of fiscal 2008, reaching an
agreement with the Works Council in Sweden regarding rationalizing a facility in
that country, beginning to fabricate parts in its Romanian facility during the
second quarter of fiscal 2008 to be used in the manufacture of JLG aerial products
in Europe, ramping up production of Norba-branded products at its Emmeloord,
Holland facility during the second quarter of fiscal 2008, reducing its work force,
installing new executive leadership, integrating operations with JLG,
implementing lean manufacturing practices, introducing new products and
outsourcing components to lower cost manufacturing sites. We incurred an
operating loss at this business again in the first six months of fiscal 2008 as we
executed on a number of the turnaround initiatives described above. We expect to
incur additional operating losses in fiscal 2008 as we continue these turnaround
activities, including costs associated with inefficiencies related to the relocation of
production of Norba-branded refuse collection vehicles to The Netherlands. We
may incur costs to continue to implement the turnaround beyond our current
expectations for such costs. *In addition, we cannot provide any assurance that
the Geesink Norba Group will be able to operate profitably after such activities
have been completed. Further, if we are unable to continue to turn around the
business of the Geesink Norba Group, then we may be required to record a non-
cash impairment charge for Geesink Norba Group goodwill*, and there could be
other material adverse effects on our net sales, financial condition, profitability
and/or cash flows.

Ex. 36, 5/1/08 8-K at 6 (emphasis added). *See* Ex. 37, 5/1/08 10-Q at 37-38.

## 8. JLG's Sales Miss Expectations.

After its acquisition in December 2006, JLG performed strongly, generating solid

operating income for Oshkosh each quarter. *See* Ex. 37, 5/1/08 10-Q at 26; Ex. 35, 2/1/08 10-Q

at 25-26; Ex. 32, 11/1/07 Scr. at 3; Ex. 31, 8/2/07 10-Q at 23; Ex. 29, 5/3/07 10-Q at 23; Ex. 27,

2/8/07 10-Q at 23. That strength continued through the second quarter of fiscal 2008. In fact,

JLG's operating income in that quarter increased 132.5% and sales outside North America

"nearly doubled over the comparable prior year quarter." Ex. 36, 5/1/08 Press Release at 2-3.

36

In the middle of June 2008, however, JLG faced an unexpected "sharp downturn in Europe." Ex. 39, 6/26/08 Trans. at 7 ("Certainly earlier in the quarter we were hearing about a delayed order, but nothing troubling. But really in the last two weeks we've had a pretty sharp downturn in Europe."). European demand for access equipment fell sharply and JLG's largest U.S. customers further reduced their expectations for access equipment purchases. Ex. 38, 6/26/08 8-K at 2; Ex. 39, 6/26/08 Trans. at 5.

"[G]eneral economic weakness, softness or expected softness in nonresidential construction, and rising material and fuel costs . . . [took] their toll on customers in a number of [Oshkosh's] markets. Most notably in [the] access equipment segment causing them to reassess their capital spending plans." Ex. 39, 6/26/08 Trans. at 2. Specifically, JLG "experienced lower order levels," receiving both order cancellations and communications from customers that they anticipated to significantly reduce their spending for the remainder of the year. *Id.* Oshkosh still projected growth for JLG for the third quarter of fiscal 2008, but not "the level of growth" previously expected. Ex. 39, 6/26/08 Trans. at 6. Oshkosh expressed concern that JLG's reduced demand for products from Geesink's Romanian facility would adversely affect Geesink. *Id.* at 3.

> **9.  Oshkosh Determines That Weakening Markets Have Impaired Geesink's Goodwill And Publicly Announces An Impairment Charge And Downward Revisions To Earnings Estimates.**

On June 24, 2008, the Audit Committee of Oshkosh's Board of Directors concluded, after careful consideration, that a non-cash impairment charge, estimated in the amount of approximately $175 million, or $2.32 per share, to the goodwill associated with Geesink was required; Deloitte reviewed this conclusion. *See* Ex. 38, 6/26/08 8-K at 2. *See also* Ex. 38, 6/26/08 Press Release at 1 (the "revised outlook . . . caused [Oshkosh] to believe that the value of Geesink no longer supports the goodwill recorded for this business, resulting in the impairment

37

charge"). The decision was the result of a combination of factors including: "The resulting slower than expected and more difficult return to profitability of Geesink's business, further escalation of raw materials costs and <u>a reduction in fabrication volume for [JLG] at Geesink's Romania facility due to a slowdown in the European access equipment market . . . .</u>" Ex. 38, 6/26/08 8-K at 2 (emphasis added). *See also* Ex. 38, Press Release at 1 (announcing Oshkosh "lowered [its] outlook for Geesink" due in part to the "slower and more difficult than expected return to profitability, coupled with *expectations of a weaker European economy* and higher raw material costs") (emphasis added).

Tellingly, on the conference call held that day to discuss Oshkosh's announcement, analysts did not ask a single question about the Geesink impairment. Rather, the call focused entirely on Oshkosh's warning that JLG's booming business was now seeing a sharp downturn in Europe. Charles Brady of BMO Capital Markets asked: "[W]ith regard to the JLG business and the Western European downturn, can you give us a little bit more sense as to the velocity or the speed of that downturn and really the magnitude that you are seeing and maybe more specifically, country wise where you are seeing a downturn?" Bohn responded: "[W]hat we are seeing is Europe really slowing down to the range we saw the slowness in North America. I think with the severe cold we've caught with the businesses in North America and the overall economy that is starting to affect some countries specifically in Europe." Ex. 39, 6/26/08 Trans. at 4. Szews added:

> Essentially if you look at our new guidance we are really taking our access equipment down in Europe. It is a modest change for North America but it is largely in Europe where we are seeing slowdown in UK, Spain and France. Our customers (technical difficulty) either orders or canceled orders. And that is where most of the (technical difficulty). Overall, we still expect our international sales outside of North America to be up slightly in the third quarter. But it is weaker than our previous expectations.

38

*Id.* Szews added that Oshkosh believed this was "an industry phenomenon" – though Oshkosh would "need to see everybody else['s] report." *Id.* at 5.

At the same time, Oshkosh also announced downward revisions to its earnings estimates for the third quarter and full fiscal year 2008 results. Ex. 38, 6/26/08 Press Release. Oshkosh announced an expected loss of approximately $1.22 to $1.32 per share for its third quarter of fiscal 2008 compared to the Company's prior estimate of $1.40 to $1.50 per share of earnings for the quarter. Ex. 38, 6/26/08 Press Release. In addition to the non-cash loss related to the $2.32 per share Geesink impairment charge, the revision was based on "'[l]ower than expected sales in both North America and Europe driven by softness in non-residential construction and general economic weakness, and rising raw material and fuel costs . . . .'" Ex. 38, 6/26/08 Press Release. *See also* Ex. 39, 6/26/08 Trans. at 4 ("The reduction in our earnings estimates for the third fiscal quarter, in addition to the impact of the Geesink charge is being driven by the broad effects of the weaker economies and weaker commercial construction."). As for the full fiscal year, Oshkosh "expect[ed] . . . that the fourth fiscal quarter 2008 EPS will be below prior year levels." Ex. 39, 6/26/08 Trans. at 3. With respect to 2009, Oshkosh was "still in the midst of the annual planning process. [It] believe[d] that [it would] continue to face strong economic headwinds in a number of [its] businesses. Economies are expected to remain weak in the US in certain Western European countries and it is uncertain where other European countries are headed." *Id.*

Szews summarized Oshkosh's conservative approach:

> [E]ven though the Fed hasn't called a recession we are probably in a recession, and anytime that we miss guidance or see any signs of weakness we pull back. It has been our history for years. We [would] very much like to see a growth year after year and like to deliver the optimal earnings that we can. So we are going to react to any kind of performance that isn't positive, and that is exactly what we did. And beyond that, it is too early for us to want to call '09.

Ex. 39, 6/26/08 Trans. at 8.

Case 2:08-cv-00797-WCG   Filed 07/24/09   Page 49 of 92   Document 91

### 10. Several Small Stockholders File Suit.

Oshkosh's share price dropped from a close of $33.51 on June 25, 2008 to a close of $22.29 on June 26, 2008. On September 19, 2008, a purported securities fraud class action stemming from the impairment charge was filed against Oshkosh and Bohn. *See* Case No. 2:08-CV-0797 (Iron Workers Local No. 25 Pension Fund action). This lawsuit was the first of three substantively identical complaints filed against them. *See* Case Nos. 08-C-0862 and 08-C-0870 (Richard Saxon and Wesley Childs actions). On February 11, 2009, the Court appointed Massachusetts Public Pension Funds as lead plaintiffs. D.I. 69. On May 18, 2009, Plaintiffs filed the Complaint, significantly expanding the purported Class Period and adding Szews, Sagehorn and Deloitte as defendants, which Defendants now move to dismiss.

This is Defendants' opening brief in support of that motion.

## ARGUMENT

### I. COUNT I MUST BE DISMISSED BECAUSE THE COMPLAINT DOES NOT SATISFY THE REFORM ACT'S HEIGHTENED PLEADING STANDARDS FOR FRAUD CLAIMS.

Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 adopted thereunder create a private right of action for securities fraud. To state such a claim, a plaintiff must adequately plead six elements: (1) a material misrepresentation or omission by defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss and (6) loss causation. *Pugh*, 521 F.3d at 693. To adequately plead these elements, a plaintiff must comply not only with Federal Rules of Civil Procedure 8 and 9(b), but also the heightened pleading standards established by the Reform Act.

The Reform Act was designed by Congress to address "'abuse of the securities laws by private litigants.'" *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 600 (7th Cir. 2006) ("*Makor I*"), *overruled on other grounds*, 127 S. Ct. 2499 (2007) (citation omitted). The Reform Act responded to this abuse "by chang[ing] the threshold pleading rules by requiring that the complaint 'with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* Accordingly, a plaintiff alleging a violation of Section 10(b) must plead all the circumstances of the alleged fraud with particularity. As with any fraud claim, Rule 9(b) requires that a plaintiff alleging securities fraud "must provide 'the who, what, when, where, and how'" for the allegedly fraudulent acts. *Stark*, 2008 WL 153542, at *3 (citation omitted). Moreover, the Reform Act requires specificity above and beyond that ordinarily required by Rule 9(b). Under the Reform Act, a plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . ." 15 U.S.C. § 78u-

41

4(b)(1). "[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." *Id.* Then, with respect to each specific statement or omission, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The required state of mind is scienter, which means "knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). Thus, a plaintiff alleging securities fraud must "plead with particularity both falsity and scienter." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir. 2002). *Accord In re Shopko Sec. Litig.*, No. 01-C-1034, 2002 WL 32003318, at *6 (E.D. Wis. Nov. 5, 2002). Generalized assertions of wrongdoing, without reference to documents, meetings, transactions or specific evidence, satisfy neither Rule 9(b) nor the Reform Act. *Arazie v. Mullane*, 2 F.3d 1456, 1466-67 (7th Cir. 1993). *See Gaines v. Guidant Corp.*, No. 1:03CV00892-SEB-WTL, 2004 WL 2538374, at *8 (S.D. Ind. Nov. 8, 2004).

