**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION**

IRON WORKERS LOCAL
NO. 25 PENSION FUND, et al.,

        **Plaintiffs,**                **Case No. 2:08-cv-0797**

    **vs.**                         **Hon. William C. Greisbach**

OSHKOSH CORPORATION, et al.,

        **Defendants.**

---

**MEMORANDUM IN SUPPORT OF
DELOITTE & TOUCHE LLP'S MOTION TO DISMISS**

---

<u>**Preliminary Statement**</u>

Plaintiffs in this lawsuit allege that, from 2003 through mid-2008, Oshkosh Corporation ("Oshkosh") and its top executives fraudulently concealed that the goodwill associated with one of Oshkosh's many subsidiaries, Geesink Norba Group ("Geesink"), had lost value under applicable accounting rules and needed to be written off.  Plaintiffs further allege that when Oshkosh did announce the Geesink writeoff on June 26, 2008, it caused Oshkosh's stock price to decline, and they now bring this putative securities fraud class action to recover their losses.  Not content to stop there, Plaintiffs also name Oshkosh's independent auditor, Deloitte & Touche LLP ("D&T"), as a defendant.  The allegations regarding D&T are scant: The less than 15 pages of the 192-page amended complaint that discuss D&T are mostly summaries and block quotations of various accounting and auditing rules, and of language from the D&T audit reports that accompanied Oshkosh's financial statements.

The allegations in Plaintiffs' amended complaint simply do not create a coherent inference of fraud. The amended complaint concedes that in the years prior to writing off the Geesink goodwill Oshkosh disclosed reams of negative information about Geesink's performance, including that Geesink had negative operating income in 12 of 18 quarters during the putative class period. Oshkosh also disclosed multiple times that it was concerned that Geesink's goodwill might be impaired. These are not the actions of a party attempting to hide Geesink's poor performance.

The allegations against D&T are even more implausible. The amended complaint is wholly bereft of *any* particularized factual allegations regarding actions taken by D&T—the who, what, where, when, and how that the Seventh Circuit requires of allegations in securities fraud cases. There are no allegations concerning how D&T tested Oshkosh's accounting for Geesink's goodwill. There are no allegations explaining how D&T purportedly reached the wrong answer regarding those tests. There are no allegations explaining why this Court should infer that, if D&T reached the wrong answer, it did so fraudulently, as opposed to mistakenly.

Consequently, Plaintiffs' allegations are insufficient to state a claim against D&T because they fail to satisfy the strict pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). If these allegations are sufficient under the PSLRA and Rule 9(b), then auditors are, in effect, insurers of the public stock market, for every time a stock price sags because a company experiences a negative business event, a complaint against an auditor would need to assert no more than a bald conclusion that the disclosure should have occurred earlier, or that the auditor should have performed a more thorough audit. Such a result would be unfaithful to both the letter and intent of the PSLRA, which Congress expressly enacted to prevent facile pleading of fraud claims

against deep-pocket public accounting firms. Thus, Plaintiffs' claims against D&T should be dismissed.

**Background**

**A.      Accounting for and Auditing Goodwill**

The amended complaint alleges that Oshkosh overstated its financial results by concealing that the "goodwill" on its books related to Geesink was "impaired" and had to be written off under Statement of Financial Accounting Standards No. 142 ("FAS 142"). Am. Compl., ¶¶ 1–5 (Docket #83). Remarkably, although Plaintiffs repeatedly invoke FAS 142,[1] the amended complaint neglects to explain how companies like Oshkosh must account for goodwill.

As defined in FAS 142, "goodwill" is an intangible asset that represents the amount paid for a business (here, Geesink itself) over and above the value of the actual assets acquired and liabilities assumed. *See* FAS 142 at Appendix F1, p. 105 (Attached as Ex. 1).[2] FAS 142 requires that, at least annually, companies analyze the goodwill of their businesses to evaluate whether any impairment exists. *Id.* ¶ 26. This impairment analysis is a two-step process: First, the company must determine whether "the fair value" of the business it purchased exceeds the carrying value of that business (including goodwill) on its books. *Id.* ¶ 19. If the fair value exceeds the carrying value, there is no impairment. *Id.* However, if the fair value of the business is less than the carrying value (again, including goodwill), a second step is necessary. In this

---

[1] *E.g.*, ¶¶ 5, 69, 121, 184, 259, 335, 435, 488, 532.

[2] As the amended complaint concedes, FAS 142 was issued in June 2001, and it prescribed the method by which Oshkosh accounted for the Geesink goodwill at all times relevant to this lawsuit. *See* Am. Compl., ¶ 69. This Court can take judicial notice of applicable accounting and auditing rules such as FAS 142. *See, e.g., In re Charles Schwab Corp. Securities Litigation*, __ F.R.D. __, 2009 WL 262456, *23 n.18 (N.D. Cal. 2009) (taking notice of accounting procedures); *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080-81 (7th Cir. 1997) (holding that courts can take judicial notice of matters of public record).

second step, the company "compares the implied fair value of [the business's] goodwill with the carrying amount of that goodwill." *Id*. ¶ 20. The "implied fair value" of the goodwill is determined by allocating the current fair value of the purchased business over all of its assets and liabilities; any amount left over is the implied fair value of the goodwill. *Id*. ¶ 21. Only when the implied fair value of the goodwill is less than its carrying value must the company declare it impaired and write off the difference. *Id*. ¶ 20.