Here, Plaintiffs fall far short of these rigorous standards. As discussed below, Plaintiffs never allege any specific misleading statements or omissions by Defendants, never allege specific facts supporting a conclusion that a statement or omission was in fact misleading and never allege specific facts demonstrating a strong inference that any Defendant acted with scienter. Moreover, Plaintiffs fail to plead loss causation. For each of these reasons, the Reform Act requires that the Complaint be dismissed.

## A. The Complaint Does Not Adequately Allege A Material Misrepresentation Or Omission.

To survive dismissal under the Reform Act, a plaintiff must plead a material misrepresentation or omission. Rather than merely identifying things that could have been said

or could have been said differently, a plaintiff must establish first that an alleged misrepresentation or omission is material. In other words, the statement must change the total mix of information upon which an investor would reasonably rely. *Makor I*, 437 F.3d at 594-95. With respect to omissions, plaintiffs must also plead that a defendant had a duty to disclose the omitted information. *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 927 (S.D. Ind. 2008). Such a duty arises only if a statement's omission makes affirmative statements materially false or misleading. *Id.*

### 1. The Complaint is impermissibly vague.

The Reform Act requires specificity. Volume is not a substitute for specificity. As one federal court recently noted, "[o]ne might be tempted to think that a complaint spanning more than 100 pages and consisting of more than 200 paragraphs could not fail to be specific. The temptation is dangerous and must be resisted." *In re 2007 Novastar Fin., Inc. Sec. Litig.*, No. 07-0139-CV-W-ODS, 2008 WL 2354367, at *2-3 (W.D. Mo. June 4, 2008). Indeed, counsels' use of a "long-winded, even prolix" complaint is "not an uncommon mask for the absence of detail." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997). As a result, "'courts have repeatedly lamented plaintiffs' counsels' tendency to place the burden on the reader to sort out the statements and match them with the corresponding adverse facts to solve the "puzzle" of interpreting Plaintiffs' claims.'" *In re Washington Mutual, Inc. Sec., Derivative & ERISA Litig.*, Nos. 2:08-MD-1919 MJP, C08-387 MJP, 2009 WL 1393679, at *11 (W.D. Wash. May 15, 2009) (quoting *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1244 (N.D. Cal. 1998)). These "puzzle pleadings" – which set forth lengthy quotes and then recite a litany of reasons why the quoted statements were allegedly false or misleading without alleging specific facts in support of the reasons or connecting the reasons to specific statements – are consistently dismissed because they violate Federal Rules of Civil Procedure 8 and 9(b) and the Reform Act. *E.g.*, *Washington*

43

*Mutual,* 2009 WL 1393679, at *11 (dismissing complaint because "Plaintiffs make no effort to connect a particular statement . . . with allegations as to why that statement was false or misleading or with allegations of facts giving rise to a strong inference of scienter . . . . [T]he Complaint fail[s] to organize and identify the allegations supporting securities fraud as to each defendant, contain[s] no useful cross-references or paragraph citations to connect the relevant allegations . . . .") (internal citation omitted); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) (dismissing complaint because plaintiffs listed lengthy quotes from various releases followed by a laundry list of reasons why the statements were allegedly false).[13]

Here, Plaintiffs attempt to hide their lack of specific allegations by overwhelming the reader with a mountain of vague or meaningless allegations. Just as in the complaints that federal courts have consistently dismissed, Plaintiffs simply quote and characterize a litany of Oshkosh public filings and earnings conference calls throughout the proposed Class Period

---

[13] *See, e.g., In re Ferro Corp. Sec. Litig.*, Nos. 1:04CV1440, 1:04CV1589, 2007 WL 1691358, at *18-19 (N.D. Ohio June 11, 2007) (dismissing complaint because "Plaintiff merely repeat[ed] (almost verbatim) the same list of reasons after each separate series of purportedly false statements"); *In re Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F. Supp. 2d 873, 904 (N.D. Ohio Mar. 22, 2006) (dismissing complaint and holding "[i]t is Plaintiffs' burden to plead fraud on *a statement-by-statement basis*, and they may not evade that requirement by requiring the Court to try to match the allegedly fraudulent statements to the allegations of wrongdoing that are scattered throughout the seventy-plus page Amended Complaint") (emphasis added); *Shuster v. Symmetricon, Inc.*, No. 94-20024 RMW, 1997 WL 269490, at *3 (N.D. Cal. Feb. 25, 1997) (dismissing complaint, noting "Plaintiff sets forth lengthy quotes . . . but does not make clear what portion of each quote constitutes a false representation"); *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1244 (N.D. Cal. 1998) (dismissing complaint and criticizing plaintiff for "lump[ing] all alleged misrepresentations together in one unwieldy 14-page segment . . . and then follow[ing] that catalog with a three-page laundry list of reasons why all the statements were allegedly false when made"); *May v. Borick*, No. CV-95-8407-LGB (EX), 1997 WL 314166, at *8 (C.D. Cal. Mar. 3, 1997) (dismissing complaint because its "organization obfuscates rather than clarifies. Plaintiff's failure to address defendants' allegedly misleading statements individually, or even by category, and to state why each statement, or category of statements is misleading, renders this Court's task, and the task of the defendants, excessively difficult.").

44

disclosing adverse results of a minor subsidiary,[14] and then follow each set with a nearly identical laundry list of more than 20 overlapping, repetitive and conclusory statements and opinions that Defendants allegedly "misrepresented or failed to disclose" to the public. *See* Compl. ¶¶ 121, 184, 259, 335, 435, 488; Exhibit A hereto (chart of the laundry list).

Nowhere in the Complaint do Plaintiffs even attempt to comply with the Reform Act by specifically identifying a statement (material or otherwise) alleged to have been false or misleading, and alleging with particularity the facts that show that the statement was false or misleading. *See, e.g.*, Compl. ¶¶ 121(v), 184(v), 259(v), 335(v), 435(v), 488(v). On this basis alone, the Complaint must be dismissed. *See, e.g.*, *Washington Mutual*, 2009 WL 1393679, at *10; *Alcatel*, 382 F. Supp. 2d at 534; *Ferro*, 2007 WL 1691358, at *18-19; *Goodyear*, 436 F. Supp. 2d at 904.

2.    **The Complaint does not adequately allege a material misrepresentation or omission in connection with Geesink.**

Even putting aside the impermissible "puzzle pleading" nature of the Complaint, it must still be dismissed because it does not allege specific facts supporting its vague assertions that unspecified statements were false and misleading at the time they were made. *Shopko*, 2002 WL 32003318, at *7-8. *See Gaines*, 2004 WL 2538374, at *8 ("Plaintiffs bear the burden of pleading sufficient facts to demonstrate that, at the time the statements were made, Defendants possessed information contrary to what they stated publicly."); *Vantive*, 283 F.3d at 1086 ("[M]uch of the

---

[14]    *See, e.g.*, Compl. ¶¶ 111-120 (2003 10-K); ¶¶ 125-183 (2004 disclosures); ¶¶ 188-258 (2005 disclosures); ¶¶ 263-334 (2006 disclosures); ¶¶ 339-434 (2007 disclosures); ¶¶ 439-487 (2008 disclosures). *See also* Compl. ¶ 108 (generally alleging "the Oshkosh Defendants issued and/or participated in the issuance of materially false and misleading statements about Oshkosh's goodwill impairment and business operations as it related to the Company overall, Geesink and, later in the Class Period, JLG, *as particularized below*") (emphasis added).

complaint fails to allege any facts to indicate why this statement would have been misleading at the several points at which it was alleged to have been made.").

To the extent one can be identified, it appears that the gist of the Complaint is that Oshkosh should have taken an impairment charge in connection with Geesink earlier than it did. Of Plaintiffs' 20-plus point refrain of purported "reasons" why Defendants' statements were false or misleading (Exhibit A hereto), at least 17 merely repeat in various incarnations the claim that Oshkosh should have taken the Geesink impairment charge by no later than the end of the fourth quarter of fiscal 2003. *See, e.g.*, Compl. ¶ 488(a)-(i), (k), (o)-(p), (r)-(s), (u)-(w). These allegations do not meet the Reform Act's standards because they are completely unsupported by allegations of specific facts indicating that GAAP required an impairment charge any earlier.

Impairment analyses are inherently forward-looking because the test is performed by "*estimat*[*ing*] the *future cash flows* expected to result from the use of the asset and its eventual disposition. If the sum of the future cash flows (undiscounted and without interest) is less than the carrying amount, an impairment loss is . . . recognized.'" *In re Serologicals Sec. Litig.*, No. Civ. A. 1:00-CV1025CAP, 2003 WL 24033694, at \*9 (N.D. Ga. Feb. 20, 2003) (quoting FAS 121) (emphasis added). In order to sustain a claim for securities fraud based on an alleged failure to take an impairment charge, a complaint must do more than merely allege, with the benefit of hindsight, that the projections on which the impairment analysis was based turned out to be overly optimistic. *Id.* at \*10. A complaint must, "for example, detail how the results of an impairment test were reported fraudulently in the company's financial disclosures, or how impairment testing should have been conducted *and* how that testing would have necessarily required recognition of an impairment." *In re Mirant Corp. Sec. Litig.*, No. 1:02-CV-1467-RWS, 2009 WL 48188, at \*22 (N.D. Ga. Jan. 7, 2009) (emphasis added). In sum, a claim that a

Case 2:08-cv-00797-WCG   Filed 07/24/09   Page 56 of 92   Document 91

defendant committed securities fraud by failing to take an impairment charge must be dismissed unless it pleads with particularity facts showing that GAAP required an earlier impairment charge. *See, e.g., id.* at *22-23; *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148 (C.D. Cal. 2007); *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 413 (S.D.N.Y. 2007); *Amalgamated Bank v. Coca-Cola Co.*, No. Civ. A. 1:05-CV-1226, 2006 WL 2818973, at *16 (N.D. Ga. Sept. 29, 2006), *aff'd sub nom. Selbst v. Coca-Cola Co.*, 262 Fed. Appx. 177 (11th Cir. 2008); *In re Loral Space & Commc'ns Ltd. Sec. Litig.*, No. 01 Civ. 4388 (JGK), 2004 WL 376442, at *17 (S.D.N.Y. Feb. 27, 2004); *Serologicals*, 2003 WL 24033694, at *9, 12.

For example, in *In re Wet Seal, Inc. Securities Litigation*, the court dismissed a claim alleging that defendant, a specialty clothing retailer, committed securities fraud by delaying a $75 million impairment charge for six months. The *Wet Seal* complaint alleged that defendant was obligated to take the impairment charge earlier because it was aware of a need to close 50 underperforming stores and had suffered "declines in sales," "negative comparable store sales," "operating losses" for the preceding 18 months, "negative cash flow" for the preceding five quarters, "a tightening of credit," substantial "net lease commitments," markdowns representing "46.6% of total retail sales," and loss of its "target teenager customer base." 518 F. Supp. 2d at 1160-61 & n.2. The court concluded that all of these alleged negative factors did not state a claim because "the impairment rules at issue here depend on *a company's judgment about future events*" and "the most reasonable inference from the [complaint] was that Defendants' beliefs squared with their representations – that the 2004 back-to-school line could turn the company around." *Id.* (emphasis added).