Critical to any FAS 142 analysis, then, is a determination of the "fair value" of the specific business unit at issue. But FAS 142 recognizes that often there is not an easy way to measure fair value, and that "[a] present value technique is often the best available technique with which to estimate the fair value of a group of net assets (such as a reporting unit)." FAS 142, ¶ 24. A present value technique, in turn, relies on "estimates of future cash flows" that incorporate a company's "own assumptions" about its future business prospects. *Id.* Thus, FAS 142 not only requires that a specific process be followed to evaluate whether a goodwill writedown is necessary, but that process typically incorporates assumptions and predictions about future performance, making it highly judgmental.

An independent auditor, of course, does not perform the FAS 142 analysis, but merely performs audit tests of its client's analysis and conclusions. The amended complaint correctly notes that this audit testing is governed in part by the auditing standards codified at AU §328, entitled "Auditing Fair Value Measurements and Disclosures." *See* Am. Compl., ¶¶ 519–20. AU §328 provides that a company's "[m]anagement"—not its independent auditor—"is responsible for making the fair value measurements and disclosures included in the financial statements." *See* AU §328.04 (Attached at Ex. 2). The auditor, on the other hand, obtains "reasonable assurance that fair value measurements and disclosures are in conformity with

4

GAAP."[3]  *Id.* at ¶ .03.  Moreover, AU §328 cautions that "[f]air value measurements for which observable market prices are not available are inherently imprecise.  That is because, among other things, those fair value measurements may be based on assumptions about future conditions, transactions, or events whose outcome is uncertain and will therefore be subject to change over time."  *Id.* at ¶ .05.  As a result, "[t]he auditor is not responsible for predicting future conditions, transactions, or events that, had they been known at the time of the audit, may have had a significant effect on management's actions or management's assumptions underlying the fair value measurements and disclosures."  *Id.*

**B.  Oshkosh's Geesink Acquisition and Subsequent Goodwill Writedown**

Oshkosh acquired Geesink in July 2001 for $137.6 million.  Am. Compl., ¶ 62.  By any measure, Geesink was always a small part of Oshkosh's operations, and it became a progressively *smaller* part of the overall company as Oshkosh grew over time.  Thus, compared to the purchase price for Geesink ($137.6 million) and the ultimate $167.4 million writeoff of Geesink's goodwill in June 2008 (*see id.* ¶ 496), Oshkosh reported total goodwill and assets in each year as follows:

| **Year** | **Total Oshkosh Goodwill** | **Total Oshkosh Assets** |
|---|---|---|
| 2004 (Am. Compl. ¶ 174) | $385 million | $1.45 billion |
| 2005 (*Id.* ¶ 248) | $399.8 million | $1.71 billion |
| 2006 (*Id.* ¶ 326) | $558.7 million | $2.1 billion |
| 2007 (*Id.* ¶ 423) | $2.43 billion | $6.4 billion |

---

[3] "GAAP" stands for generally accepted accounting principles.

5

Likewise, Geesink's contribution (or negative contribution, as was most often the case) to Oshkosh's operating income was minor, as the following chart comparing Geesink's operating income to Oshkosh's overall operating income shows:

| Year | Geesink Operating Income | Oshkosh Operating Income |
|---|---|---|
| 2004 (*Id.* ¶¶ 92, 174) | ($1.8 million) | $180.4 million |
| 2005 (*Id.* ¶¶ 92, 248) | ($8.6 million) | $267.2 million |
| 2006 (*Id.* ¶¶ 92, 326) | $2.9 million | $326 million |
| 2007 (*Id.* ¶¶ 92, 423) | $(19.3 million) | $590.3 million |

Although Geesink was only a small part of Oshkosh's overall operations, Plaintiffs do not and cannot credibly allege that Oshkosh and its senior executives hid Geesink's poor performance from its investors. By Plaintiffs' own account, Oshkosh disclosed in each quarter during the putative class period Geesink's operating income. And, in 12 of 18 quarters, Oshkosh disclosed that Geesink had *negative* operating income. Am. Compl., ¶ 92. Indeed, using the numbers cited in the amended complaint, Oshkosh disclosed that Geesink's total operating income during this time was *negative* $40.8 million. *Id.*

Throughout this period, Oshkosh and its executives made clear that they were attempting to improve Geesink's performance and, according to the amended complaint, were open with Oshkosh's investors about both their disappointment in Geesink's performance and their optimism for Geesink's future. For instance, in 2004, Oshkosh "highlighted the lack of demand for Geesink products in Europe and the adverse impact on sales." Am. Compl., ¶ 135. Further, in the third quarter of 2007, Oshkosh's CEO and Chairman of the Board said on an earnings call with analysts and investors: "Our struggles [with Geesink] have been disappointing, but the more we dig into the issues, the more we believe the business can be successful with some facility

6

rationalization and proper leadership." *Id*. ¶ 390 (brackets in original). Similarly, one quarter later, Oshkosh's CEO and chairman said that Geesink "is a business that has underperformed way too long and caused a decline in this segment's operating income in a year when the rest of the segment showed solid improvement." *Id*. ¶ 416. Thus, although Oshkosh was attempting to turnaround Geesink's performance and its executives remained optimistic, its investors were apprised of both the optimism for the future as well as Geesink's disappointing actual results.

Even more importantly, in addition to disclosing the negative facts about Geesink's performance, Oshkosh repeatedly disclosed to investors that its was concerned about a possible impairment of Geesink's goodwill. For instance, Plaintiffs concede that, at the end of 2004, Oshkosh not only disclosed the operating losses at Geesink, but also specifically disclosed that Oshkosh "considered the operating loss at Geesink to be an indicator of a potential impairment of the $132.6 million in goodwill it recorded for that acquisition." Am. Compl., ¶ 179. Moreover, although FAS 142 only requires that impairment analyses be performed yearly unless events occur during the year that might suggest an impairment, Oshkosh disclosed in the first quarter of 2005 that it had performed "another goodwill impairment review" of Geesink—one that would not have occurred unless there was a reason to do it. *Id*. ¶ 200. Two quarters later, in third quarter of 2005, Oshkosh disclosed that it would "look at [the Geesink impairment] every quarter right now." *Id*. ¶ 231.