Similarly, in *In re Serologicals Securities Litigation*, the court dismissed a securities fraud claim premised on an alleged delay in recognizing an impairment of assets because

47

plaintiffs did not plead with particularity a violation of former FAS 121. 2003 WL 24033694.
In November 1999, defendant stated in a financial disclosure that, because of "negative market
conditions," it had conducted a test for impairment under then-FAS 121 (now FAS 144) of the
goodwill value in its non-specialty antibody business. *Id.* at *2. Serologicals determined that a
write-down was unnecessary because its estimate of undiscounted future cash flows generated by
the antibody business was greater than the business' book value. *Id.* at *3. However, five
months later, defendant announced an approximately $25 million impairment charge, which
reduced the antibody business' goodwill value by more than 50%. *Id.* at *4. Plaintiffs claimed
that Serologicals' statement in November 1999 that no impairment was needed, preceding its
recognition of a substantial impairment in April 2000 by only five months, was an intentional
and material misrepresentation. In dismissing the complaint, the court held that plaintiffs had not
sufficiently alleged a violation of GAAP because plaintiffs did not allege that defendants
reported the results of their impairment test fraudulently, explaining:

> The plaintiffs do not allege that the defendants failed to perform the requisite FAS
> 121 impairment review in the third quarter of 1999, or that the defendants
> incorrectly estimated the future undiscounted cash flows . . . during that prior
> review. The plaintiffs' failure to allege the specifics of what the defendants knew
> and when they knew it is fatal to the instant complaint . . . .

> The plaintiffs have not pled with particularity facts indicating that the defendants'
> review of the recoverability or failure to recognize an impairment in 1999 did not
> comply with FAS 121. Nor do the plaintiffs allege that the defendants
> misrepresented the results of the 1999 impairment review. Moreover, the
> plaintiffs do not allege that the factors and conditions affecting an estimation of
> the future cash flows of the non-specialty assets in 1999 were identical to those
> affecting such an estimation in 2000. Thus, the court finds that the plaintiffs fail
> to allege with any particularity facts to suggest that the non-specialty assets were
> impaired at the times that the defendants said they were not or, more importantly,
> that they should have known they were so impaired.

*Id.* at *10. *Accord Mirant*, 2009 WL 48188, at *21 (dismissing claims because plaintiffs failed
to "allege facts establishing that FAS 121 required [defendant] to recognize an impairment"

charge); *Caiafa*, 525 F. Supp. 2d at 413 (dismissing complaint because it lacked allegations that internal reports suggesting the delay in taking an impairment charge was a violation of GAAP or fraud); *Amalgamated*, 2006 WL 2818973, at *16 ("Here, besides broadly alleging that the conditions in Germany were such that Defendants knew the value of their German franchise rights had declined, and besides pointing in hindsight to a[n] impairment charge taken in 2004, Plaintiffs do not allege that the FAS 144 tests . . . were either fraudulent in and of themselves, or fraudulently reported in CCC's financial disclosures.") (citation omitted); *Loral Space*, 2004 WL 376442, at *17 (holding "[t]he plaintiffs have failed to allege sufficient facts to show that the failure to take an earlier impairment charge was so clearly required by accounting principles that the failure to take such a charge was fraudulent, particularly in view of the disclosures of the ongoing poor performance of Globalstar").

Here, Plaintiffs offer nothing to distinguish their Complaint from the impairment-related claims dismissed in *Wet Seal*, *Mirant*, *Caiafa*, *Amalgamated Bank*, *Serologicals* and *Loral Space*. Plaintiffs do not allege facts showing that Defendants lied about performing the impairment analyses; they do not allege facts showing that Defendants lied about the results of those impairment analyses; they do not allege facts showing that Defendants knowingly used unreasonable projections in the impairment analyses; and they do not allege facts showing that the use of reasonable projections would have demonstrated an impairment.

Instead, Plaintiffs baselessly criticize Oshkosh's Geesink valuation models for purportedly failing "to factor in historic and repeated operating losses at Geesink, the recession pressures with its industry, declining demand for Geesink products, unrealistic restructuring charges, unachievable sales targets, unrealistic cost reduction plans, and repeated failed efforts to

49

restructure the business." *See* Compl. ¶¶ 121(g), 184(g), 259(g), 335(g), 435(g), 488(g).[15] But it is perfectly apparent from the Complaint that these allegations are just made up, and that Plaintiffs actually have no idea what was or was not factored into the Geesink model. Plaintiffs do not allege what recession pressures were assumed, what restructuring charges were assumed, what sales targets were assumed or what cost reduction plans were assumed, and therefore cannot allege that any of these assumptions (or other assumptions by Oshkosh) were unreasonable. Indeed, the Complaint does not allege a single fact about such things. It does not allege that any confidential witness (or anyone for that matter) gave Plaintiffs a Geesink valuation model or told Plaintiffs what was in or was not in the model at any time – nor that any confidential witness ever told Plaintiffs that something in the valuation model was known to be wrong at the time the model was prepared. Nor does the Complaint allege anything about what an appropriate model would have forecast for Geesink at any point in time or why an appropriate model would have required an impairment according to GAAP. Indeed, not *one* of the confidential witnesses says he or she played any role in the impairment analysis or disagreed with Oshkosh's conclusions when they were made. Instead, Plaintiffs offer nothing but naked reverse-engineering of a fraud claim: because the valuation model led to results Plaintiffs now

---

[15] *See also* Compl. ¶¶ 121(i), 184(i), 259(i), 335(i), 435(i), 488(i) ("Oshkosh was manipulating its assumptions and inputs for its fair value models to achieve the desired result that Geesink's fair value always exceeded its carrying value for testing goodwill impairment."); Compl. ¶¶ 123, 186, 261, 337, 437, 490 ("[T]he Oshkosh Defendants' statements regarding historical, actual and forecasted earnings, earnings per share, operating income, goodwill and assets were materially false and misleading because at the time they were made the Oshkosh Defendants knew those figures were unattainable, lacked any reasonable basis in fact and were the result of contrivances and manipulations in the valuation of Oshkosh's goodwill . . . .").

Case 2:08-cv-00797-WCG    Filed 07/24/09    Page 60 of 92    Document 91

do not like, the model _must_ have failed to previously consider some relevant factor. That is pure speculation and nothing short of irresponsible pleading.

Plaintiffs also seem to think it is important to allege that the Individual Defendants were familiar with Geesink's "financial situation," and so offer a number of statements from confidential witnesses to that effect. _See_ Compl. ¶¶ 86-103. But nowhere does the Complaint allege that any confidential witness thought Geesink's "financial situation" was something other than what Oshkosh publicly disclosed. Compl. ¶ 87. In truth, the confidential witnesses' statements simply confirm what Oshkosh told investors throughout the Class Period – that Geesink faced difficulties and Oshkosh was working hard to turn it around. Compl. ¶¶ 83-91.

Moreover, although Plaintiffs repeatedly assert that Oshkosh's efforts to restructure Geesink were somehow doomed from the start, they never allege why that was so – and they certainly never allege why Defendants should have known at the time that their restructuring efforts were doomed. At bottom, Plaintiffs offer no support for these claims other than the fact, visible only in hindsight, that an impairment charge became necessary in 2008 as the global economy steamrolled into the worst recession since the 1930s. The Reform Act requires dismissal of such claims rooted solely in hindsight and speculation.[16]

### 3. The Complaint does not adequately allege a material misrepresentation or omission in connection with the integration of Oshkosh's subsidiaries.

In addition to their meritless claim regarding Geesink's impairment, Plaintiffs seem also to allege that Defendants made materially false and misleading statements and omissions about

---

[16] _See Higginbotham_, 495 F.3d at 759-60 (fraud by hindsight does not state a securities claim); _Pugh_, 521 F.3d at 694-95 (same); _Stark_, 2008 WL 153542, at *9 (same); _Maiden v. Merger Techs., Inc._, No. 06-C-349, 2008 WL 4643538, at *4 (E.D. Wis. Oct. 20, 2008) (same).

the integration of various companies Oshkosh acquired, and the costs of such acquisitions. Thus, the Complaint claims that Oshkosh:

- failed to disclose that its "acquisition strategy was a failure because it had not successfully integrated acquired companies" (*see* Compl. ¶¶ 121(j), 184(j), 259(j), 335(j), 435(j), 488(j));

- failed to disclose that it had "overpaid" for certain acquisitions (*see* Compl. ¶¶ 355(z), 435(x), 488(x)); and

- failed to disclose that it "did not understand the business" of two of the companies it acquired (*see* Compl. ¶¶ 335(aa), 435(y), 488(y)).

None of these allegations satisfies the Reform Act. To begin with, assertions of "success" or "failure," "overpa[yment]" for an acquisition, or whether someone "understand[s] the business" are not the kinds of concrete information on which investors reasonably rely. They are subjective judgments that are immaterial as a matter of law. *In re Winn-Dixie Stores Inc. Sec. Litig.*, 531 F. Supp. 2d 1334, 1348 (M.D. Fla. 2007) (dismissing complaint for failure to plead a material misstatement or omission because repeated allegation that "'centralization was a complete failure'" described mismanagement, not securities fraud); *In re Federal-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 563 (E.D. Mich. 2001) (holding statements involving the "'viability of . . . growth strategy'" and "'on target to achieve projected 'synergies' and cost savings'" to be inactionable puffery). *See also Werner v. Werner*, 267 F.3d 288, 299 (3d Cir. 2001) ("'Where the incremental value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities acts.'") (quoting *In re Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 640 (3d Cir. 1989)). Regardless, all of these claims must be dismissed because none is supported by specific factual allegations.

52

*First*, Plaintiffs offer no support for their repeated conclusory allegation that Oshkosh's "acquisition strategy was a failure because it had not successfully integrated acquired companies." In fact, this "fail[ed]" acquisition strategy generated earnings that grew from a loss of $0.01 per share in fiscal 1996 to $3.58 per share in fiscal 2007. *See* Ex. 33, 11/21/07 10-K at 2. Regardless, Plaintiffs' sweeping assertions of integration problems seem to be based solely on wild extrapolation from the innocuous statements of two former IT employees (CW-7 and CW-12), who worked at Oshkosh at unspecified times and opine that Oshkosh lacked a "formal plan" to integrate various computer systems and was "very slow to integrate" the computer systems. Compl. ¶ 79. *See also* Compl. ¶¶ 121(l), 184(l), 259(l), 335(l), 435(l), 488(l). Neither witness is alleged to have said that these supposed integration issues extended beyond computer systems, and neither witness is alleged to have said that the supposed computer system integration issues led to any material financial impact or that any such financial impact was inconsistent with any statement Defendants made. Indeed, neither witness said that integration of computer systems of different subsidiaries was necessary or something that had to be accomplished quickly and pursuant to a formal plan.