Although Geesink's performance improved in 2006 before declining again in 2007 (*see supra* at 6), Oshkosh remained candid about its frequent impairment reviews for Geesink. Indeed, according to the amended complaint, Oshkosh announced at the close of 2006 that, in the fourth quarter of that year, Geesink operated at a loss and also that it experienced "a decrease in orders in the United Kingdom and France." Am. Compl., ¶ 332. Oshkosh then specifically

7

disclosed that this created an impairment concern: "As a result of this loss and decrease in backlog, the Company continued to monitor whether an impairment of the Geesink Norba Group goodwill had occurred." *Id*. As Geesink's performance continued to decline, Plaintiffs admit that Oshkosh continued to update investors quarterly regarding the results of the Company's impairment analyses. *Id*. ¶ 401 (explaining results from second and third quarter 2007 analyses).

Significantly, Oshkosh did not perform its impairment analyses alone. Instead, Plaintiffs allege that Oshkosh "engaged third-party business appraisers to assist in the valuation of intangible assets in connection with the Company's larger acquisitions, including Geesink." Am. Compl., ¶ 252 (internal quotation marks omitted). Notably, Plaintiffs do not allege that any such third-party appraiser concluded that an impairment should have been taken prior to June 2008.

On June 26, 2008, Oshkosh announced that, despite its best efforts, it had determined that because of the "slower and more difficult than expected return to profitability" for Geesink, "coupled with expectation of a weaker European economy and higher raw materials costs," FAS 142 necessitated a writeoff of Geesink's goodwill. Am. Compl., ¶ 492. Plaintiffs allege that, as a result of this announcement, the price of Oshkosh's stock dropped $11 per share, *id*. ¶ 557, but they neglect to mention that in the same June 26, 2008 announcement, Oshkosh also announced negative news having no relation to Geesink, including "[l]ower than expected sales in both North American and Europe driven by softness in non-residential construction and general economic weakness, and rising raw material and fuel costs"; "weaker performance expectations compared with previous estimates for, most notably, the Company's access equipment segment and, to a lesser extent, its fire & emergency and commercial segments"; and an expectation "that fourth fiscal quarter EPS will be below prior year's levels." 6/26/2008 Oshkosh Press Release (Attached as Ex. 3).

## C.       The Amended Complaint

Plaintiffs' amended complaint seizes on Oshkosh's announcement of the Geesink goodwill writeoff and alleges that it should have been recorded earlier. Although Plaintiffs do not allege a specific date on which the impairment should have been recognized, they do contend that it "should have been taken at least four and a half years earlier than it was." Am. Compl., ¶ 75.

The amended complaint's allegations against Oshkosh and its executives span 163 pages and more than 500 paragraphs. *See* Am. Compl., ¶¶ 1–502. These allegations consist principally of quotations from the Company's and officers' public statements indicating that Geesink was not performing well, but that they were working to improve it. Nowhere in these allegations against the Company and the individual defendants is there any attempt to re-perform a FAS 142 analysis for the Geesink goodwill as it allegedly should have been done. Indeed, nowhere in the amended complaint is there any allegation of what the results of such an analysis would have been. Nowhere in the amended complaint is there any allegation that anyone at Oshkosh actually concluded that Geesink's goodwill was impaired prior to June 26, 2008. Instead, Plaintiffs simply assert the conclusion that FAS 142 required Oshkosh to record the Geesink impairment at an earlier date because (1) Geesink was losing money at some of these earlier dates, and (2) Oshkosh eventually did recognize such an impairment.

In sharp contrast to Plaintiffs' allegations against Oshkosh and its senior executives, Plaintiffs' allegations against D&T occupy less than 15 pages and less than 50 paragraphs. Am. Compl., ¶¶ 503–549. Moreover, the allegations against D&T are comprised almost entirely of block quotations and summaries of various accounting and auditing standards, and of the four D&T audit reports that Oshkosh filed as attachments to its audited financial statements.

9

Significantly, the amended complaint does not contain a single non-conclusory allegation concerning *any* audit step taken by D&T or how the audit step was performed outside of applicable professional standards, let alone any allegation regarding how D&T performed audit tests of Oshkosh's FAS 142 analyses, why D&T arrived at the wrong result, and why its arrival at that wrong result was the result of fraud. Instead, Plaintiffs rely only on conclusory allegations, and even those conclusory allegations are belied by more specific allegations elsewhere in the amended complaint. For instance, Plaintiffs allege that in auditing the Geesink's goodwill, D&T "failed to consider the fact that the business segment consistently generated operating losses quarter after quarter despite management assumptions that the business would be profitable in the next year." Am. Compl., ¶ 522. But these operating losses that D&T supposedly ignored are the very same operating losses disclosed in the Oshkosh financial statements that D&T audited. Likewise, Plaintiffs allege the conclusion that "D&T failed" to "test goodwill at Geesink" during its audits of Oshkosh. *Id.* ¶ 532. But elsewhere in the amended complaint, one of Plaintiffs' own confidential witnesses confirms that "D&T participated" in "the goodwill impairment reviews for Geesink." *Id.* ¶ 86. These conclusory and contradictory allegations fail to state a claim against D&T for securities fraud.