*Second*, Plaintiffs' claim that Oshkosh should have informed investors that it "significantly overpaid for AK Specialty and JLG" and that it "had a track record of overpaying for companies that operated in declining markets" is also completely unsupported. *See* Compl. ¶¶ 335(x), 488(x). Plaintiffs allege that "the *consensus* among Oshkosh insiders was that the Company overpaid for businesses it acquired during its acquisition spree" (Compl. ¶ 78 (emphasis added)), but in support of this statement, Plaintiffs offer a consensus of *one*. The Complaint alleges that "CW-1 . . . stated, *as did others*, that Oshkosh overpaid for several of the companies it acquired." Compl. ¶ 78 (emphasis added). Plaintiffs' failure to identify the "others"

– even by code name – is telling. The Court simply cannot presume that any of the "others" were in a position to draw this conclusion because it has been deprived of any identifying information. And CW-1's opinion, standing alone, that Oshkosh overpaid for some of its acquisitions lacks relevance to a fraud claim because it is phrased purely in retrospect after a nearly unprecedented market collapse. CW-1 is not alleged to have said that any Defendant thought – much less, *knew* – during the Class Period that Oshkosh had supposedly overpaid for any of its acquisitions. *See* Compl. ¶¶ 335(z), 435(x), 488(x).[17] In short, CW-1's statements not only do not support a claim of fraud, they contradict it: If Bohn and Szews engaged in an "acquisition spree" for personal profit, as Plaintiffs allege, such a plan would be *thwarted* by overpaying for acquisitions.

*Third*, Plaintiffs' allegation that Oshkosh was required to disclose that it "did not understand the business of AK Specialty and JLG" is also completely lacking in factual support. Compl. ¶ 488(y). Plaintiffs base this claim on secondhand gossip from a former JLG employee who stated that *other* JLG employees "joked about how little Oshkosh knew about the access equipment business." Compl. ¶ 103. *See also* Compl. ¶¶ 78, 79, 93, 95, 96, 97, 101, 102 (additional irrelevant allegations about AK Specialty Vehicles, Pierce and JLG). Such flimsy allegations prove only the extreme lengths to which Plaintiffs have gone to manufacture a claim.

---

[17]    Similarly, Plaintiffs rely upon CW-10, a former executive at *Oshkosh Specialty Vehicles*, who offers an opinion that "the valuation model used by Oshkosh for the *JLG* acquisition was unrealistic." Compl. ¶ 101 (emphasis added). Not only do Plaintiffs fail to allege facts that would make CW-10 an expert in valuation models or accounting, Plaintiffs provide the unsupported personal opinion from a person *employed by a different Oshkosh subsidiary* to speculate that the valuation model for JLG was unrealistic.

4. **The Complaint does not adequately allege a material misrepresentation or omission in connection with Oshkosh's forward-looking statements.**

As noted above, one of the fundamental flaws in the Complaint is its failure to specifically identify _which_ statements in the lengthy announcements and disclosures quoted and paraphrased in the Complaint are alleged to have been false and misleading. Plaintiffs seem to complain generally that Defendants' statements were too optimistic. _See_ Compl. ¶¶ 124, 187, 262, 338, 438, 491. However, "'predictions of future performance are inevitably inaccurate because things almost never go exactly as planned.'" _In re Healthcare Compare Corp. Sec. Litig._, 75 F.3d 276, 281 (7th Cir. 1996) (citations omitted). Courts have long recognized that optimism is not fraud,[18] and the Reform Act created a safe harbor that protects companies in making forward-looking statements relating to earnings projections, plans of future economic performance and statements of belief, and the assumptions underlying or relating to them.[19]

------

[18] _E.g._, _Rosenzweig v. Azuriz Corp._, 332 F.3d 854, 869 (5th Cir. 2003) ("The generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial . . . . [A company is] under no duty to cast its business in a pejorative, rather than a positive, light."); _Guidant_, 536 F. Supp. 2d at 928 (holding plaintiffs "have not adequately distinguished such statements from the sorts of optimistic, forward-looking statements that courts have routinely held to be puffery upon which reasonable investors would not rely"); _Gaines_, 2004 WL 2538374, at *18 ("Courts consistently hold that puffery and 'optimistic rhetoric' generally cannot provide a basis for a securities fraud action."); _Shopko_, 2002 WL 32003318, at *7 ("vague, general assertions of success" do not support a fraud claim); _In re Bally Total Fitness Sec. Litig._, Nos. 04 C 3530, 04 C 3634, 04C 3713, 04 C 3783, 04 C 3844, 04 C 3936, 04 C 4697, 06 C 1437, 2007 WL 551574, at *6 (N.D. Ill. Feb. 20, 2007) (noting general corporate optimism is immaterial). Moreover, any optimism Oshkosh expressed was always accompanied by appropriate warnings, including the specific warning that if the Geesink turnaround effort were unsuccessful, Oshkosh might suffer an impairment. _See supra._

[19] "As stated by the Conference Committee that presented the bill which ultimately became law, the purpose of the Reform Act's Safe Harbor is 'to encourage issuers to disseminate relevant information to the market without fear of open-ended liability.'" David M. Brodsky & Daniel J. Kramer, _Federal Securities Litigation: Commentary and Forms_, 2-1 (2008). _See_

(cont'd)

55

15 U.S.C. § 78u-5(i)(1). *See also Western Pa. Elec. Employees Pension Trust v. Plexus Corp.*, No. 07C0582, 2009 WL 604276, at *8 (E.D. Wis. Mar. 6, 2009).

The safe harbor precludes liability for forward-looking statements that are identified as such and are *either* "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or immaterial" *or* are made without actual knowledge of falsity. 15 U.S.C. § 78u-5(c). *See, e.g., Rosenzweig*, 332 F.3d at 869. Because the two-prong safe harbor is disjunctive, meaningful cautionary language will absolutely protect the maker of a forward-looking statement from liability regardless of the maker's state of mind. *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003).

Here, Oshkosh's forward-looking statements are doubly protected because they fall within *both* parts of the safe harbor. *First*, Oshkosh's statements were identified as forward-looking and urged caution upon the reader. *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 163-64 (N.D. Tex. 2007). Indeed, Oshkosh's filings were "replete with anticipatory and forward-looking statements, marked by words such as 'anticipate,' 'expect,' 'believe,' 'likely,' etc." *Id.* at 163. And those forward-looking statements were always accompanied by warnings about factors that might cause actual results to vary from the projections. Moreover, Oshkosh's cautionary statements were tailored and updated to reflect the current risks that Oshkosh faced. *Plexus*, 2009 WL 604276, at *9. As Judge Adelman recently

---

*(cont'd from previous page)*
also *Harris v. IVAX Corp.*, 182 F.3d 799, 806 (11th Cir. 1999) ("Congress enacted the safe-harbor provision in order to loosen the 'muzzling effect' of potential liability for forward-looking statements, which often kept investors in the dark about what management foresaw for the Company."); *Arazie*, 2 F.3d at 1465 ("The securities laws encourage companies to make public predictions of future performance to assist investors in estimating a firm's future value.").

Case 2:08-cv-00797-WCG    Filed 07/24/09    Page 66 of 92    Document 91

held, "[t]he statute does not require prescience concerning possible risks; that is, cautionary language does not have to identify the particular risk that actually materializes." *Id.* at *8 (citation omitted).[20] Yet here, Oshkosh's warnings included repeated specific warnings about precisely the factors that Plaintiffs say caused their loss – *i.e.*, that an inability to turn Geesink around would result in an impairment charge and that it may face difficulty in integrating acquisitions. As a result, Defendants' forward-looking statements are absolutely protected by the first prong of the safe harbor.

*Second*, Defendants' forward-looking statements are also protected by the second prong of the safe harbor because Plaintiffs have not alleged specific facts creating a strong inference that Defendants made any forward-looking statement with actual knowledge that it was false. As demonstrated in the next section, the Complaint does not adequately allege scienter with respect to any statement by any Defendant. *A fortiori,* the Complaint does not allege actual knowledge of falsity with respect to any forward-looking statement.

## B.    The Complaint Does Not Adequately Allege Scienter.

Even if Plaintiffs had adequately alleged a materially false or misleading statement or omission (which they do not), the Reform Act would still require dismissal of the Complaint because Plaintiffs have failed to plead scienter adequately. To plead scienter, a plaintiff must allege facts that give rise to a "strong inference" that the defendant acted with "a mental state embracing intent to deceive, manipulate or defraud." *Tellabs*, 127 S. Ct. at 2507. *See* 15 U.S.C. § 78u-4(b)(2).

---

[20]    "'[W]hen an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the damage of the investment to make an intelligent decision about it according to her own preferences for risk and reward.'" *Plexus,* 2009 WL 604276, at *8 (citing and quoting with parenthetical *Harris*, 182 F.3d at 807).

The Supreme Court has directed federal courts to dismiss securities fraud complaints unless "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510. As a result, to survive a motion to dismiss, plaintiffs "must not only plead a violation with particularity; they must also marshal sufficient facts to convince a court at the outset that the defendants likely intended 'to deceive, manipulate, or defraud.'" *Makor I*, 437 F.3d at 594-95. This pleading burden must be met <u>separately</u> with respect to each defendant. *Tellabs*, 127 S. Ct. at 2511, n.6; *Pugh*, 521 F.3d at 693-94; *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 797 (N.D. Ill. 2007) (citation omitted).

Scienter is "demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham*, 495 F.3d at 756. As noted in the preceding section, the Reform Act's safe harbor requires that, to the extent Plaintiffs challenge forward-looking statements made by Oshkosh, they must prove Defendants made the statements with actual knowledge of falsity rather than mere recklessness. 15 U.S.C. § 78u-5(c)(1)(B); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Makor II*"); *Guidant*, 536 F. Supp. 2d at 930.

In assessing scienter, a court must consider all potential inferences – not just those that favor a plaintiff. *See Higginbotham*, 495 F.3d at 759. As *Tellabs* instructs, the Reform Act's comparative analysis requires consideration of the facts as a whole, including not only all the factual allegations of the complaint, but also the documents incorporated into the complaint by reference and other matters about which a court may take judicial notice. *Tellabs*, 127 S. Ct. at 2509. The court "must weigh the strength of the plaintiffs' inferences in comparison to plausible nonculpable explanations for the defendants' conduct." *Pugh*, 521 F.3d at 693.

Under the Reform Act, a court *must* dismiss a complaint unless an inference of scienter is cogent and at least as compelling as *any* opposing inference that could be drawn from the facts alleged. *Tellabs*, 127 S. Ct. at 2509; *Higginbotham*, 495 F.3d at 757. *See Stark*, 2008 WL 153542, at *6; *Guidant*, 536 F. Supp. 2d at 932. Omissions and ambiguities in a complaint count against an inference of scienter. *Tellabs*, 127 S. Ct. at 2511. After all, to "determine whether a 'strong' inference of scienter has been established, the judiciary must evaluate what the complaint reveals and disregard what it conceals." *Higginbotham*, 495 F.3d at 757.