## Argument

Plaintiffs purport to state a claim against D&T under §10(b) of the Securities Exchange Act of 1934 and the SEC regulations implementing it. *See* 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5. To state such a claim, Plaintiffs must allege that D&T (1) made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) upon which Plaintiffs relied; (5) that caused Plaintiffs' economic loss; and (6) is causally connected to the material misrepresentation. *See Dura Phamaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).

The pleading requirements for securities fraud are articulated in Federal Rule of Civil Procedure 9(b) and in the PSLRA. The passage of the PSLRA was "prompted by significant evidence of abuse in private securities lawsuits," as the Joint Committee Report of the Senate and House of Representatives explained when Congress passed the legislation. H.R. Conf. Rep. 104-369, 1995 U.S.C.C.A.N. 730, *31. These abuses included "the targeting of deep pockets, including accountants … without regard to their actual culpability." *Id. See also Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 320 (2007) (explaining that the PSLRA was "[d]esigned to curb perceived abuses of the §10(b) private action—'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers'"). Congress responded to these abuses by heightening the pleading requirements for securities claims, noting along the way that even Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled with particularity "ha[d] not prevented abuse of the securities laws by private litigants." H.R. Conf. Rep. 104-369 at *41. In short, Congress intended the PSLRA to require a real change in the specificity of the allegations necessary to sustain a securities fraud claim.

The amended complaint here does not pass muster. Plaintiffs allege that D&T issued four "false" statements—its audit reports attached to Oshkosh's annual financial statements for 2004, 2005, 2006, and 2007.[4] *See* Am. Compl., ¶ 506. Here, the amended complaint does not

---

[4] Audit reports are generally the only output of an audit. *See* AU §110.01 (Attached as Ex. 4). They typically are a page or less in length. An "unqualified" audit report states that the auditor's audit complied with generally accepted auditing standards and that, in the auditor's opinion, the financial statements that were audited comply in all material respects with generally accepted accounting principles. *Id*. D&T's 2004 through 2007 audit reports are the *only* public statements D&T made regarding Oshkosh during the class period, other than the audit report for Oshkosh's 2003 financial statements, which Plaintiffs concede is outside the limitations period. *See* Am. Compl., ¶ 506.

Case 2:08-cv-00797-WCG   Filed 07/24/09   Page 11 of 26   Document 97

adequately allege that any of D&T's audit reports was false or that D&T made any misstatement with scienter. As a result, Plaintiffs' claims against D&T should be dismissed with prejudice.[5]

I. **The Complaint Fails To State A Claim Because It Does Not Adequately Allege That D&T Made A False Statement.**

Federal Rule of Civil Procedure 9(b) "requires plaintiffs to plead 'with particularity' any 'circumstances constituting fraud.'" *Robin v. Arthur Young & Co.*, 915 F.2d 1120, 1127 (7th Cir. 1990). "This means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). Additionally, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading," as well as "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1).

Where, as here, a plaintiff claims that an impairment charge should have been recorded earlier, it is insufficient to allege merely that a writedown was eventually recorded. *See, e.g., Acito v. Imcera Group, Inc.*, 47 F.3d 47, 53 (2nd Cir. 1995) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."); *Kriendler v. Chemical Waste Management, Inc.*, 877 F. Supp. 1140, 1149 (N.D. Ill. 1995) ("Thus, the Plaintiffs in this case may not simply proffer the fact that CHW's financial

---

[5] This memorandum does not address the amended complaint's allegations regarding Oshkosh's acquisition of JLG, because Plaintiffs do not allege that they suffered any injury arising from the writedown of JLG's goodwill. *See* Am. Compl., ¶¶ 555-58. Although the amended complaint does not say so, the reason for the absence of loss causation allegations regarding JLG is apparent: When Oshkosh announced the writedown of the JLG goodwill on May 4, 2009, its stock price rose, starting at $10.10 on May 1 to $10.92 on May 4 to $11.46 on May 5. *See Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008) ("We may take judicial notice of documents in the public record, including publicly reported stock prices, without converting a motion to dismiss into a motion for summary judgment."). As a result, Plaintiffs' allegations regarding JLG should be read as nothing more than an attempt to prejudice the Court, and they do so by omitting the most pertinent facts.

results in July 1993 differed from the earlier-offered projections."); *In re Serologicals Securities Litigation*, 2003 WL 24033694, *12 (N.D. Ga. 2003) ("Timing, alone, cannot support an inference of fraud."); *Amalgamated Bank v. The Coca-Cola Co.*, 2006 WL 2818973, *16 (N.D. Ga. 2006) (similar).

Rather, "[t]he standard is whether the need to write-down the [asset] was 'so apparent' to [the company] before the announcement, that a failure to take an earlier write-down amounts to fraud." *Kriendler*, 877 F. Supp. at 1154. *See also Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 410 (S.D.N.Y. 2007) (same); *In re Serologicals*, 2003 WL 24033694 at *12 (same). To pass this test, "the Complaint must provide *detail* as to *why* an impairment was required under then-existing accounting rules." *In re Mirant Corp. Securities Litigation*, 2009 WL 48188, *22 (N.D. Ga. 2009) (emphasis added). "[T]he Complaint must, for example, detail how the results of an impairment test were reported fraudulently in the company's financial disclosures, or how impairment testing would have necessarily required a recognition of an impairment." *Id.* Absent such detail, there is simply no support for a conclusory allegation of fraud.