Here, the Complaint does not support any inference of scienter – much less a "strong inference" – as to any of the Defendants. Indeed, in many instances, Plaintiffs fail even to attempt to plead scienter as to Defendants individually – merely making group-pled allegations that are, as a matter of law, insufficient to show scienter. For the Individual Defendants, Plaintiffs try several different avenues to establish a strong inference of scienter – often rooted in alleged statements by unidentified confidential witnesses that never suggest fraud and, in any event, must be steeply discounted. As discussed below, however, each of these avenues leads to a dead end. Because Plaintiffs fail to establish scienter on the part of any Oshkosh officer, they also fail to establish scienter as to Oshkosh itself. Accordingly, the Complaint must be dismissed.

## 1. Plaintiffs' allegations regarding confidential witnesses do not support an inference of scienter.

With a complete absence of any documentary evidence to support their claims, Plaintiffs are left to rely entirely on the purported statements of sixteen former employees they interviewed in the course of the investigation for their Complaint. *See* Compl. ¶¶ 35-51. These statements do not support an inference of scienter for at least two reasons. _First_, not one witness alleges that any Defendant acted with scienter or even that any Defendant ever said anything false or misleading (even in hindsight). Presumably, in their months-long investigation, Plaintiffs and

59

their counsel talked to more than just the 16 former employees they chose to mention in the Complaint.[21] Even after omitting those witnesses who Plaintiffs deemed unhelpful, Plaintiffs are still left with no confidential witness who can make any allegation of wrongdoing. The fact that in the eight months since this lawsuit was first filed, Plaintiffs have found not a single document or a single witness to corroborate their claims of fraud is, by itself, powerful evidence supporting a contrary inference. _Second_, even if the statements were somehow interpreted to provide evidence of scienter, the allegations must be disregarded because Plaintiffs have not pled information that would permit the Court to conclude that their witnesses were reliable sources of the information they report.

### (a) The confidential witness allegations do not support an inference of scienter.

To begin with, taken individually or as a whole, the confidential witnesses' statements do nothing to support an inference of scienter. To adequately plead scienter based on the testimony of confidential witnesses, the witnesses must provide testimony of a defendant's knowledge or awareness of the alleged fraud. _In re Int'l Rectifier Corp. Sec. Litig._, No. CV07-02544-JFWVBKX, 2008 WL 4555794, at *17 (C.D. Cal. May 23, 2008). Speculation as to what defendants should, could, or would have known about the alleged fraud is insufficient. _Ferro_, 2007 WL 1691358, at *12.

---

[21] "The purpose of the heightened pleading requirement in fraud cases is to force the plaintiff to do more than the usual investigation before filing a complaint." _Gaines_, 2004 WL 2538374, at *6. "'Greater precomplaint investigation is warranted in fraud cases because public charges of fraud can do great harm to the reputation of a business . . . .'" _Id._ at 6, n.10 (quoting _Ackerman v. Northwestern Mut. Life Ins. Co._, 172 F.3d 467, 469 (7th Cir. 1999)). Indeed, fraud charges are frequently brought "'irresponsibly by people who have suffered a loss and want to find someone to blame for it.'" _Id._

60

Here, to the extent the confidential witnesses' statements prove anything, they work to contradict any inference of scienter, confirming instead the publicly disclosed efforts of Oshkosh and its executives to guide Geesink toward profitability. For instance, the confidential witnesses say that Oshkosh took an active role in monitoring the profitability of its subsidiaries. Compl. ¶ 102. The confidential witnesses say that Oshkosh took substantial steps to attempt to return Geesink to profitability, including bringing on "a lean manufacturing expert" and "reduc[ing] costs . . . by . . . moving some of Geesink's manufacturing operations to Romania." Compl. ¶ 91. In other words, the confidential witnesses identify exactly the same problems, and exactly the same efforts to resolve those problems, that Oshkosh identified in its public filings. Beyond that, the confidential witnesses (armed with the power of hindsight) merely state the obvious – that the Geesink restructuring was ultimately unsuccessful. Compl. ¶ 84 ("[D]espite efforts to revive Geesink, the business floundered."); Compl. ¶ 91 ("[T]he lean team's overall mission was not accomplished."); Compl. ¶ 91 ("Oshkosh's plan to centralize Geesink's business in an attempt to control costs was an operational failure."). Even armed with hindsight, no witnesses offer opinions that any Defendant knew a statement was false or misleading *at any time, let alone at the time when the statement was made* or even provide innuendo that sounds in fraud.

### (b) Confidential witness allegations are steeply discounted.

Even if any of Plaintiffs' confidential witnesses had said something that suggested scienter, that would still not be sufficient because in the Seventh Circuit, statements supposedly made by confidential witnesses are steeply discounted. *Higginbotham*, 495 F.3d at 757. *See Plexus*, 2009 WL 604276, at *4. This is because "anonymity conceals information that is essential to the sort of comparative evaluation required by *Tellabs*." *Higginbotham*, 495 F.3d at 757. "[I]t is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential

61

sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." *Id.* at 757.

Indeed, in *Higginbotham*, the Seventh Circuit gave no credence to allegations attributed to three

sources who could not provide any details showing that the company's officers knew their

statements were false. *Id.* at 757-58. Likewise, more recently in *Plexus*, Judge Adelman

concluded that confidential witness allegations did not provide evidence of a defendant's

knowledge. 2009 WL 604276, at *4. The same result follows here.

### (c) Plaintiffs fail to identify the confidential witnesses with particularity.

Moreover, a plaintiff must "describe [its] sources with sufficient particularity to support

the probability that a person in the position occupied by the source would possess the

information alleged . . . or in the alternative provide other evidence to support their allegations."

*Makor I*, 437 F.3d at 596 (internal quotation marks omitted). In determining the particularity of

confidential witness allegations, a court should consider "'the level of detail provided by the

confidential sources, the corroborative nature of the other facts alleged (including from other

sources), the coherence and plausibility of the allegations, the number of sources, the reliability

of the sources, and similar indicia.'" *Bally*, 2007 WL 551574, at *6 (quotation omitted). A

plaintiff must provide information about the job duties, responsibilities or other necessary

information about the confidential witnesses. *See, e.g., In re Career Educ. Corp. Sec. Litig.*, No.

03 C 8884, 2006 WL 999988, at *4 (N.D. Ill. Mar. 28, 2006); *Selbst v. McDonald's Corp.*, 432 F.

Supp. 2d 777, 782 (N.D. Ill. 2006).

Here, Plaintiffs' confidential witness allegations fail in all respects. *First*, Plaintiffs offer

no way "to tell whether a confidential witness is speaking from personal knowledge or merely

regurgitating gossip and innuendo." *Ferro*, 2007 WL 1691358, at *12 (quoting *In re Metawave

Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003)). *See In re Career*

62

*Educ. Corp. Sec. Litig.*, No. 03 C 8884, 2007 WL 1029092, at *4 (N.D. Ill. Mar. 29, 2007) (rejecting witnesses' statements because "Plaintiffs have not shown that the witnesses have any basis for their knowledge for some of the statements, and for others, the witnesses are only relaying rumors and second-hand information").

*Second*, Plaintiffs provide no timeline for any of the confidential witnesses' employment. *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 943 (S.D. Ind. 2005) ("With few exceptions, plaintiff provides no dates or facts regarding when the confidential witnesses were employed at any of the ITT institutes about which they claim to have knowledge of misconduct or when they acquired the information they claim to possess."). In fact, only for CW-5 do Plaintiffs give any glimpse of any such information – suggesting he started working at Geesink in 2003. Compl. ¶ 84. Without knowing when any confidential witness was employed, the Court cannot conclude which, if any, of the confidential witnesses would actually have any opportunity to know anything about any relevant facts.

*Third*, Plaintiffs rely heavily upon non-Oshkosh employees, whose knowledge is necessarily limited. *See In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 959-60 (8th Cir. 2008) (anecdotes from confidential witnesses about individual customers and specific plants are insufficient to demonstrate company-wide performance); *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 149-55 (3d Cir. 2004) (former employees who worked in branch offices were unlikely to have personal knowledge of Chubb's company-wide performance). Many of the confidential witnesses worked neither in Oshkosh headquarters nor for Geesink. CW-3, CW-4, CW-9 and CW-14 are allegedly former JLG employees. Compl. ¶¶ 38, 39, 44, 49. CW-8 allegedly worked for an unspecified "Oshkosh subsidiary." Compl. ¶ 43. CW-10 allegedly worked for Oshkosh Specialty Vehicles. Compl. ¶ 45.

*Fourth*, Plaintiffs fail to even identify job titles for 14 of the 16 confidential witnesses. *See* Compl. ¶¶ 36, 40, 45 ("former high level executive"); Compl. ¶ 37 ("former lean specialist"); Compl. ¶¶ 38, 48 ("former executive"); Compl. ¶ 39 ("former business analyst"); Compl. ¶¶ 41, 50 ("former senior executive"); Compl. ¶ 42 ("former senior information technology executive"); Compl. ¶ 43 ("former controller"); Compl. ¶ 46 ("former project leader"); Compl. ¶ 47 ("former senior technical analyst"); Compl. ¶ 49 ("former regional vice-president"). Vague descriptions of the confidential witnesses' general roles do not provide the Court with the ability to evaluate the witnesses' bases for knowledge. *Selbst*, 432 F. Supp. 2d at 782 (description of confidential witness as a director of financial consulting and accounting was insufficient to create basis for knowledge of corporation's overall financial health).

*Fifth*, for most, if not all, of the confidential witnesses, Plaintiffs provide no basis for their knowledge or corroborating detail for their allegations. For example, CW-16 is identified by title and his only basis for any knowledge is that he allegedly "reported to" the CFO of Geesink, and allegedly stated that Szews was involved in the impairment anayses and "signed off" on the impairment charges. Compl. ¶¶ 51, 87. Such a description creates no basis to believe CW-16 would know on a firsthand basis the level or role that Szews played with impairment analyses, nor does it identify a time period for which CW-16's statements are possibly true.

Plaintiffs' allegations about other witnesses are similarly vague and lacking in any concrete information to support a conclusion that they are reliable and trustworthy. With respect to CW-3, Plaintiffs merely state: "CW-3 was *involved* with the company's SEC filings and analyst conference calls." Compl. ¶ 38 (emphasis added). Plaintiffs do not allege that CW-3 (or any confidential witness for that matter), authored any of the SEC filings or conference call scripts. CW-12 worked at "the corporate level" and was "involved" in integrating information

64

technology systems. Compl. ¶ 47. *See also* Compl. ¶ 42 (CW-7 was also "involved" in integrating IT systems). CW-10 merely "attended meetings with auditors and with Oshkosh's accounting team." Compl. ¶ 45. Although CW-9 is identified by title, the confidential witness is noted only to have "observed . . . limitations" on JLG personnel. Compl. ¶ 44. *See also* Compl. ¶ 37 (alleging CW-2 "observed the Company's operations in several different countries"). Plaintiffs' description of CW-4 lacks even that much, only identifying CW-4 as being "aware of pressure put on JLG employees." Compl. ¶ 39. There can be no doubt that under *Makor I,* a mere statement of "observ[ation]," "attend[ance]" "involve[ment]" or "aware[ness]" is insufficient to lend credence to any of the witnesses' allegations.