Notably, the Seventh Circuit considered a lawsuit alleging a failure to writedown assets in *DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990). There, the assets in question were loans held by a bank, and the plaintiffs brought a securities fraud lawsuit against the bank's auditor, alleging that the auditor should have concluded that the loans were impaired sooner. The Seventh Circuit held that the complaint lacked the specificity necessary to support a claim of fraud because it did not "explain how [E&Y] did or should have recognized that the provisions for reserves established by Continental's loan officers were inaccurate." *Id.* at 626. Moreover, that the bank ultimately wrote down the value of the loans was insufficient to state a claim:

> "For any bad loan the time comes when the debtor's failure is so plain that the loan is written down or written off. No matter when a bank does this, someone

may say that it should have acted sooner. If all that is involved is a dispute about the timing of the writeoff, based on estimates of probability that a particular debtor will pay, we do not have fraud; we may not even have negligence. Recklessness or fraud in making loans is not the same as fraud in discovering and revealing that the portfolio has turned sour."

*Id*. at 627. Thus, the Seventh Circuit concluded that the *DiLeo* plaintiffs had not sufficiently alleged that the writedown should have occurred earlier: "You cannot tell from reading [the complaint] why the DiLeos believe that the problems were so apparent that reserves should have been jacked up before the end of 1983—*why* failure to increase the reserves amounted to 'fraud.'" *Id*. at 627 (emphasis added). As a result, the Court affirmed the dismissal for failure to state a claim.

*DiLeo* is indistinguishable from Plaintiffs' allegations here. As in *DiLeo*, Plaintiffs here allege that a writedown ultimately occurred and say it should have occurred earlier, but do no more. The amended complaint does not allege how a FAS 142 impairment analysis of Geesink's goodwill should have come out at any time earlier than June 2008, let alone how it should have come out as of each of the four specific dates as to which Plaintiffs assert claims against D&T. As explained above, FAS 142 requires a technical and judgmental analysis in order to analyze whether the goodwill associated with an asset like Geesink is impaired. AU §328, in turn, makes clear that such an analysis is "inherently imprecise" and "uncertain." Consequently, it is too superficial simply to point to Geesink's poor performance prior to June 2008 and then assert the bald conclusion that a writedown must have been necessary. FAS 142 requires a far more complex analysis—one that Plaintiffs wholly ignore in the amended complaint—and AU §328 explains the inherent limitations of an auditor's work in evaluating a company's analysis.

In short, Plaintiffs have failed to state a claim because they do not allege the required factual details suggesting that the Geesink goodwill should have been written down earlier than it

14

was, or that D&T's audit reports regarding Oshkosh's financial statements were somehow fraudulent.

## II. The Complaint Fails To State A Claim Because It Does Not Allege That D&T Acted With Scienter.

In addition to alleging that D&T issued a false statement (which they do not), Plaintiffs must allege, with particularity, facts (as opposed to conclusions) giving rise to a strong inference that D&T acted with scienter. *See* 15 U.S.C. §78u-4(b)(2). This "strong inference" of scienter, as the Supreme Court has recently explained, must be "cogent *and* at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 314 (2007) (emphasis added). The evaluation of Plaintiffs' scienter allegations, then, involves a two-step process: "first the inference must be cogent, and second it must be as cogent as the opposing inference." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 705 (7th Cir. 2008).

The Supreme Court defines scienter as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976), quoted and reaffirmed in *Tellabs*, 551 U.S. at 319. In certain circumstances, reckless disregard of the truth can satisfy the scienter requirement. *See SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998). However, the Seventh Circuit has defined reckless disregard as "highly unreasonable [conduct] … which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989). "[B]are allegations that [the defendant] should have known or that its knowledge was due to a reckless disregard of the truth are not sufficient to turn a possible negligence or malpractice action into an action for securities fraud." *Robin v. Arthur*

15

*Young & Co.*, 915 F.2d 1120, 1127 (7th Cir. 1990). As a result, this Court has recognized that stating a fraud claim against an auditor is (and should be) particularly difficult to do:

> [A]s applied to an outside auditor, recklessness means that the accounting firm practices amounted to no audit at all, or to an egregious refusal to see the obvious; or to investigate the doubtful, or that the accounting judgments that were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts. Red flags indicating scienter are "specific, highly suspicious facts and circumstances available to the auditor *at the time of the audit.*" Allegations that an auditor had a motive to commit fraud simply because it stood to collect auditing fees is insufficient. Finally, allegations that defendant violated GAAS or GAAP, standing along, are usually insufficient to support an inference of scienter.

*Lewis v. Straka*, No. 05-C-1008, 2006 WL 2927658, at \*10 (E.D. Wis. Oct. 12, 2006) (Adelman, J.) (emphasis in original).

In this case, Plaintiffs do not identify, much less allege with particularly, *any* facts creating a "strong inference" that D&T acted with the requisite fraudulent intent. Indeed, the amended complaint fails to allege any specific actions by D&T at all. Instead, it merely makes conclusory assertions that Geesink's *publicly-disclosed* poor performance prior to June 2008, along with Oshkosh's eventual writeoff of Geesink's goodwill in June 2008, mean that D&T should have concluded sooner that a writeoff was required. This is not enough to satisfy PSLRA's heightened pleading requirements for alleging scienter, as explicated by the Supreme Court in *Tellabs*.

### A. Plaintiffs' Conclusory Allegations Do Not Create A "Cogent" Inference That D&T Acted With Scienter.

Pleading a "cogent" inference of scienter is difficult in accounting cases, because the accounting rules "tolerate a range of reasonable treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. Commissioner of Internal Revenue*, 439 U.S. 522, 544 (1979). This is particularly true for goodwill impairment analyses, because, as explained above, FAS 142's two-step process relies heavily on a company's estimates and

assumptions about the *future* performance of the business unit at issue. By definition, then, FAS 142 analyses are a judgmental undertaking: "When the impairments became so severe as to require specific accounting charges, and whether the requirements of the accounting principles were satisfied, necessarily involves issues of judgment." *In re Loral Space & Communications Ltd. Securities Litigation*, 2004 WL 376442, *17 (S.D.N.Y. 2004).