Likewise, for other witnesses, instead of concrete and meaningful detail, Plaintiffs rely solely on vague adverbs to establish credibility for many confidential witnesses, noting, for example, that "CW-1 worked *very closely* with the Company's top executives," CW-3 "*closely* observed the transition in leadership" at JLG, and CW-5 "worked *closely* with the Company's top executives." Compl. ¶¶ 36, 38, 40 (emphasis added). *See also* Compl. ¶ 42 (CW-7 was "involved" in the integration and "worked *closely* with senior executives throughout the Company") (emphasis added). CW-6 "communicated *regularly* with the company's most senior executives." Compl. ¶ 41 (emphasis added). Likewise, CW-15 was "*significantly* involved with" Geesink's financials and "*regularly* communicated" with senior management. Compl. ¶ 50 (emphasis added). *See also* Compl. ¶ 87 ("CW-15 worked with Szews regarding same on a regular basis."). And, CW-14 "worked *directly* with other high-level executives." Compl. ¶ 49 (emphasis added). These descriptions do not meet the standards set forth in *Makor I.*

In the end, because Plaintiffs fail to allege the confidential witnesses' job responsibilities and access to information, the Court is "left to speculate whether the [confidential witnesses]

65

obtained the information they purport to possess by firsthand knowledge or rumor." *Chubb*, 394

F.3d at 148; *Bally*, 2007 WL 551574, at *7. Speculation based upon second or thirdhand

knowledge flunks the Reform Act's test. *Davis v. SPSS, Inc.*, 431 F. Supp. 2d 823, 831 (N.D. Ill.

2006); *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1068 (W.D. Wash.

2003). Here, much of what the confidential witnesses "state" is no more than water cooler gossip.

*See Ferro*, 2007 WL 1691358, at *12 ("In this case, most of the statements from the confidential

witnesses do not appear to be based on personal knowledge. Rather, as Defendants note, they do

amount to 'water-cooler gossip,' 'irrelevant speculation,' and 'gratuitous criticism.'"). For

example, CW-14 stated that JLG employees "joked about how little Oshkosh knew about the

access equipment business." Compl. ¶ 103. Like all of Plaintiffs' confidential witness

allegations, even if true, this innuendo and gossip could not provide any basis for scienter.

### 2. Plaintiffs fail to allege facts sufficient to support a strong inference of scienter against the Individual Defendants.

#### (a) Plaintiffs' group-pled allegations must be disregarded.

Allegations of scienter made against one defendant are not imputed to other defendants.

*Tellabs*, 127 S. Ct. at 2511, n.6. Accordingly, allegations against "Defendants," and the

"Individual Defendants" fail to meet the Reform Act's requirements for pleading scienter because

they do not allege facts concerning each defendant's state of mind regarding his or her alleged

violations, or the particular underlying facts that would support a strong inference that each

defendant acted with the requisite state of mind. *Pugh*, 521 F.3d at 693 (noting that Seventh

Circuit has "rejected the 'group pleading doctrine'") (citation omitted).

Here, Plaintiffs have completely disregarded the prohibition on group pleading. Nearly

all of their allegations of knowledge or reckless disregard are made generically against

"Defendants" (*e.g.*, Compl. ¶¶ 564, 571, 572), "Oshkosh Defendants" (*e.g.*, Compl. ¶¶ 6, 86, 105,

108, 121, 123, 184, 186, 259, 261, 335, 337, 435, 437, 488, 490, 550, 561), or the "Individual Defendants." (*e.g.*, Compl. ¶¶ 24, 578). Each of these attempts to use group pleading to establish scienter falls short of Plaintiffs' obligations under the Reform Act and must be disregarded.

### (b) A motive to increase the stock price does not support a strong inference of scienter.

Plaintiffs allege that the motive for Defendants' alleged misstatements and omissions was to inflate the Oshkosh stock price to Defendants' benefit. Compl. ¶¶ 75-76, 551. This conclusory allegation does not support a strong inference of scienter. *Stark*, 2008 WL 153542, at *11 ("[P]ecuniary benefit is perhaps the most frequent motive for fraud. However, in addition to being a motive underlying fraud, pecuniary benefit is the underlying motive in most every action undertaken in a capitalistic business."). For one thing, company management is almost always motivated to increase the price of its stock. As a result, courts have consistently recognized that the allegation of such a motive does not support an inference of scienter. For example, in *In re Allscripts Inc. Securities Litigation*, defendant Allscripts acquired three companies. Plaintiffs alleged that "[t]hroughout this period of acquisitions . . . Allscripts was highly motivated to keep the price of its common stock high." No. 00 C 6796, 2001 WL 743411, at *32 (N.D. Ill. June 29, 2001). The court rejected the allegation that "the Company's recent acquisitions supplied Defendants with a motive to inflate the price of the Company's stock." *Id.* at *32-33.[22]

---

[22] *See also Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (alleged use of corporate acquisitions and public offering to inflate stock price and complete another acquisition insufficient to plead scienter); *Rosenzweig*, 332 F.3d at 867 (alleged motive to inflate stock price to raise capital insufficient); *Guidant*, 536 F. Supp. 2d at 932, n.20 ("We note also that Plaintiffs' allegations that Defendants were motivated to commit fraud by the desire to consummate the J&J merger do not create the requisite strong inference."); *In re Bally Total Fitness Sec. Litig.*, Nos. 04 C 3530, 04 C 3634, 04C 3713, 04 C 3783, 04 C 3844, 06 C 3936, 04 C 4697, 04 C 1437, 2006 WL 3714708, at *9 (N.D. Ill. July 12, 2006) ("We cannot infer scienter . . . from their general desire for their corporation to appear profitable and thereby

*(cont'd)*

Here, Plaintiffs allege that Defendants' "acquisition spree" motivated them to keep the price of the Company's stock up. Compl. ¶ 2. Like the plaintiffs in *Allscripts*, Plaintiffs' allegations fail to support a strong inference of scienter because they allege only a motive commonly shared by corporations. *Allscripts*, 2001 WL 743411, at *32-33. For the same reason, an executive's motivation to increase his or her company's stock price for profit is also too commonplace to support an inference of scienter. *See Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 714 (N.D. Ill 2005).

### (c)    A "hands on" management style does not support a strong inference of scienter.

Plaintiffs allege that the Individual Defendants were "given substantial authority over the day-to-day management and operation of the Company" and "were hands-on executives who were directly involved in the Company's everyday business." *See, e.g.*, Compl. ¶ 26. These allegations do not support a strong inference of scienter.

Vague allegations of executives' involvement in the business do not establish scienter or demonstrate that the executives must have known the supposed "true condition" of a company. *Vantive*, 283 F.3d at 1088; *Roth*, 527 F. Supp. 2d at 798-99. Indeed, if a court were to infer scienter merely because a chief executive was a chief executive and therefore "must have known," the Reform Act's pleading requirements would be eviscerated. *In re Autodesk, Inc., Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000).

---

*(cont'd from previous page)*
obtain financing and engage in mergers and acquisitions."); *In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 264 (S.D.N.Y. 2004) ("Plaintiffs' first motive allegation – that Defendants desired to use inflated stock as currency for Cross Media's acquisitions – is inadequate.").

68

Here, Plaintiffs have alleged only that the Individual Defendants were actively involved in the Company, attended various meetings, had access to various internal reports, and signed various Oshkosh securities filings. None of these allegations support a strong inference of scienter because none of them are accompanied by any allegations of fact indicating knowledge by the Individual Defendants of the falsity of any statement.

Attendance at a meeting is irrelevant without an allegation that something was said at the meeting that was inconsistent with a public statement.[23] Similarly, an allegation that a defendant received a "report" is meaningless unless the plaintiff alleges what was in the report that should have alerted the defendant to the purported misstatement. *Vantive*, 283 F.3d at 1087-88. As the Seventh Circuit has noted, "there is a big difference" between knowing about reports and knowing that the reports contain information inconsistent with public disclosures. *Higginbotham*, 495 F.3d at 758.[24] Moreover, where a plaintiff challenges forward-looking statements, an inference that a defendant had actual knowledge that the statements were false or misleading

---

[23] *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1264-65 (11th Cir. 2006) (scienter was not adequately pled because complaint did not allege what was said at meeting, to whom it was said, or in what context); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 376 (5th Cir. 2004) ("'[M]eetings with upper management' is too vague of an indication of where or to whom the alleged comment was made.") (citation omitted); *Vantive*, 283 F.3d at 1087-88 (holding insufficient allegations that defendants knew the company's true condition because of their "'interaction with other corporate officers and employees [and] their attendance at management and board meetings'") (citation omitted).

[24] *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004) ("Contrary to Plaintiffs' assertions, fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information."); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035-36 (9th Cir. 2002) ("Without [the contents or the purported data of internal reports] . . .'we cannot ascertain whether there is any basis for the allegations that the officers had actual or constructive knowledge' of flat patient demand 'that would cause their optimistic representations to the contrary to be consciously misleading.'") (citation omitted).

69

because of alleged access to internal reports is "particularly weak." *In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 740 (W.D. Ky. 2004). This is because corporate officers and directors "have access to internal documents and proprietary information as a matter of course in their jobs," but "having access to financial data through sophisticated information technology does not mean that Defendants could predict the future or that they knew what they were telling the public was false." *Id.*

Furthermore, without allegations (not present here) that the Individual Defendants knowingly misrepresented facts in SEC filings, the fact that they signed Sarbanes-Oxley Certifications attesting to the accuracy of the information in those filings does not suffice to plead scienter. *E.g.*, *Roth*, 527 F. Supp. 2d at 791, 805; *In re BearingPoint, Inc. Sec. Litig.*, 525 F. Supp. 2d 759, 773 (E.D. Va. 2007); *Bally*, 2006 WL 3714708, at *8. Although the Individual Defendants, by virtue of signing the filings, ascertained that they were true, those signatures do not transform the failure to meet the projections in those filings into fraud. Plaintiffs' allegations of "hands-on" involvement only confirms Oshkosh's repeated disclosures that the Company was focused on turning Geesink around. It does not contribute to an inference of scienter.

### (d) Bohn's and Szews' stock sales and option exercises do not support a strong inference of scienter.

Finally, with no specific allegations of fact whatsoever to support any inference of scienter, Plaintiffs fall back on the argument that occasional stock sales and option exercises by Bohn and Szews[25] during the nearly five-year Class Period somehow prove an intent to defraud the market. This argument is also unsupported and meritless.

---

[25] Although Plaintiffs allege generally that the "Oshkosh Defendants were . . . motivated" by stock sales (Compl. ¶ 551), they do not allege any sales by Sagehorn. Accordingly, their allegations are patently insufficient to allege motive to commit fraud on his part. *In re*

*(cont'd)*

70

Because executives sell stock all the time for a wide variety of reasons, a plaintiff must plead specific facts demonstrating that a particular executive's stock sales were "unusual or suspicious." *Pugh*, 521 F.3d at 694. At most, even unusual or suspicious stock sales can only provide circumstantial evidence of scienter to be considered with all other evidence and inferences. *Id.* at 695. Here, Plaintiffs must plead that Defendants had actual knowledge that their forward-looking statements were false or misleading. *Guidant*, 536 F. Supp. at 930. Accordingly, circumstantial evidence of stock sales cannot suffice.