Here, Plaintiffs do not plead facts sufficient to create a cogent inference of scienter. By Plaintiffs' own account, Oshkosh's executives were open with investors about the poor results for Geesink that were reported in almost every quarter during the putative class period, as well as about their concurrent belief that they would turn Geesink's performance around. That management's optimism was ultimately unsuccessful cannot be the basis for scienter: "Simply because hindsight shows that [a company's] optimism was an error in judgment does not mean that fraud was committed." *Kriendler v. Chemical Waste Management, Inc.*, 877 F. Supp. 1140, 1154 (N.D. Ill. 1995). Rather, Plaintiffs must allege with particularity that Oshkosh's "estimates of income from the assets in question … were less than their carrying value, or that [the Company's] estimates were unfounded." *In re Wet Seals, Inc. Securities Litigation*, 518 F. Supp. 2d 1148, 1162 (C.D. Cal. 2007). Plaintiffs then must allege *facts* that, if proved, would create a strong inference that *D&T* knew, or was at least reckless in not knowing, that this was true.

Plaintiffs do not do this. Even if Plaintiffs somehow sufficiently alleged that D&T's audit tests of Geesink's goodwill reached incorrect conclusions (which they did not), the amended complaint contains no allegations of fact showing that D&T intentionally or recklessly reached those conclusions. Instead, the amended complaint offers the same "bare allegations" that D&T "should have known" and that "its knowledge was due to reckless disregard of the truth" that the Seventh Circuit firmly rejected in *Robin*. 915 F.2d at 1127. *See also In re*

*Northfield Laboratories, Inc. Securities Litigation*, 527 F. Supp. 2d 769, 790 (N.D. Ill. 2007) ("Because of the heightened pleading requirements of the PSLRA, it is not enough simply to allege that defendants knew the results of the ANH trial. Rather, plaintiffs must plead with particularity *facts* that give a strong inference that they knew.") (emphasis added). Stated bluntly, Plaintiffs have failed completely to allege facts creating *any* inference of fraud, much less the required strong inference.

This is particularly true because Oshkosh disclosed throughout the class period that Geesink was not performing well. It simply makes no sense—it is not a "cogent" inference— that Oshkosh perpetrated a fraud to cover up the sinking value of Geesink, but did so by disclosing in 12 of 18 quarters that Geesink had negative operating income. It is doubly dubious to extend any such inference to D&T, as to which *no* allegations suggest an awareness that the optimism Oshkosh expressed about Geesink's turnaround was inconsistent with the performance numbers that were disclosed simultaneously. Plaintiffs' suggestion that they have alleged enough to create a cogent inference of scienter is all the more outrageous given the allegations in the amended complaint acknowledging that Oshkosh disclosed not only that it was performing more frequent FAS 142 analyses than required—which at the very least hints that it was concerned that Geesink's goodwill might be impaired—but actually disclosed explicitly at various points along the way that it was concerned about a potential Geesink impairment because of Geesink's negative performance. Plaintiffs offer no explanation why a company trying to conceal impaired goodwill would draw investors' attention to its concern that an impairment might be present, or why a company would perform more frequent FAS 142 analyses than necessary if it only wanted to conceal the outcome. And it simply defies any cogent theory of

fraud that Oshkosh would have hired "third-party business appraisers" to assist in its FAS 142 analysis if it only wanted to reach inaccurate results or to conceal the honest results.

*In re Loral Space & Communications* is instructive on these points. There, the plaintiffs brought a securities fraud suit alleging that Loral should have written down the value of Globalstar, a company it partially owned, because of poor performance. 2004 WL 376442, *3 (S.D.N.Y. 2004). The defendants challenged the sufficiency of the plaintiffs' scienter pleadings. The defendants pointed out that, during the time that the plaintiffs alleged Globalstar should have been written down, Loral disclosed that Globalstar had performed poorly, attracting less subscribers to its satellite telephone network than Loral had hoped. *Id*. at *9. Much like Oshkosh here, Loral admitted that Globalstar's performance was "a little bit slower than we had hoped," but that Loral was "hopeful that we'll be able to recover." *Id*. The Court dismissed the lawsuit. It reasoned that "plaintiffs have failed to allege sufficient facts to show that the failure to take an earlier impairment charge was so clearly required by accounting principles that the failure to take such a charge was fraudulent, *particularly in view of the disclosures of the ongoing poor performance of Globalstar*." *Id*. at *17 (emphasis added).

What was true in *Loral Space & Communication* is true here as well. It is no longer sufficient for securities plaintiffs to simply launch a raft of conflicting allegations, hoping that some will find their mark and the others will be ignored. Rather, the particularized allegations *as a whole* must tell a coherent—a "cogent"—story. Here, Oshkosh's frequent disclosures of Geesink's poor operating performance belie any inference that either Oshkosh or D&T were covering up Geesink's difficulties. As a result, this case does not add up even to the familiar securities fraud story referenced by the Seventh Circuit in *DiLeo*, where a company "bathes itself in a favorable light" and only "[l]ater … discloses that things are less rosy." *DiLeo*, 901 F.2d at

627. Rather, this is a situation where Plaintiffs do not even allege that Oshkosh was less than candid about Geesink's poor performance each period, but contend only that its optimism about a future turnaround was misplaced. This, along with the paucity of factual allegations concerning D&T, makes it impossible to conclude that Plaintiffs have satisfied even the first step in the *Tellabs* analysis by establishing a cogent inference that D&T acted with scienter.