To determine whether stock sales are unusual or suspicious, courts have looked to several factors, including: (1) how much and what percentage of the defendants' shares of stock were traded; (2) the timing of the trading; and (3) whether the trade was consistent with the defendant's previous practices. *Friedman v. Rayovac Corp.*, 291 F. Supp. 2d 845, 854 (W.D. Wis. 2003). Here, all three factors weigh against an inference of scienter.

*First*, the incidental size of Bohn's and Szews' stock sales and option exercises, in comparison to their holdings of Oshkosh stock, affirmatively rebuts any inference of a conspiracy to profit through fraud. Plaintiffs allege that Bohn sold shares representing just 13% of his Oshkosh holdings in February 2008[26] and do not even allege how the volume of any of

---

(cont'd from previous page)

*PETsMART Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 1000 (D. Ariz. 1999). Moreover, the fact that Plaintiffs have not pled any sales by Sagehorn, or indeed, by any Oshkosh insiders besides Bohn and Szews, cuts against a finding of scienter against any Defendant. *See, e.g.*, *Higginbotham*, 495 F.3d at 759 ("One possible inference is that the *absence* of sales by other managers who would have been in the know . . . implies that nothing was thought to be out of the ordinary . . . ."); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999) ("Here, three of the individual defendants sold no stock at all during the class period, raising doubt whether the sales were motivated by an intent to profit from inflated stock prices before the upcoming losses were reported.").

[26] Plaintiffs allege that Bohn sold 13.3% of his shares, focusing on transactions on February 19 and 20, 2008, that they incorrectly refer to as stock sales. Compl. ¶ 9. Actually, as publicly

*(cont'd)*

Szews' stock and option activity compared to the rest of his holdings. As to Szews, no response is required because no facts are alleged. [27] As to Bohn, we are unaware of any case holding that a sale of just 13% of a defendant's stockholdings, without more, creates a strong inference of scienter. *E.g., In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 390 (4th Cir. 2005) (stating that defendants' sales of 1.17%, 1.47%, 1.79% and 13% of their holdings during the class period "were nearly *de minimis*"); *Vantive*, 283 F.3d 1094 (no scienter where CEO sold 13% of his holdings); *In re FVC.COM Sec. Litig.*, 32 Fed. Appx. 338, 341 (9th Cir. 2002) ("Altogether, however, the individual defendants sold only 13% of their total holdings (shares and vested options), a far smaller proportion than one would expect if the sellers knew that revenues were heavily overstated and soon to be restated."). Here, there can be no doubt that Bohn's and Szews' sales histories do not support a strong inference of scienter – even if Plaintiffs had properly pled such allegations. *E.g., supra; In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 873 (N.D. Cal. 2004) (sales of 21% and 50% did not establish scienter). *See* Exhibit B. In fact, Bohn increased his holdings of Oshkosh stock by *49.12%* during the time when he supposedly knew that stock was fraudulently overvalued. *See* Exhibit B. That is flatly inconsistent with any inference of scienter. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424-25 (9th Cir. 1994) ("'[I]f, as Plaintiffs allege, the Officers knew that WOW was heading for financial disaster, they probably would have bailed out of their substantial holdings. Each of the Officer

---

*(cont'd from previous page)*

disclosed, Bohn made a cashless exercise of 133,334 stock options he had received pursuant to an executive incentive compensation plan. *See* Ex. B hereto (chart of all trades by Bohn and Szews during and outside of the Class Period based on publicly filed Form 4s)

[27] Plaintiffs offer only the unexplained and conclusory allegation that the timing, frequency and volume of Szews' trades are "highly suspicious." Compl. ¶ 553. This is insufficient. *See supra*.

Defendants, by contrast, held onto most of their WOW stock and incurred the same large losses as did the Plaintiffs themselves . . . .") (citation omitted).

*Second*, the regular timing of Bohn's and Szews' trades is also inconsistent with scienter. Plaintiffs attempt to obscure Bohn's and Szews' practices of routine option exercises and stock trades by omitting a number of dates on which they made trades during and outside the proposed Class Period. *See* Exhibit B (marking transactions omitted by Plaintiffs with asterisks). Rather, *all* of Bohn's and Szews' transactions reflect regular and expected options exercises and sales that occurred in open trading window periods. *See id.*

The bulk of the trades occurred more than *three years before the "bad news" was disclosed. See* Compl. ¶ 552; Exhibit B. Leading up to the June announcement, Szews had not sold shares since September 19, 2007, a period of more than *8 months* before the "truth" was revealed – and, like all Szews' sales since May 2005, were *de minimis* to his total holdings. *See* Exhibit B; Ex. 41, 9/20/07 Szews Form 4; Ex. 41, 9/18/08 Szews Form 4 (showing no change in stock ownership between September 2007 and 2008). Even Bohn's February 19 and 20 trades (the only trades for which Plaintiffs provide *any* concrete allegations) occurred more than *two weeks after* Oshkosh's February 1 conference call (Compl. ¶¶ 455, 501), *three months after* Oshkosh closed its books for 2007 (Compl. ¶ 501) and over *four months before* the announcement of the Geesink goodwill impairment charge (Compl. ¶¶ 86, 501). *See In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) (no inference of scienter where stock sales took place twelve, four and three months before disclosure of bad news); *Guidant,* 536 F. Supp. 2d at 931 ("[O]ther transactions were made over eleven months prior to the eventual disclosure of Guidant product defect . . . ."); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 385 (E.D.N.Y. 2003) (no inference of scienter supported by sales two months prior to negative

73

disclosure); *Nursing Home Pension Fund, Ltd. v. Oracle Corp.*, 242 F. Supp. 2d 671, 685 (N.D. Cal. 2002) (no inference of scienter from sales two months prior to disclosure); *Head v. NetManage Inc.*, No. C 97-4385-CRB, 1998 U.S. Dist. LEXIS 20433, at *13 (N.D. Cal. Dec. 30, 1998) (no inference of scienter where stock sales occurred two months prior to disclosure); *Wenger*, 2 F. Supp. 2d at 1251 ("[N]one of the sales occurred at suspicious times, such as immediately before a negative announcement.").

Further, sales following the release of good news or financial success do not support an inference of scienter. *Guidant*, 536 F. Supp. 2d at 931 (plaintiffs failed to establish inference of scienter where insiders' sales "took place after the announcement of positive financial results during a window in which corporate officers typically trade"). *See Lipton*, 284 F.3d at 1037; *In re Tibco Software, Inc. Sec. Litig.*, No. C 05-2146, 2006 U.S. Dist. LEXIS 36666, at *59 (N.D. Cal. May 24, 2006); *In re FVC.COM Sec. Litig.*, 136 F. Supp. 2d 1031, 1040 (N.D. Cal. 2000), *aff'd*, 32 Fed. Appx. 338 (9th Cir. 2002). Here, Bohn's February 2008 transactions occurred during an open trading period, a few weeks after Oshkosh's first quarter 2008 earnings announcement where the Company maintained its positive outlook. Ex. 34, 2/1/08 Press Release.

*Third*, Plaintiffs have not alleged facts showing that any of Bohn's and Szews' transactions deviated from their normal practices in a way that would support an inference of scienter. Bohn and Szews periodically exercised options[28] and sold stock both before and during the Class Period. The fact that they sold more shares during the lengthy Class Period than before

---

[28] The vast majority of the "stock sales" alleged by Plaintiffs are actually option exercises. *See* Exhibit B. Accordingly, Plaintiffs' inference of scienter is further weakened because the options were an intended part of Bohn's and Szews' compensation. *See Burlington*, 114 F.3d at 1424 ("A large number of today's corporate executives are compensated in terms of stock and stock options. It follows then that these individuals will trade those securities in the normal course of events.") (citation omitted).

it is readily explainable by the fact that they had access to far fewer shares and options before the lengthy Class Period and therefore had fewer to sell.[29] In any event, Bohn's and Szews' pre-Class Period trades are sufficiently equivalent to those in the Class Period to thwart any inference of scienter. Indeed, Bohn's exercise and sale of 198,749 options before the Class Period in July 2003 were far more substantial than his exercise and sale of 133,334 options in February 2008, particularly in light of the two 2-for-1 stock splits that occurred in the interim.

In sum, none of Plaintiffs' allegations about stock sales support the required strong inference of scienter against the Individual Defendants.

### (e) Oshkosh's disclosures refute any implication of scienter.

Finally, even if Plaintiffs had alleged facts supporting an inference of scienter, those facts would be powerfully outweighed by the facts alleged that support the opposite inference. In a recent case, Chief Judge Randa held that disclosures of unfavorable information during a class period weigh against an inference of scienter. *Maiden*, 2008 WL 4643538, at *4 ("In contrast, KPMG's competing inference of non-fraudulent intent is much stronger. It is a more cogent inference because it comports with KPMG's repeated warnings about improper transactions and side agreements."). Numerous courts have held that "detailed risk disclosure . . . negates an

---

[29] The inference of no scienter is made even more powerful by the absurd length of Plaintiffs' Class Period. In a case with "an unusually long class period of sixty-three weeks" (less than one-third the length of Plaintiffs' purported Class Period), the United States Court of Appeals for the Ninth Circuit stated: "It is obvious why they have [pled such a lengthy class period]; it is not because the allegations found elsewhere in the complaint support an inference of fraud throughout the class period, but because lengthening the class period has allowed the plaintiffs to sweep as many stock sales into their totals as possible, thereby making the stock sales appear more suspicious than they would be with a shorter class period." *Vantive*, 283 F.3d at 1092. That Plaintiffs have still failed to show *any* suspicious stock transactions for Bohn or Szews or plead *any* transactions by Sagehorn makes the lack of scienter here abundantly clear.

75

inference of scienter." *Worlds of Wonder*, 35 F.3d at 1425. *See, e.g., Gaines*, 2004 WL 2538374, at *14. Indeed, with respect to cases involving impairment charges, courts have specifically declined to infer scienter where the risk of a possible impairment charge in the future was disclosed. *E.g., Wet Seal*, 518 F. Supp. 2d at 1165 ("'[T]he detailed risk disclosure . . . negate[d] an inference of scienter.'") (citation omitted); *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 578 (D. Md. 2005) ("Acterna's substantial public disclosures, which were replete with unfavorable financial information and express warnings about the possibility of writing off goodwill, do not give rise to a strong inference of intentional or reckless misconduct on the part of the individual Defendants.").

Here, as noted above, Oshkosh regularly tested Geesink's goodwill for impairment and repeatedly cautioned investors that an impairment charge could be necessary if they were unsuccessful in improving Geesink. In 2007, for example, Oshkosh warned:

> To the extent that Geesink is not able to achieve expected progress on its turnaround initiatives in fiscal 2008, the Company could be required to record a goodwill impairment charge. The range of potential charge would be based on a number of factors, including the results of the Company's cost reduction activities, the timing and results of the insourcing of fabrications to Geesink's Eastern European facility, Geesink's operating performance, competition, required future capital expenditures, interest rates and long-term growth assumptions. The Company cannot provide any assurance that future goodwill impairment tests will not result in a charge to future earnings.