## B.    The Professional Fees Earned By D&T Are Insufficient To Show Scienter.

Plaintiffs do claim that D&T had a "profitable relationship" with Oshkosh, but this allegation does not establish scienter either. *See* Am. Compl. ¶ 535. Numerous courts have rejected the contention that the receipt of fees for accounting services is tantamount to scienter. *See, e.g., Robin v. Arthur Young & Co.*, 915 F.2d 1120, 1127 (7th Cir. 1990) (auditor's receipt of professional fees "not sufficient to support an inference of scienter").[6] Courts recognize that major accounting firms such as D&T generally want to maintain profitable client relationships, and that this understandable desire is hardly indicative of fraud. *See, e.g., Fidel v. Farley*, 392 F.3d 220, 233 (6th Cir. 2004). Indeed, the Seventh Circuit has held that it is *irrational* to infer that a major accounting firm would join a client's fraud in order to preserve fees: "An accountant's greatest asset is its reputation for honesty, followed closely by its reputation for careful work. Fees for two years' audits could not approach the losses [the auditor] would suffer from a perception that it would muffle a client's fraud." *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (1990). Thus, Plaintiffs' only motive allegation is not "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

[6] *See also, Fidel v. Farley*, 392 F.3d 220, 232 (6th Cir. 2004), *Melder v. Morris*, 27 F.3d 1097, 1103 (5th Cir. 1994); *In re Ikon Office Solutions, Inc. Securities Litigation*, 66 F. Supp. 2d 622, 628 (E.D. Pa. 1999); *Queen Uno L.P. v. Cour d'Alene Mines Corp*, 2 F. Supp. 2d 1345, 1360 (D. Colo. 1998); *Zucker v. Saski*, 963 F. Supp. 301, 308 (S.D.N.Y. 1997); *Geinko v. Padda*, 2001 WL 1163728 at *8 (N.D. Ill., Sept. 28, 2001).

## C. The Most Compelling Inference From Plaintiffs' Allegations Is That D&T Did *Not* Act With Scienter.

Even if Plaintiffs have alleged a cogent inference of scienter (which they have not), they still have not alleged an inference that is "at least as compelling as any opposing inference of nonfraudulent intent" once the competing potential inferences are weighed. *Tellabs*, 551 U.S. at 314. *See also Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) ("[W]e must weigh the strength of the plaintiffs' inferences in comparison to plausible nonculpable explanations for the defendants' conduct."). On one hand is Plaintiffs' contention that Oshkosh and its executives engaged in fraud and convinced the auditors from a major accounting firm to participate in that fraud. This is weak. Plaintiffs offer no explanation what incentive the auditors had to participate in the fraud, other than the professional fees that they would earn regardless of whether they issued a qualified or unqualified opinion. Plaintiffs offer no explanation why, if the Company and D&T were going to perpetrate a fraud, they would choose to do it with regard to Geesink, which was a minor contributor to a much larger corporation. Plaintiffs offer no explanation why, if Oshkosh and D&T were going to fool investors into thinking Geesink was performing better than it was, they would consistently have disclosed to investors that Geesink had negative operating income. Plaintiffs offer no explanation why, if Oshkosh was committing fraud, it would have performed impairment analyses more frequently than necessary, or would have hired third-party business appraisers to assist in the process. Plaintiffs make no attempt to explain why, if D&T failed to test Geesink's goodwill for impairment (Am. Compl., ¶ 532), Plaintiffs' own confidential witness says that D&T *was* involved in the impairment reviews. *Id.* ¶ 86.

On the other hand, the Court could infer that D&T did not recklessly or intentionally fail to perform audit tests of Oshkosh's FAS 142 analysis of Geesink's goodwill, and did not ignore the fact that Geesink performed poorly during the time leading up to the writeoff. This comports

Case 2:08-cv-00797-WCG   Filed 07/24/09   Page 21 of 26   Document 97

with the fact that Geesink's poor performance was publicly-disclosed throughout the class period in financial statements that D&T audited. It comports with the complete absence of any allegations in the amended complaint regarding how Oshkosh's FAS 142 analyses or D&T's audit tests of them should have been conducted differently. It comports with the lack of any allegation that the third-party business appraisers hired by Oshkosh to assist in the impairment reviews concluded an impairment occurred before June 2008. Finally, it comports with the fact that the D&T auditors had no motive to participate in the alleged fraud.

For all of these reasons, the inference that D&T engaged in innocent conduct is far more compelling than any inference of scienter and, as a result, Plaintiffs have not met the PSLRA's requirement for pleading scienter against D&T.

## III. Count II Of The Amended Complaint Fails To State A Claim Based On "Scheme Liability."

Count II of the amended complaint purports to state a claim against D&T under SEC Rule 10b-5(a) and (c) (codified at 17 C.F.R. §240.10b-5(a) and (c)). On Plaintiffs' theory, a claim under these two sections means that they "need not allege … that any of Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law." Am. Compl., ¶ 569.

The Supreme Court has long held that private securities litigants cannot state claims for secondary liability—that is, for aiding and abetting the fraudulent actions of others. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994). Thus, to state a claim under Rule 10b-5(a) or (c) for allegedly fraudulent actions other than oral or written statements, a plaintiff still must satisfy each of the preconditions for primary liability, including a material, manipulative or deceptive device or contrivance, made with scienter, relied

22

on by the plaintiff, and causally connected to the plaintiff's loss.  *See Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S.Ct. 761, 769 (2008).