Ex. 33, 11/21/07 10-K at 40. As in *Wet Seal* and *Acterna*, these disclosures negate any inference of scienter.

### 3. Plaintiffs have failed to plead scienter as to Oshkosh.

Establishing corporate liability for a violation of Rule 10b-5 requires "'look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement . . . rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.'" *Roth*, 527 F. Supp. 2d at 805 (quoting *Southland*,

76

365 F.3d at 366-67). Thus, a complaint must plead particular facts supporting a strong inference that a corporate officer, acting within the scope of his or her authority, possessed the requisite scienter. *Pugh*, 521 F.3d at 697; *Higginbotham v. Baxter Int'l, Inc.*, Nos. 04C4909, 04C7096, 2005 WL 1272271, at *7 (N.D. Ill. May 25, 2005). *See Plexus,* 2009 WL 604276, at *5; *Roth*, 527 F. Supp. 2d at 805; *Bally,* 2006 WL 3714708, at *11. Here, the Complaint fails to do this.

Because there is no cogent and compelling inference of scienter on the part of the Individual Defendants – or any other officer or agent of Oshkosh for that matter – there can be no compelling inference as to Oshkosh.

**C.     The Complaint Does Not Adequately Allege Loss Causation.**

The Complaint must also be dismissed on the independent ground that Plaintiffs have not adequately pled loss causation. In any private action under the Exchange Act, "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "The [PSLRA] thereby makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately alleged and prove the traditional elements of causation and loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). In other words, a plaintiff must show both that the "alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception." *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007). *Accord Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005) (noting "to establish loss causation, 'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered'") (citation omitted).

To plead loss causation, a plaintiff must also "'prove it is more probable than not'" that a significant amount of its loss was caused by the corrective disclosure, and not other statements.

77

*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 270-71 (5th Cir. 2007) (reversing order certifying a securities fraud class action on loss causation grounds) (quoting *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 666 (5th Cir. 2004). *See Fener v. Belo Corp.*, 560 F. Supp. 2d 502, 504 (N.D. Tex. 2008). In sum, a plaintiff must plead that, *absent the situation concealed by fraud*, its investment would not have lost value.

Here, Plaintiffs have made no attempt to meet this requirement. Indeed, in their cursory attempt to plead loss causation, Plaintiffs indicate for the first time that Oshkosh "was violating GAAP by not recording an impairment of goodwill in connection with . . . Oshkosh's acquisition of . . . *JLG*"[30] and that Oshkosh had previously "fail[ed] to disclose that *the Company's* goodwill was materially impaired since the beginning of the Class Period."[31] Compl. ¶¶ 555-556. Plaintiffs then state "[a]s a direct result of Defendants' disclosures on July [*sic*] 26, 2008, the price of Oshkosh common stock dropped precipitously . . . ." Compl. ¶ 557.

These allegations are insufficient to state loss causation. *First*, Plaintiffs have not demonstrated that the June 26, 2008 disclosures that end the Class Period corrected *any* of their purported misrepresentations or omissions. *Compare* Exhibit A *with* Ex. 38, 6/26/08 8-K. For example, there can be no doubt that Plaintiffs have not linked allegations dealing with IT integration or its history of acquiring companies to the June 26, 2008 disclosures. To the extent any of the statements Plaintiffs identify as misrepresentations or omissions *were* misrepresentations or omissions, they *remain* so.

---

[30] Oshkosh did not announce an impairment charge relating to JLG on June 26, 2008. *See* Ex. 38, 6/26/08 8-K.

[31] The Company, of course, refers to Oshkosh. *See* Compl. at 1. Oshkosh did not announce an impairment of *Oshkosh* goodwill on June 26, only an impairment of the booked goodwill value for Geesink.

78

*Second*, Defendants disclosed a number of items on June 26, 2008 and Plaintiffs have not demonstrated that the pre-announcement of Geesink's impairment, as opposed to the other items disclosed that day, caused their loss. On June 26, Oshkosh pre-announced not only the Geesink impairment charge, but also downward revisions to its earnings guidance for the third quarter and full fiscal year 2008 attributable to outside economic factors resulting in a sudden decrease in European demand for access equipment. Ex. 38, 6/26/08 Press Release at 1; Ex. 38, 6/26/08 8-K at 2; Ex. 39, 6/26/08 Trans. at 2, 5-6. Plaintiffs have not alleged any facts to support a conclusion that Oshkosh's stock price drop was driven by the impairment pre-announcement – and not the announcement of downward revisions based on numerous outside economic factors – that would ultimately result in market-wide losses.

In fact, on the conference call held that day, analysts did not ask a single question about the Geesink impairment. Rather, the call focused entirely on JLG – and how the economy was affecting its performance. Moreover, Plaintiffs' own confidential witnesses acknowledge the general "deteriorating conditions in the marketplace" and "declining market conditions." Compl. ¶¶ 88, 90. Market peers – as to whom an impairment of Geesink goodwill would have been completely irrelevant – were affected by Oshkosh's announcement of its lowered outlook. *See* Ex. 46 (6/27/08 article regarding The Tanfield Group Plc 40% share price drop). In fact, Plaintiffs cite a June 27 news article (which they incorrectly identify as June 26) quoting Charles Brady (who on the June 26 earnings call asked specific questions about JLG, *supra* 38) commenting on the announcement's significance. Compl. ¶ 495. Brady stated: 'The magnitude of (Thursday's) downward revision in access equipment's outlook is a surprise and highlights the speed at which JLG's business outlook has deteriorated." *Id.* (quoting Ex. 43, *Oshkosh shares fall on outlook: Expecting quarterly loss, truck-maker raises prices*, Milwaukee Journal Sentinel,

79

June 27, 2008). In the same article, Alexander Blanton from Ingalls & Snyder LLC commented: "The thing that was keeping them up for the year was JLG's European business. So, clearly there's a vulnerability if Europe doesn't stay strong." Ex. 43, *Oshkosh shares fall on outlook: Expecting quarterly loss, truck-maker raises prices*, Milwaukee Journal Sentinel, June 27, 2008. Because Plaintiffs have not adequately alleged loss causation, the Complaint must be dismissed.

## II. COUNT II MUST BE DISMISSED BECAUSE THE COMPLAINT DOES NOT STATE A SECTION 10(B) CLAIM FOR A FRAUDULENT SCHEME OR COURSE OF BUSINESS.

Plaintiffs' market manipulation claim under Rule 10b-5(a) and (c) also fails. "The gravamen of a market manipulation claim is that defendants' actions convey to investors, via the market (which, absent manipulation, would produce a price that fairly reflects the value of securities), a false sense of a security's value." *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, No. 06 Civ. 643 (GEL), 2007 WL 2694469, at *7 (S.D.N.Y. Sept. 13, 2007). "In other words, instead of deceiving investors by making false statements, fraudsters in market-manipulation cases deceive investors by causing the market to make their false statements for them." *Id.* (emphasis added). "'Manipulation' is 'virtually a term of art when used in connection with securities markets.' . . . 'The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting *market activity*.'" *TCS Capital Mgmt., LLC v. Apax Partners, L.P.*, No. 06-CV-13447, 2008 WL 650385, at *22 (S.D.N.Y. Mar. 7, 2008) (internal citations omitted).

If the sole basis for such a claim is alleged misrepresentations or omissions, a plaintiff has not pled a market manipulation claim under Rule 10b-5(a) and (c). *E.g., ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007) ("A market manipulation claim, however, cannot be based solely upon misrepresentation or omissions . . . . There must be some market activity . . . ."); *Lentell*, 396 F.3d at 177; *In re Recoton Corp. Sec. Litig.*, 358 F. Supp. 2d

80

1130, 1138 n.4 (M.D. Fla. 2005) ("Plaintiffs base their claims on alleged misrepresentations and omissions and make no attempt to cast the claims in terms of market manipulation pursuant to Rule 10b-5(a) and (c)."). There must be some market activity. *TCS*, 2008 WL 650385, at *22. For example, in *TCS*, the "'deception'" was the alleged failure to disclose deal-terms – which the court concluded was "nothing more than a reiteration of the misrepresentations and omissions that underlie plaintiffs [*sic*] disclosure claim." *Id.*

Here, Plaintiffs' claims are no different. Their Rule 10b-5(a) and (c) claim is inextricably intertwined with their Rule 10b-5(b) misstatement and omission claim. Plaintiffs' Rule 10b-5(a) and (c) claim alleges that "Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the knowing and/or deliberately reckless *suppression and concealment of information* regarding the impairment of goodwill with respect to the Company's acquisition of Geesink and JLG . . . that rendered *Defendants' statements* regarding earnings guidance throughout the Class Period, each *materially false and misleading when made.*" Compl. ¶ 572 (emphasis added). *See also* Compl. ¶ 28 ("The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct, which operated as a fraud or deceit on purchasers of Oshkosh common stock *by disseminating materially false and misleading statements and/or concealing material adverse facts.*") (emphasis added); Compl. ¶ 555 ("Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of Oshkosh common stock and operated as a fraud or deceit . . . by *failing to disclose that the Company was violating GAAP by not recording an impairment of goodwill in connection with the assets acquired as part of Oshkosh's acquisitions of Geesink and JLG and, therefore materially overstating the Company's earnings, income, goodwill and assets . . . .*") (emphasis added). Accordingly, Count II of the Complaint must be dismissed.

81

## III. COUNT III MUST BE DISMISSED BECAUSE THE COMPLAINT DOES NOT STATE A SECTION 20(A) CLAIM.

The Complaint does not sufficiently allege a Section 20(a) "control person" claim against the Individual Defendants. An essential predicate to a claim for control person liability is that the plaintiff first state a primary violation of the securities laws against a defendant. *Southland*, 365 F.3d at 383 ("Control person liability is secondary only and cannot exist in the absence of a primary violation."). Because, as discussed above, Plaintiffs fail to state an underlying 10(b) claim, their "control person" claims against Bohn, Szews and Sagehorn must also be dismissed. *See, e.g., Pugh*, 521 F.3d at 693, 698; *Stark*, 2008 WL 153542, at *19; *Guidant*, 536 F. Supp. 2d at 933; *Roth*, 527 F. Supp. 2d at 806; *Friedman*, 291 F. Supp. 2d at 845.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss should be granted, and the Complaint should be dismissed with prejudice.

Edward P. Welch
Robert S. Saunders
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: 302-651-3000
Fax: 302-651-3001
edward.welch@skadden.com
rob.saunders@skadden.com

s/ Daniel T. Flaherty
Daniel T. Flaherty, Bar No. 1011357
GODFREY & KAHN, S.C.
100 West Lawrence Street
Appleton, Wisconsin 54911
Telephone: 920-830-2800
Fax: 920-830-3530
dflahert@gklaw.com

*Attorneys for Defendants Oshkosh Corporation, Robert G. Bohn, Charles L. Szews, and David M. Sagehorn*

DATED: July 24, 2009