Here, Plaintiffs' amended complaint does not allege *any* acts by D&T other than the four audit reports it issued regarding Oshkosh's financial statements.  As a result, the amended complaint cannot state a claim that D&T acted fraudulently under Rule 10b-5(a) or (c), and Count II of Plaintiffs' amended complaint should be dismissed as to D&T.  *Cf. Pugh v. Tribune Co.*, 521 F.3d 686, 697 (7th Cir. 2008) (dismissing claims for supposed fraudulent actions short of oral or written misrepresentations where the elements of a primary claim were not properly pled).

## IV.    Plaintiffs Are Not Entitled To Amend Their Complaint Again Under The PSLRA.

For the reasons stated above, the claims against D&T should be dismissed, and the Court need not and should not allow Plaintiffs another bite at the apple.  The PSLRA states that "[i]n any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the [pleading] requirements … are not met."   15 U.S.C. §78u-4(b)(3)(A).   Courts have interpreted this statutory language to prohibit multiple amendments to complaints.  The principal decision interpreting the statute is *In re Champion Enterprises Inc., Securities Litigation*, 145 F. Supp. 2d 871 (E.D. Mich. 2001), where, in response to multiple amendments to the plaintiffs' complaint, the court reasoned:  "The essential question raised by plaintiffs' motion [to amend] is *not* whether amendment should be allowed under Rule 15 of the Federal Rules of Civil Procedure, but rather, whether the Reform Act restricts Rule 15 in Securities Fraud cases.  I believe it must."  *Id.* at 872 (emphasis in original; footnote omitted).  The Court continued:

> If the Reform Act is read to mean that when a complaint is filed under the Reform Act, a judge must scrutinize the complaint and advise the pleader where the complaint is deficient, and then give the pleader an opportunity to amend the

complaint, and when that is done, the judge must again, perhaps like a law school professor, advise the pleader that he or she has not passed the test, and if not, give the people another opportunity to meet the heightened pleading requirements and even after that, still another opportunity, if the pleader requests it, then the Reform Act is meaningless. If this is the interpretation of the Act, then Rule 15 always trumps the plain requirements of the Act, and what Congress did when it passed this act over a presidential veto, means nothing.

*Id.* As a result, the court held that the "plain language of the Reform Act does not contemplate amending complaints," and that "[t]o conclude otherwise would be to abrogate the very purpose of the legislation." *Id.* at 873.

On appeal, the Sixth Circuit adopted the district court's analysis. It explained that "[w]e agree with the district court that the purpose of the PSLRA would be frustrated if the district courts were required to allow repeated amendments to complaints filed under the PSLRA." *Miller v. Champion Enterprises, Inc.*, 346 F.3d 660, 692 (6th Cir. 2003). Thus, the court affirmed the district court's decision to allow the amended complaint. *See also PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 700 (6th Cir. 2004) ("[W]e think it correct to interpret the PSLRA as restricting the ability of plaintiffs to amend their complaint, and thus as limiting the scope of Rule 15(a) of the Federal Rules of Civil Procedure.") (internal quotation omitted). This interpretation has been endorsed by the Third Circuit and this Court as well. *See In re NAHC, Inc. Securities Litigation*, 306 F.3d 1314, 1332–33 (3rd Cir. 2002) (holding that the district court did not abuse its discretion in prohibiting an amendment to a complaint based in part on *Champion Enterprises*); *Maiden v. Merge Technologies*, 2008 WL 4643538, *4 (E.D. Wis. 2008) (Randa, C.J.) (adopting *Miller* and dismissing securities fraud claim with prejudice).[7]

---

[7] *Accord In re First Union Corp. Securities Litigation*, No. Civ. 3:99CV237-H, 2006 WL 163616, *7 (W.D.N.C. Jan. 20, 2006) (dismissing amended complaint with citation to *Champion Enterprises*); *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 722–23 (E.D. Va. 2003) (Continued…)

In this lawsuit, Plaintiffs have already once amended their complaint, which now includes allegations against D&T in addition to the Oshkosh defendants. To allow Plaintiffs to again amend their complaint following dismissal of the current complaints is prohibited by the PSLRA. Plaintiffs have had their chance to state a claim against D&T and have failed to do so. "[T]he purpose of the Reform Act is to prevent harassing strike suits filed the moment a company's stock price falls. The Reform Act could not achieve this purpose if plaintiffs were allowed to amend and amend until they got it right." *Champion Enterprises*, 145 F. Supp. 2d at 873 (internal footnote omitted). Consequently, Plaintiffs' amended complaint should be dismissed with prejudice.

---

("Only dismissal of insufficient complaints without leave to amend preserves the teeth of the Reform Act.").

**<u>Conclusion</u>**

For the foregoing reasons, D&T the claims against D&T should be dismissed with prejudice.

Dated: July 24, 2009                          **MICHAEL BEST & FRIEDRICH LLP**

By:  /s/ Timothy M. Hansen
      Paul F. Linn, SBN 1009685
      Timothy M. Hansen, SBN 1044430
      100 East Wisconsin Avenue, Suite 3300
      Milwaukee, WI  53202-4108
      Tel:  414.271.6560
      Fax:  414.277.0656

      John Hartmann, P.C.
      Joshua Z. Rabinovitz
      Elizabeth S. Hess[†]
      Kirkland & Ellis LLP
      300 N. LaSalle Street
      Chicago, IL 60654
      Tel: 312.862.2000
      Fax: 312.862.2200

      *Counsel for Deloitte & Touche LLP*

---

[†]Motion for admission pending