# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

IRON WORKERS LOCAL
NO. 25 PENSION FUND, et al.,

        Plaintiffs,

      v.                           Case No. 08-C-797

OSHKOSH CORP., et al.,

        Defendants.

---

## DECISION AND ORDER

---

On May 18, 2009, Plaintiffs filed a 192-page amended complaint in which they allege that Defendant Oshkosh Corp., as well as its officers and its auditor, Deloitte & Touche, committed securities fraud, in violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. The Defendants have moved to dismiss, arguing that the amended complaint fails to set forth with particularity the fraud allegations against them. They further assert that the complaint fails to allege plausible fraudulent statements or scienter (*i.e.*, intent to defraud), and it also fails to connect the dots between the allegedly fraudulent statements and any loss suffered by the Plaintiffs. For the reasons given herein, the motions to dismiss will be granted.

## I. Background

The Oshkosh Corporation is a manufacturer of heavy trucks used by industry and the military. Although the company has been around nearly a hundred years, it was a growth spurt of

recent vintage that propelled it into the Fortune 500 and a listing on the New York Stock Exchange. In Plaintiffs' view, the company was able to achieve this growth not through the sustainable organic expansion of Oshkosh's core businesses but through a "myopic acquisition spree" fueled by the top executives' egos. (Pltf. Br. at 5.) Specifically, from 1996 to 2006, the company acquired some fifteen companies, including businesses in the firefighting, ambulance, towing and concrete mixing industries.

**A. Geesink Norba**

The principal focus of this action is the company's accounting treatment for its purchase, in July 2001, of a Dutch company called Geesink Norba Group ("Geesink"), a leading manufacturer of garbage trucks. According to the complaint, the purchase gave Oshkosh a sought-after international presence and served to boost the dynastic egos of Oshkosh CEO Robert Bohn and CFO Charles Szews. (Am. Compl., ¶ 82.) Oshkosh paid $137.6 million for the company and, according to the complaint, everyone soon realized that Oshkosh had paid too dearly for Geesink. Of the $137.6 million purchase price, $95.6 million was considered "goodwill," i.e., an amount exceeding the book value of the company. For present purposes, goodwill is simply a placeholder figure that represents the fact that companies are worth more as a going concern – and sometimes a lot more – than the book value of their land, buildings, machines, computers and the like. Plaintiffs assert that soon after the purchase of Geesink, it became clear that Geesink would not meet Oshkosh's financial projections. According to confidential sources, the purchase was a failure from the beginning. Geesink management had to be replaced, and managers soon observed that the company was not meeting its sales forecasts. (Am. Compl. ¶¶ 83-84.) Confidential sources also stated that executives Bohn and Szews were aware of Geesink's problems throughout this period and pressured

2

Geesink's management to increase sales in Europe so that the acquisition could live up to its billing. (Am. Compl. ¶¶ 86-88.)

Although many of Geesink's troubles resulted from poor market conditions, the amended complaint also asserts that there were management issues as well. A confidential source stated that the companies had difficulty integrating their computer systems, and management at Geesink became a "revolving door" that made accomplishing goals difficult. (Am. Compl. ¶¶ 89-90.) The failure to immediately meet projections led to short-sightedness and a narrow focus on trying to meet short-term goals and cut costs in an attempt to convince shareholders that the deal wasn't a total waste. In addition, a culture clash between the new Oshkosh management and Geesink management hindered growth.

According to the amended complaint, it should have been obvious that the acquisition was a failure by 2003 at the latest, as the company's "losses alone were evidence that the various restructuring efforts at Geesink were not working and that Geesink's goodwill was impaired." (Am. Compl. ¶¶ 92.) Given this string of losses, the Plaintiffs argue, Oshkosh should have recognized an impairment to Geesink's goodwill. A given goodwill valuation only makes sense if the company's prospects for profit-making render the company worth more than its book value; because Geesink's continuing losses undermined that premise, it no longer made sense (in Plaintiffs' view) to pretend that Geesink was worth some $96 million more than its book value. Under Generally Accepted Accounting Principles ("GAAP"), goodwill must be assessed annually, and it must be assessed more frequently where circumstances warrant. *See, e.g., In re Remec Inc. Securities Litigation,* 415 F. Supp. 2d 1106, 1113-14 (S.D. Cal. 2006). According to the amended complaint, the circumstances of Geesink's continuing losses and its general weakness should have caused

3

Oshkosh to reevaluate its goodwill and recognize an impairment. By failing to do so, Plaintiffs allege, Oshkosh kept its assets and stock price artificially inflated during the class period.

Beginning in 2004 Oshkosh reported Geesink's quarterly earnings and losses as follows:

Q1 2004 $2 million
Q2 2004 ($2.6 million)
Q3 2004 ($3.4 million)
Q4 2004 $2.2 million
Q1 2005 ($2.6 million)
Q2 2005 ($1.5 million)
Q3 2005 ($5.1 million)
Q4 2005 $.6 million
Q1 2006 $.9 million
Q2 2006 $1.6 million
Q3 2006 $1.3 million
Q4 2006 ($.9 million)
Q1 2007 ($4.2 million)
Q2 2007 ($6.2 million)
Q3 2007 ($.5 million)
Q4 2007 ($8.4 million)
Q1 2008 ($5.4 million)
Q2 2008 ($8.6 million)

The total losses during the period amounted to $40.8 million. The class period begins on November 26, 2003, when the pattern of actionable fraud allegedly began.[1] On that date, the company filed its annual report (its fiscal year ends September 30 rather than December 31). All annual reports filed during the class period were audited by Defendant Deloitte & Touche. In the 2003 10-K, the company stated that it expected to be able to reduce costs at Geesink; that competition in Europe was limited; that sales would grow 2.8% in the next fiscal year; and that there were no significant modifications to goodwill. (Am. Compl. ¶¶ 115-118.) The next quarterly

_____

[1]Plaintiffs suggest the fraud began earlier, but the statute of limitations barred any claims based on earlier activity.

4

earnings release showed increased profits for Oshkosh Corporation overall, due largely to its defense business, but a slight decline in its commercial business. (Am. Compl. ¶¶ 127-128.) During an analyst conference call, Bohn and Szews appeared satisfied with Geesink's earnings. Even so, Szews noted that Geesink's order backlog had dropped and estimated Geesink refuse sales would "be flat in fiscal 2004, due to no projected recovery in European markets." (Am. Compl. ¶ 132.) The 10-Q reflected the company's concerns about demand, noting that "European refuse backlog remained down due to a soft European economy."[2]

The next quarter was also favorable for the company as a whole. Bohn reported that "[i]t's our strongest quarter ever, and our defense business, including its robust parts sales, was the driving force behind it." (Am. Compl. ¶ 139.) Even so, the commercial sector was still lagging. Bohn recognized that Geesink's second quarter results were "lower than expectations; primarily due to the low production volumes as European refuse markets remained extremely weak." But, "[o]n a more positive note, the production line for our new model is fully operational and the first GPM III was delivered. We've also introduced a new rear-loader in Europe targeted at the price-conscious customer." (Am. Compl. ¶¶ 143.) The theme continued into the next quarter: business was good for Oshkosh Corporation, but weakness lingered at its Geesink unit. On July 27, 2004, CEO Bohn noted the strength of Oshkosh Corporation's overall earnings growth but singled out weakness in Europe as a drag on earnings:

> Market dynamics for all segments are robust and improving, except for the European refuse market, which remains weak. . . . We are not counting on improvement in European market conditions in the short-term and have initiated significant measures

---

[2]Typically a company announces earnings and holds a conference call the same day. The company's SEC filing – a 10-K or 10-Q – follows soon after. The complaint cites statements the company made through all three of these forms.

5

to improve Geesink Norba Group's performance, including a work force reduction and introduction of a new line of value-priced refuse bodies.

(Am. Compl. ¶ 152.)

During the conference call, Bohn expanded on the information provided in the earnings release:

A major factor remains the weakened European refuse market, which is down about 20% from its peak. That has had a cascading earnings impact in the form of lower volume, tighter price competition and underabsorption of overhead. Coupled with the factory conversion to a new production line for the GPM III and the start-up of ValuPak production, you have valid underlying reasons for the lack of performance, but that doesn't alleviate our need to take action. And we have.

We took a $1.8 million redundancy charge to right size the work force and align it with overall market conditions. We focused on bringing the GPM III on line quickly and have exceeded productivity targets. The first few ValuPak units produced in Romania have met quality requirements and orders for this new value-priced line are beginning to flow. These launches cost $1.2 million during the third quarter. We believe these developments, along with a stabilizing industry order rate for new bodies, have us poised for a recovery in 2005, 2006.

(Am. Compl. ¶ 154.)

Although the European refuse market was weak, CFO Szews projected that Geesink would return "to modest profitability on flat sales in fiscal 2005 due to manufacturing efficiencies anticipated following the re-layout of manufacturing processes in [fiscal 2004]." (Am. Compl. ¶ 156.)

Sluggishness continued in the European refuse business, however. In the company's July 28, 2004 10-Q, it noted that while the commercial segment was picking up, refuse sales were falling behind. "[L]osses in the Company's European refuse business [are] due to weak industry conditions in Europe and related workforce downsizing, increased steel and component costs, manufacturing inefficiencies, competitive pricing conditions as a result of new market entrants in rear- and

6

front-discharge concrete mixers and higher start-up costs on new product launches." (Am. Compl. ¶ 159.) The company estimated "that industry volume in European refuse products are down approximately 20.0% from 2003 levels and that pricing is adversely impacted in most European countries." (Am. Compl. ¶ 160.)

At the end of fiscal year 2004, Bohn repeated the motif that had been developing for the last several years. Business was good – it was Oshkosh Corp.'s best year ever – but the Geesink business was still underperforming:

> We estimate European municipal markets experienced a downturn of 15% in 2004, following a 5% downturn in 2003. We also believe that selling prices declined in several countries across Europe. This, compounded by significant investments to convert our Emmeloord operations for production of our new-style, smooth-sided refuse bodies, led [Geesink] to report a loss. However, [Geesink's] plants are more efficient following installation of new moving lines in The Netherlands. And, we've only begun to realize sales opportunities for the new smooth-sided bodies and the new ValuePak line of value-priced rear loaders. At this point we don't see recovery in the refuse market across Europe as a whole. We will aggressively promote our ValuePak line built in Romania to help drive revenues.

(Am. Compl. ¶ 169.)

During the end-of-year conference call, an analyst asked a pointed question: "Why shouldn't we just look at [Geesink] as having been just a bad acquisition that's getting worse? And at what point do you say … we made a mistake and maybe we do something different?" (Am. Compl. ¶ 173.) Either Bohn or Szews (the complaint does not specify) answered the question by blaming the weak European economy, which led to limited demand for its garbage removal line. It was noted that competitors had gone, or were going, bankrupt, and in the meantime Geesink had been improving efficiency and trimming its workforce to stay competitive. This left the company on "a very good footing." "Now, we don't see a lot of improvement in the market in '05. We do think

7

that by '06, that we're going to start getting some benefits in volume in this marketplace and pricing, because there are too strong a rumors about our competitors going bankrupt, about people for sale. There will be a crack in that market." (Am. Compl. ¶ 173.)

In its annual 10-K filing, the company explained the process for evaluating its goodwill, and noted that it had evaluated Geesink for an impairment in its goodwill.

> In evaluating the recoverability of goodwill, it is necessary to estimate the fair value of the reporting units. In making this assessment, management estimates discounted anticipated cash flows of a reporting unit based on a number of factors including historical operating results, business plans and market conditions. Rates used to discount cash flows are dependent upon interest rates and the cost of capital at a point in time. There are inherent uncertainties related to these factors and management's judgment in applying them to the analysis of goodwill impairment. It is possible that assumptions underlying the impairment analysis will change in such a manner that impairment in value may occur in the future.

(Am. Compl. ¶ 178.)

Although Geesink's losses prompted the company to consider writing down Geesink's goodwill, it believed that the European economy was primarily to blame for the losses. It had taken a loss in 2004 due to workforce reductions, and if the European market picked up at all the company believed its leaner position would allow it to achieve profitability. "Based on the Company's estimated benefits of these investments in fiscal 2004 and additional investments planned for fiscal 2005, and based on the Company's estimates of improving European refuse market conditions beginning in fiscal 2006, the Company developed long-term projections of estimated cash flows from [Geesink] to assess the fair value of the business." (Am. Compl. ¶ 180.) Its conclusion was that Geesink's fair value was some $20 million more than the company was carrying it on the books for, and thus there was no impairment to Geesink's goodwill value.

8

The trend continued into fiscal 2005. The company overall continued its profitability, but there were still problems at Geesink. CEO Bohn suggested that Geesink "went through too many changes at once – engineering and fielding a completely new design and installing a new production system simultaneously. Combined with the weak European market, that has taken its toll on profitability at Geesink." (Am. Compl. ¶ 193.) Bohn stated that the company had sent a team of executives to evaluate problems at Geesink and noted that there was a risk the company would have to take a goodwill impairment charge. Even so, he noted the possibility that Geesink could return to profitability over the coming year or year-and-a-half. During the first-quarter conference call on January 25, 2005, an analyst echoed the question that had been asked at an earlier call: "is there a point when you and the board say, you know what, we're not going to keep doing this, or is it just things always take longer than expected?" (Am. Compl. ¶ 198.) Szews stated that with new management in place and a little patience, "I think we have got some opportunities there, I believe we can turn this thing around." In the company's 10-Q, it noted that it had performed another goodwill evaluation for Geesink but concluded that goodwill was not impaired given realistic hopes of turning the company around. (Am. Compl. ¶ 200.)

The trajectory continued into Q2 of 2005: the company had record earnings, but Geesink continued to lag behind. Even so, management's tone became somewhat more optimistic:

> Our European refuse operation still needs significant improvement, but we've made substantial progress overall. The incoming order rate was up about 58 percent in the second quarter compared to the prior year, giving every indication that the European market is starting to strengthen. We earned a five-year service contract with Sita UK, a major customer, and resolved many of the issues associated with our Geesink-branded GPM III product. The "lean" team will remain in the Netherlands for a few more months to oversee implementation of the cost reduction opportunities

they identified. Today, we are even more confident that our European refuse operation can turn a profit in fiscal 2006.

(Am. Compl. ¶ 209.)

As before, the company stated that it had considered Geesink's goodwill valuation but opted not to find any impairment in light of its prospects for a turnaround and expectations of profitability within the near year or so. (Am. Compl. ¶ 216.)

The next quarter was a bad one for Geesink's books. The company took a $4.3 million charge for workforce reductions resulting from its "leaner" operations, but Bohn noted on the analyst conference call that "[w]e believe this workforce reduction will restore [Geesink] to profitability beginning in … the fourth quarter of fiscal 2005." (Am. Compl. ¶ 226.) During the call one analyst again pressed for an analysis of the impairment issue: "[T]he impairment on Geesink. Could you talk about what you said you don't expect any to happen? But on the other hand, Geesink has certainly been a disappointment quarter after quarter after quarter. When does that decision get made? And what would the implications be?" (Am. Compl. ¶ 231.) Defendants responded: "Well, the decision, I guess we look at it every quarter right now, but we believe that we are going to be profitable in fiscal '06. And if we are profitable, more likely than not then we do not have an impairment decision next year based upon the current action plans that we have in place. If on the other hand, we consistently lose money quarter after quarter in '06, we probably are facing an impairment charge and the amount I couldn't predict." (*Id.*)

Bohn's predictions for profitability were finally borne out in the final quarter of 2005. He believed that the company's cost-savings measures and product improvements had resulted in a small turnaround (a modest profit of $600,000), and expected that Geesink could be "modestly

10

profitable throughout fiscal 2006 due to product design changes, outsourcing and other cost reduction activities in process." (Am. Compl. ¶ 240.) The company's 2005 10-K explained the goodwill evaluation process and again noted that Geesink's fair value exceeded its carrying value; as such, no impairment to goodwill was found. But the filing observed that if Geesink was "not able to achieve expected sales and operating income performance in fiscal 2006 and fiscal 2007, the Company could be required to record a goodwill impairment charge." (Am. Compl. ¶ 255.)

Geesink remained profitable into fiscal 2006, earning some $900,000 in the first quarter. "[P]rofitability of the Company's European refuse operations in the first quarter of fiscal 2006 compared to an operating loss of $2.6 million in the first quarter of fiscal 2005. Such improvement resulted from favorable market conditions and the restructuring of that business in fiscal 2004 and 2005." (Am. Compl. ¶ 267.) During the Q1 conference call, Bohn explained his growing optimism:

> [W]e have an improved outlook for the Geesink Norba Group. They continue to move along the turnaround path: they are slightly ahead of schedule on outsourcing key components to reduce product costs; their full time cost reduction team is driving further cost reduction initiatives; and they have worked through their workforce reduction very smoothly. We expect them to complete the last of the workforce reductions by early in the third quarter, and we believe the workforce will then be sized appropriately for the Geesink Norba Group to be successful in their markets.

(Am. Compl. ¶ 271.)

The turnaround trend continued into the next quarter, which was Geesink's best quarter since Oshkosh had bought the company. Geesink earned some $1.6 million in the second quarter of 2006, and CFO Szews explained that the results were due to "higher sales volume and lower manufacturing costs . . . . We continue to expect Geesink Norba Group operating income to improve sequentially each quarter in fiscal 2006 as we execute on our cost reduction plan." (Am. Compl.

¶ 287.)   In the third quarter, Geesink showed another large profit of $1.3 million.  During the

conference call Bohn praised the management team for its efforts to make Geesink more "lean."

(Am. Compl. ¶ 300.)  Szews, however, noted that the company expected more modest results in the

near future: We expect this business to have break-even results in the fourth quarter of fiscal 2006

due to seasonal factors, softness in demand in the United Kingdom and chassis availability issues

in France."  (Am. Compl. ¶¶  303, 310.)

      That prediction came true in the last quarter of fiscal 2006.  Although the 2006 fiscal year

was Oshkosh Corporation's "most successful financial performance ever," Geesink lost $900,000.

(Am. Compl. ¶ 314.)  Still, Szews reflected continued optimism during the company's conference

call.  He believed that orders were strong and that the company's cost reduction efforts would

continue to pay dividends.  (Am. Compl. ¶ 325.)  The company's 10-K, however, indicated its belief

that Geesink refuse product sales would be down slightly in fiscal 2007 "due to slow demand in the

United Kingdom and the lack of available chassis in France."  (Am. Compl. ¶ 328.)  The 10-K also

contained a detailed discussion of the issue of Geesink's goodwill:

> While the Company's Geesink Norba Group reported operating income of $2.9
> million in fiscal 2006, its fourth quarter performance resulted in a loss.  In addition,
> its backlog was down 25.0% as of September 30, 2006 due to a decrease in orders
> in the United Kingdom and France.  As a result of this loss and decrease in backlog,
> the Company continued to monitor whether an impairment of the Geesink Norba
> Group goodwill had occurred.  Goodwill associated with the Geesink Norba Group,
> which was recorded in connection with the acquisition of this business in July 2001,
> totaled €107.6 million as of September 30, 2006 ($136.5 million based on the
> exchange rate as of September 30, 2006).  Most of the European refuse markets
> served by the Geesink Norba Group have been in a recession since 2001.  While
> experiencing a slight improvement in fiscal 2005 and 2006, the Company believes
> that refuse collection vehicle market sales volumes in Europe declined by more than
> 20% from fiscal 2001 levels to fiscal 2004 levels and that pricing in several of its
> markets declined by 5% to 10% over this period.  During fiscal 2004, the Company
> launched a new Geesink-branded, smooth-sided, rear loader refuse collection vehicle

12

and the ValuPak, value-priced refuse collection vehicle into the European refuse market to spur demand for the Company's products. Following the launch of the new Geesink-branded rear loader, its product cost substantially exceeded the Company's estimated product cost and initial production units involved substantial warranty claims until certain design changes were made in fiscal 2005 and 2006. These issues caused the Geesink Norba Group to begin reporting operating losses in the business in the quarter ended June 30, 2004. The Company made a management change and assigned its lean team to the business in early fiscal 2005 to resolve the product design issues and to substantially reduce the manufacturing costs of the Geesink-branded rear loader. As a result of these initiatives, the Company recorded a $3.7 million workforce reduction charge in fiscal 2005 to rightsize its workforce in The Netherlands and to commence a strategy to outsource certain activities to lower cost manufacturing sites. In the fourth quarter of fiscal 2005 and the first three quarters of fiscal 2006, the Geesink Norba Group returned to profitability. During the fourth quarter, the United Kingdom market began to decline as a result of a decrease in government funding and the consolidation of two of Geesink's primary customers in that country. In addition, limited chassis availability in France reduced orders in that country. The Company expects that the business will incur operating losses through the first two quarters of fiscal 2007, but that the business will be modestly profitable in fiscal 2007. The Company believes that profitability will continue to improve in fiscal 2008 following the improvement of the markets in the United Kingdom and France, additional cost reduction activities and other planned actions. Based largely on the Company's estimated benefits of its cost reduction initiatives in fiscal 2005 and 2006 and the improvement in the end markets, the Company developed long-term projections of estimated cash flows from the Geesink Norba Group to assess the fair value of the business. As a result, the Company determined that the fair value of the Geesink Norba Group exceeded its carrying value at September 30, 2006, and therefore determined that the goodwill recorded in connection with the acquisition of the Geesink Norba Group was not impaired.

(Am. Compl. ¶ 332.)

As had been foreshadowed somewhat, Geesink's turnaround stalled and it lost $4.2 million in the first quarter of 2007 and then lost $6.2 million in the second quarter. This latter figure included a substantial $4.9 million charge for more labor reductions, part of the company's continued cost savings and restructuring efforts. Oshkosh Corporation had also purchased JLG, a large manufacturer of "access equipment" such as aerial work platforms, lifts and stock pickers, and

13

the company believed that Geesink's factory in Romania could be integrated into the new JLG business:

> we expect to leverage our Geesink Norba Group Romanian factory to serve as a supplier for JLG and its aerial products. The eastern European operation will serve as a cost effective supplier of large weldments and fabrications, and we will expand the operation to manufacture parts for both the Geesink Norba Group and JLG. We believe that these actions will result in annual savings for the Geesink Norba Group of over EUR 7 million beginning in fiscal 2008, and then expect the savings to grow as we move more work into Romania.

(Am. Compl. ¶ 368.)

CFO Szews elaborated: "We expect that our Romanian factory will be able to support certain JLG fabrication requirements, creating a win-win situation for the two businesses, as [Geesink] will benefit from increased absorption with a more fully utilized facility and JLG will gain a low-cost supplier of parts. We expect all of these efforts to form a sustained turnaround at this business." (Am. Compl. ¶ 372.) In response to an analyst's question, Szews acknowledged that Geesink had dealt the company's earnings a "body blow," however, and he didn't predict much of a turnaround in the near future, due largely to the fact that European holidays comprise much of the company's fiscal fourth quarter (thus weakening demand). (Am. Compl. ¶ 375.) In the 10-Q for the company's second quarter of fiscal 2007, Oshkosh again provided a detailed explanation of its decision not to take an impairment charge:

> In the third quarter of fiscal 2006, Geesink, seeking a low-cost country to produce products, established a production facility in Eastern Europe. As Geesink started up this operation, existing facilities became underutilized. As a result, Geesink's excess capacity and overhead has in part led to operating losses. In addition, during fiscal 2006, Geesink increased salaried headcount to rectify product design issues associated with the fiscal 2005 launch of its GPM III model. Geesink believes the problems have been corrected and the additional headcount is no longer necessary. During the second quarter of fiscal 2007, Geesink began an initiative to reduce operating costs, eliminate excess headcount and close an underutilized facility. In

14

connection with these and other initiatives, the Company recorded charges totaling $4.9 million for workforce reductions and other adjustments in the second quarter of fiscal 2007. At the same time, the Company developed a plan to further leverage Geesink's lowcost country manufacturing capabilities in Eastern Europe by insourcing certain work including production related to the Company's recently acquired access equipment segment.

The Company presently believes that its strategy of reducing its workforce and other expenses, idling a facility and developing low-cost country manufacturing capabilities will result in the business returning to acceptable profitability over an eighteen to twenty-four month period. Based largely on the estimated benefits of Geesink's cost reduction initiatives and estimated low-cost country expansion, the Company developed long-term projections of estimated cash flows for Geesink to assess the fair value of the business. Based on these projections, the Company determined that the fair value of Geesink exceeded its carrying value at March 31, 2007, and therefore determined that the goodwill recorded in connection with the acquisition of Geesink was not impaired. The Company will continue to monitor its turnaround activities at Geesink and their impact on the Company's valuation of this investment.

(Am. Compl. ¶ 381.)

The next quarter brought a small operating loss of $500,000 for Geesink. Bohn conceded that: "Our struggles [with Geesink] have been disappointing, but the more we dig into the issues, the more we believe the business can be successful with some facility rationalization and proper leadership." (Am. Compl. ¶ 390.) The 10-Q echoed the impairment analysis quoted above, and concluded that "[t]he Company does not believe that this new estimated operating loss significantly altered the long-range value of Geesink and hence no detailed impairment calculation was performed at June 30, 2007." (Am. Compl. ¶ 401.)

The next quarter brought more losses for Geesink. During the conference call, CEO Bohn conceded that things were not working out:

We also made several major decisions this quarter regarding the Geesink Norba Group, our European refuse business and this is a business that has underperformed way too long and caused a decline in this segment's operating income in a year when

15

the rest of the segment showed solid improvement. We are working through some very aggressive actions that we expect to put into business that will give it a much stronger foundation than what we have today, to grow and to be profitable.

(Am. Compl. ¶ 418.)

Bohn explained that plans were in the works to shuffle production around to different plants in Europe and to achieve efficiencies that way. Oshkosh's new CFO, David Sagehorn, explained that "[w]e do not expect to see the results of the turnaround at the Geesink Norba Group until fiscal 2009, as we work through fiscal 2008 to complete the actions that we expect to allow the business to return to profitability." (Am. Compl. ¶ 420.) The company's fiscal year-end 10-K provided another assessment of the goodwill impairment issue, echoing previous conclusions while incorporating continued losses into the calculation. Ultimately, the company concluded no goodwill write-down was required, but it suggested one could be imminent if expectations did not materialize:

> To the extent that Geesink is not able to achieve expected progress on its turnaround initiatives in fiscal 2008, the Company could be required to record a goodwill impairment charge. The range of potential charge would be based on a number of factors, including the results of the Company's cost reduction activities, the timing and results of the insourcing of fabrications to Geesink's Eastern European facility, Geesink's operating performance, competition, required future capital expenditures, interest rates and long-term growth assumptions. The Company cannot provide any assurance that future goodwill impairment tests will not result in a charge to future earnings.

(Am. Compl. ¶ 433.)

The first quarter of fiscal 2008 continued the pattern of losses at Geesink, with that unit losing some $5.4 million. Szews (now president and chief operating officer) stated that the restructuring was in "full swing" and noted that construction of a facility in Romania was underway in an effort to produce parts for Oshkosh's JLG company and transition away from facilities in

16

Sweden and the Netherlands. (Am. Compl. ¶ 447.) This news came against the background of a declining Oshkosh stock price. Although the company was still very profitable, its growth had slowed. Bohn addressed investors and analysts on the conference call: "We know that many of you listening today are frustrated by our recent share price decline. We are too. We do not think that the current price accurately reflects the strength of this management team, our ability to mitigate weaker economic conditions or the long-term prospects for the Oshkosh family of companies." (Am. Compl. ¶ 451.) Roughly two weeks later, the complaint notes, Bohn sold some $5.7 million of company stock. (Am. Compl. ¶ 455.)

The 10-Q noted that Geesink's sales were actually up 54.5% over the same quarter the previous year. This was due to a rebound in U.K. demand and favorable exchange rates. Even so, the company lost money due to "start-up costs at the Company's Romanian operations and facility rationalization costs to move production from Sweden to The Netherlands." (Am. Compl. ¶ 460.)

Oshkosh Corporation released its second quarter earnings on May 1, 2008. During the conference call, Szews acknowledged that Geesink had lost some $8.6 million and noted that "[o]verall, results in this segment were quite disappointing due to difficulties in restructuring our European refuse collection vehicle business . . ." (Am. Compl. ¶ 473.) Szews also acknowledged "experiencing larger inefficiencies during the ramp-up than we anticipated as we integrate the production of the Geesink and Norba product lines," and expressed hope that "these inefficiencies will be overcome as our employees move up the learning curve. Geesink also began fabricating parts in its Romanian facility in the second quarter to be used in the manufacture of JLG aerial products in Belgium." (Am. Compl. ¶ 473.) During the call, an analyst asked Szews pointedly about Geesink: "what do we need to see before we throw in the towel on this one?" Szews

17

responded by noting the continued problems resulting from integration and multiple shifts in facilities: "Well, it's coming to a head pretty quickly here. We essentially moved all of the production of Norba into the Emmeloord, Netherlands facility. We're a little bit constipated. That's what caused the downturn in the forecast for at least the Geesink business and that we really need to exit by the end of the third quarter because we're a little bit behind in production." (Am. Compl. ¶ 476.)

The company's May 1, 2008 10-Q reflected that although Geesink had increased its sales significantly over the same period the previous year, several factors resulted in continued operating losses. "The increase in the operating loss related primarily to charges associated with a previously announced facility rationalization plan and inefficiencies associated with the relocation of production of Norba-branded products to The Netherlands, along with an unfavorable foreign exchange rate that resulted in a larger loss in U.S. dollars." (Am. Compl. ¶ 482.) And once again, the 10-Q noted that the company was continuing to evaluate the goodwill of Geesink for possible impairment. Because the losses were due to restructuring and facilities problems (rather than, say, weakened demand or increased competition), the company did not view Geesink's goodwill as impaired but stated that it would continue to monitor the situation. (Am. Compl. ¶ 483.)

Eight weeks later, on June 26, 2008 (the end of the class period) Oshkosh issued a press release announcing that it was lowering its earnings estimates for the third quarter and 2008 and taking a goodwill impairment charge:

> Oshkosh Corporation (NYSE: OSK), a leading manufacturer of specialty vehicles and vehicle bodies, today announced that it expects a loss of approximately $1.22 to $1.32 per share for its third quarter of fiscal 2008 compared to the Company's prior earnings per share (EPS) estimate range of $1.40 to $1.50 of income for the quarter. The expected loss relates to a non-cash charge for the impairment of

18

goodwill to be recorded in connection with the Company's European refuse collection vehicle manufacturer, the Geesink Norba Group (Geesink). The impact of the impairment charge on third fiscal quarter earnings is estimated to be approximately $175 million, or $2.32 per share. Projected third fiscal quarter results also reflect weaker performance expectations compared with previous estimates for, most notably, the Company's access equipment segment and, to a lesser extent, its fire & emergency and commercial segments.

Lower than expected sales in both North America and Europe driven by softness in non-residential construction and general economic weakness, and rising raw material and fuel costs, have caused us to reduce our outlook for the third quarter and full fiscal year 2008, said Robert G. Bohn, Oshkosh Corporation chairman and chief executive officer. During the quarter, we also lowered our outlook for Geesink due to a slower and more difficult than expected return to profitability, coupled with expectations of a weaker European economy and higher raw materials costs. This revised outlook has caused us to believe that the value of Geesink no longer supports the goodwill recorded for this business, resulting in the impairment charge we are announcing today.

(Am. Compl. ¶ 492.)

The company held a conference call the same day, during which management conceded that Geesink's facilities rationalization program was simply not working – its benefits were lower than expected while its costs were higher. In addition, business coming from Oshkosh's recently acquired JLG division was drying up due to a "slowdown in the European access equipment market." (Am. Compl. ¶ 493.) The company believed that Geesink would break even in 2009 but acknowledged that it could no longer carry it on the books at the current value. It estimated an impairment charge of $175 million.

On the news, Oshkosh Corporation's stock dropped some 33% in heavy trading on what was a sharply down day for the entire market. The drop came amidst the overall decline in the economy and the stock market; I may take judicial notice that the Dow Jones Industrial Average had already dropped from over 14,000 in October 2007 to 11,811 on June 25, 2008 – a drop of more than

19

sixteen percent in roughly nine months – and these drops foreshadowed further plummets into the six-thousands and the recession that occurred in late 2008 and 2009. The Defendants note that during the conference call after the announcement, no analyst asked about Geesink – their focus instead was on the decline in JLG's business. In fact, the amended complaint cites a June 26, 2008 article from the *Milwaukee Journal-Sentinel*, which quoted an analyst who stated that "[t]he magnitude of (Thursday's) downward revision in access equipment's outlook is a surprise and highlights the speed at which JLG's business outlook has deteriorated." (Am. Compl. ¶ 495.) This suggests, according to the Defendants, that the precipitous stock drop had much more to do with JLG than with any write-down of Geesink's goodwill.

In the company's year-end 10-K, filed in November 2008, Oshkosh explained the goodwill impairment charge at some length:

> The Company has taken steps over the last 18 months to turn around the Geesink business, including selling an unprofitable facility in The Netherlands during the first quarter of fiscal 2008, reaching an agreement with the Works Council in Sweden regarding rationalizing a facility in that country in order to consolidate Norba-branded production in The Netherlands, reducing its work force, installing new executive leadership, integrating operations with JLG, implementing lean manufacturing practices, introducing new products and outsourcing components to lower cost manufacturing sites. In June 2008, it became evident that synergies related to Geesink's facility rationalization program would be lower than expected and costs to execute the rationalization would be higher than anticipated. The resulting slower than expected and more difficult return to profitability of Geesink's business, further escalation of raw material costs, a softening of economies in Western Europe and a reduction in fabrication volume for the Company's access equipment segment at Geesink's Romania facility due to a slowdown in the European access equipment market led to the Company's conclusion that a charge for impairment was required. During the third quarter of fiscal 2008, the Company took these factors into account in developing its fiscal 2009 and long-term forecast for this business. With the assistance of a third-party valuation firm, the Company determined that Geesink goodwill and nonamortizable intangible assets were impaired and the Company recorded non-cash impairment charges of $167.4 million and $7.8 million, respectively, in the third quarter of fiscal 2008, representing the

entire amount recorded for these assets. The evaluation was based upon a discounted cash flow analysis of the historical and forecasted operating results of this business.

(Am. Compl. ¶ 496.)

## II. Analysis

The amended complaint brings claims for violations of Section 20 of the Exchange Act, as well as Rules 10b-5 and 10b-5(a) and (c). As suggested above, the principal focus of the amended complaint is the company's failure to take a goodwill impairment charge and acknowledge that it was carrying the Geesink company on its books at an inflated value. This fraudulent and unrealistic valuation allegedly caused harm to those in the proposed class who bought shares of Oshkosh during the class period. The Defendants' motions to dismiss assert that the amended complaint fails to specify its allegations of fraud with particularity because the complaint is excessively lengthy and vague. They further argue that the complaint fails to plausibly allege that any of the Defendants acted with the requisite mental state or that their actions caused the Plaintiffs' loss.

## A. Pleading under the Private Securities Litigation Reform Act ("PSLRA")

Section 10(b) of the Exchange Act and Rule 10b-5, adopted thereunder, create a private right of action for securities fraud. Rule 10b-5 makes it unlawful "(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 CFR § 240.10b-5.

21

The Supreme Court has recognized, however, that "[p]rivate securities fraud actions . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law. As a check against abusive litigation by private parties, Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA)." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313 (2007) (citation omitted). Under the PSLRA, a complaint alleging securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). These requirements echo the mandate found in Fed. R. Civ. P. 9(b) that allegations of fraud must be pleaded with particularity. *In re Stone & Webster, Inc., Securities Litigation,* 414 F.3d 187, 194 (1st Cir. 2005).

"In a typical § 10(b) private action, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh v. Tribune Co.,* 521 F.3d 686, 693 (7th Cir. 2008).

**B. Claims Relating to Geesink's Goodwill**

### 1. The Complaint Fails to Allege Fraud with Particularity

Despite the Tolstoy-esque length of the amended complaint, the Defendants argue that the complaint's allegations are not stated with sufficient particularity under Rule 9 and the PSLRA. The Plaintiffs' response brief argues that it has pled more than enough detail: in fact, they assert, no fewer than 386 paragraphs in the amended complaint contain allegations about how the Defendants' statements were material and misleading. (Pltf. Br. at 19.) As such, they argue that

22

the Defendants have been more than adequately apprised of the nature of the claims being leveled against them.

It is true that the "gist" of the complaint is clear enough: the Plaintiffs believe the Geesink acquisition was a failure from the get-go (the company overpaid for it), and the company should have admitted this "at least five years" before it did by recognizing a goodwill impairment. (Am. Compl. ¶ 86.) But from this general premise the amended complaint asserts that essentially every statement the company made (as set forth in Section I above) was fraudulent. That is, every earnings announcement since November 26, 2003 was fraudulent because it failed to tell the truth about Geesink's goodwill impairment.

Recognition of an impairment involves an accounting judgment about the future: to take an impairment is an admission that future prospects do not justify carrying the asset on the books at its present value, whereas maintaining one's goodwill evaluation is a prediction that the company's prospects for earnings are sound. But even though such an analysis is based largely on forecasts about the future, that does not give companies *carte blanche* to issue reckless or completely unfounded statements about their goodwill. Failure to take an impairment charge may constitute securities fraud when "the need to write-down [the asset] . . . was 'so apparent' to [the defendant] before the announcement, that a failure to take an earlier write-down amounts to fraud.' " *Caiafa v. Sea Containers Ltd.*, 525 F. Supp.2d 398, 410 (S.D.N.Y.2007) (alterations and ellipsis in original) (quoting *In re K-tel International, Inc. Securities Litigation,* 107 F. Supp.2d 994, 1001 (D. Minn. 2000), aff'd, 300 F.3d 881 (8th Cir.2002)).

I conclude, however, that the kind of generalized allegations found in the amended complaint do not suffice under Rule 9(b) or the PSLRA. Most importantly, the allegations of fraud

make no attempt to differentiate between the vastly different circumstances surrounding each reporting period and each statement made during those periods. Under the PSLRA an allegation of fraud cannot be "one size fits all" – each allegation must be tied to an explanation for *why* the statement was untrue and why the speaker had reason to know it was untrue. Despite the hundreds of paragraphs set forth in the complaint, nowhere do we find these kind of particularized allegations about each of the company's statements pertaining to Geesink's goodwill. The complaint is filled with citations to the company's SEC filings, and these filings detail the various problems and opportunities the company faced as it attempted to integrate its acquisition. But what may have been true in 2004 or 2008 was surely different in 2006 when Geesink was actually making money. Wasn't the company entitled to have some optimism that its restructuring efforts were working after four quarters of positive earnings? Surely the goodwill impairment analysis would have been different every quarter – as set forth above, some quarters gave reason for optimism, whereas others looked bleaker. Each new quarter involved some new factor: an acquisition, the reshuffling of management, the closing of plants, changes in the market, etc., and each of these considerations presented a new scenario in which profitability may have been achieved (or not). The complaint does not specify, however, why the company's statements were unrealistic in each quarter. Instead, it asserts a general premise (Oshkosh paid too much for Geesink) and then simply claims that every statement during the class period was fraudulent because the company refused to recognize that fact. Each quarter's statements are bundled together as a pattern of fraud lasting four and one-half years, and we are to asked simply to believe that *everything* the company said about Geesink was a lie, when in fact the situation each quarter was highly volatile.

24

In *City of Sterling Heights Police & Fire Retirement System v. Vodafone Group Public Ltd. Co.,* 655 F. Supp. 2d 262 (S.D.N.Y. 2009), the district court summarized cases involving allegations that the company committed securities fraud by not writing down its assets sooner. In that case, Defendant Vodafone announced that it would incur a $40-49 *billion* impairment charge associated with its German, Italian and Japanese operations. *Id.* at 266. Plaintiffs' allegations there mirrored the allegations in this case. They argued that the defendant knew its European operations were failing but held off taking a goodwill write-down despite that knowledge. The district court found such allegations too conclusory to survive a motion to dismiss:

> The plaintiff alleges that because the Company's operations in Germany, Japan and Italy had not expanded as rapidly as expected at the time of acquisition, the defendants were "increasingly aware that the impairment indicators existed." (Compl. ¶ 139.) The Complaint speculates that Mannesmann's "extremely high price" left Vodafone with "no margin of error." (Compl. ¶ 140.) "Thus, once the German results were even the slightest bit disappointing, impairment would exist." (Compl. ¶ 141.) Such assertions are too broad to be objectively assessed and fail to identify any awareness by the defendants that an impairment charge was necessary.

*Id.* at 270-71.

Similarly, the Seventh Circuit has frowned upon generic *ex post facto* complaints that allege fraud based largely on subsequent data:

> The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition. Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud.

*DiLeo v. Ernst & Young,* 901 F.2d 624, 627-28 (7th Cir. 1990).

Similarly, in *In re Wet Seal, Inc.,* the district court dismissed the complaint because its premise was wholly unsupported by any factual allegations that suggested fraud rather than, say, bad luck. There, the complaint alleged that management knew future prospects were bleak but nevertheless maintained a rosy outlook:

> The problem with the FACC [First Amended Class Action Complaint] . . . is that it is premised largely on the idea that management and members of the board knew the new line would fail, which in turn meant that they knew that Wet Seal would fail to recapture its customer base and to generate sufficient cash flows to support its balance sheet. But Plaintiffs fail to plead the concrete facts that support their premise—they do not explain the precise information, known to Defendants but not the investing public, that indicated the 2004 line would fail. The omission of such facts from the FACC is fatal, because Defendants repeatedly warned that, if the 2004 back-to-school line were not successful, they might face charges to earnings or insolvency. These disclosures mean Defendants' conduct was more consistent with their understanding of the difficult financial condition of the company and their honest hope that their turn-around efforts would succeed and thereby return Wet Seal to profitability.

*In re Wet Seal, Inc. Securities Litigation,* 518 F. Supp.2d 1148, 1151 -1152 (C.D. Cal. 2007) (emphasis added).

The same holds true here. The complaint fails to identify what information management possessed, each quarter, that would have given them the foreknowledge that Geesink was doomed. And it further fails to account for the fact that the company's disclosures repeatedly warned that if management's hopes were not realized, the company might have to take a goodwill impairment. Instead, the complaint's assertions are so broad that they cannot even be meaningfully assessed. The complaint baldly asserts that the company should have taken a write-down "at least" five years before it did, but provides no explanation for how the Plaintiffs reached that result. It further fails to explain how much the goodwill should have been written down, and when, and what specifically about the company's goodwill evaluation was fraudulent. The complaint's sweeping allegations

26

fail especially when one considers that a goodwill evaluation is a "custom" process based on several factors present at the time the assessment is made. As Oshkosh Corporation's filings state:

> In making this [goodwill] assessment, management estimates discounted anticipated cash flows of a reporting unit based on a number of factors including historical operating results, business plans and market conditions. Rates used to discount cash flows are dependent upon interest rates and the cost of capital at a point in time. There are inherent uncertainties related to these factors and management's judgment in applying them to the analysis of goodwill impairment. It is possible that assumptions underlying the impairment analysis will change in such a manner that impairment in value may occur in the future.

(Am. Compl. ¶ 178.)

Although the amended complaint recognizes that there are a "number of factors" that figure into the goodwill assessment, it ignores these by its reliance on the blanket assertion that Geesink was essentially worthless during the entire class period. Instead of explaining why each statement was fraudulent – *i.e.*, why management knew the company's prospects were weak – the complaint makes the following generic conclusion about Oshkosh's reporting of goodwill:

> Oshkosh's valuation model for testing goodwill impairment was flawed and unrealistic because it failed to factor in historic and repeated operating losses at Geesink, the recession pressures within its industry, declining demand for Geesink products, unrealistic restructuring charges, unachievable sales targets, unrealistic cost reduction plans, and repeated failed efforts to restructure the business.

This conclusory paragraph is repeated six times, verbatim, throughout the amended complaint. (Am. Compl. ¶ 121(g), 184(g), 259(g), 435(g), 488(g), 335(g)). It is inconceivable, first of all, that each of these charges (unachievable sales goals, declining demand, recession pressures, etc.) would have applied in blanket fashion to each and every one of the company's statements over the course of more than four years. As the company's filings and other statements made clear, there were countless factors that affected Geesink's profitability. The complaint's reliance on boilerplate

27

pleading about the company's goodwill evaluation does not come close to the particularized allegations that are required by the PSLRA.

Putting the accounting jargon about impaired goodwill to one side, what the amended complaint is really alleging is that Oshkosh was simply too bullish in its quarterly predictions about future prospects at Geesink. But instead of explaining why optimism was unwarranted at each step of the way (*i.e.*, why management knew otherwise), the amended complaint simply cites disappointing figures from the future as though these are evidence of fraud in the past. If that were true, of course, we would have to conclude that almost every company in the fall of 2008 was run by fraudsters because their predictions would have been knocked down by the dramatic recession that ensued. It should go without saying that one could be mistaken in a prediction about the future without committing fraud – the fact that losses ultimately occurred does not mean the Defendants had reason to know that there was little basis for predicting or hoping otherwise. "For any bad loan the time comes when the debtor's failure is so plain that the loan is written down or written off. No matter when a bank does this, someone may say that it should have acted sooner. If all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence." *DiLeo,* 901 F.2d at 626.

That the executives committed fraud is especially unlikely given the fact that Geesink was a recently-acquired company in a new territory. As Plaintiffs note, this was Oshkosh Corporation's first significant entree into the European market. Its SEC filings are riddled with qualifiers about supply and demand problems in various countries, as well as the vicissitudes of foreign currency markets. Some of its predictions were rosy, while others were less sanguine. And in Oshkosh's

28

case, the company explained each quarter that its Geesink operation was a work in progress. Factories were shutting down and production was being moved, new management teams were brought in, and it was introducing new products to meet shifting demand, until it eventually tried to integrate its larger JLG acquisition into the mix and leverage that company to create a market for Geesink's operations. In short, the landscape was ten times more complex than the market for teen clothing, as in *Wet Seal,* and yet the complaint merely relies on a one-size-fits-all allegation of fraud, as though everything the company said about Geesink during more than four years was a lie simply because Geesink ultimately lost money.

The difficulty of making such predictions is demonstrated by the first quarter of fiscal 2008. In that quarter, Geesink actually managed to boost its sales significantly over the previous year's first quarter, but even then, the company lost money: "[t]he increase in the operating loss related primarily to charges associated with a previously announced facility rationalization plan and inefficiencies associated with the relocation of production of Norba-branded products to The Netherlands, along with an unfavorable foreign exchange rate that resulted in a larger loss in U.S. dollars." (Am. Compl. ¶ 482.) This is not the case of a horse-and-buggy company bullheadedly insisting that good times are around the corner despite the mass appeal of the automobile; instead, Geesink was a company in flux, in a foreign market that was in flux, and it was run by an ever-changing management regime (as one confidential informant complained) that was itself part of a growing conglomerate and integration effort. It is reasonable to question the decisions that management made, but given the complexities of the business, an assertion that they committed *fraud* requires more than the cut-and-paste job found in the amended complaint.

29

In sum, given all of the parameters underlying the goodwill calculation, which changed quarter-to-quarter, it is not enough to broadly plead that all of the company's statements over a four and one-half year period were false because they failed to take an unspecified write-down of goodwill. "That Vodafone ultimately would take an impairment charge in 2006 does not in itself provide an actionable basis to claim that the failure to do so earlier was fraudulent." *Vodafone,* 655 F.Supp.2d at 272.

To plead with particularity under such circumstances, a Plaintiff would need to identify, at a minimum, which of the company's assumptions were unfounded. For example, in this case the state of the market for refuse trucks in Europe was a key factor in Geesink's sales prospects. At some times, the company's filings recognized that the market was weak, while in others the company expressed some hope. A plaintiff arguing for a quicker write-down of goodwill would have to explain how, in a given quarter, the company's optimism about that market was not just wrong (as demonstrated by later data) but so wholly unfounded that it was fraudulent. Another key factor was the company's prospects for employing "lean" measures to cut costs. A plaintiff would have to show not just that the measures did not work, but that the company had no reasonable expectation that they *could* work. Ultimately, as the Plaintiffs recognize, a company's valuation of its goodwill is an assessment about the future, and in order to show fraud a complaint will have to set forth not merely the fact that the company was wrong, but that the company had little chance of ever being right. *Acito v. IMCERA Group. Inc.,* 47 F.3d 47, 53 (2d Cir. 1995) ("lack of clairvoyance simply does not constitute securities fraud"). These are just a few examples. Because the amended complaint fails to explain with any particularity why each of the company's statements were fraudulent *within the context they were made*, the complaint must be dismissed.

30

## 2. The Amended Complaint Fails Adequately to Allege Scienter

Under 15 U.S.C. § 78u-4(b)(2), a plaintiff must allege facts that give rise to a "strong inference" that the defendants acted with "a mental state embracing intent to deceive, manipulate or defraud." In reviewing a complaint, a court must determine whether the inference of scienter is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 314. In *Tellabs,* the Supreme Court made clear that a court's inquiry is more searching than is typical in ruling on a motion to dismiss. It is not merely a question of whether the facts *as alleged* give rise to an inference of scienter; the question is whether the inference of scienter is a strong one when compared to other inferences one might draw based on common sense and experience. "The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323-24.

As noted above, the amended complaint fails to identify specific information known to the Defendants that would suggest they knew their forecasts about Geesink's prospects were unreasonable. Instead, the amended complaint alleges the Defendants knew generally that the European economy was weak, or that restructuring efforts would fail, or that the company's historical profits did not justify its goodwill valuation. These general allegations are not substitutes for actual knowledge that the company's forecasts were unreasonable, however. There are no allegations of secret internal forecasts predicting gloom, doctored books hiding the truth or accounting gimmicks painting a rosier picture. None of the confidential witnesses stated that any

31

of the Defendants knew X was true while they said Y, or that internal projections showed something different from what was publicly disclosed. "There are no allegations that there were any internal reports that suggested that the failure to take an impairment charge earlier was an incorrect application of accounting principles, much less an error so grievous that it exceeded differences over accounting principles and rose to the level of fraud." *In re Loral Space & Communications Ltd. Securities Litigation,* 2004 WL 376442, *17 (S.D.N.Y. 2004). Geesink – a new venture in a new territory – was dependent on a multitude of parameters that changed every quarter, and management had little ability to predict with certainty that its hope for profitability was a lost cause. The fact that they remained optimistic does not mean they committed fraud. And the fact that one of the Big Four accounting firms evidently agreed with their approach weakens the inference that the need to recognize an impairment was so manifest that the failure to do so was fraudulent.

It is important, too, to recognize that the company's disclosures were not universally bullish, and its reasons for optimism were concrete and particularized rather than reflections of knee-jerk egotism or quixotic sunniness. During slower periods, the company repeatedly explained why new approaches – restructuring, new leadership, improved demand, etc. – might lead to better results, but at the same time it cautioned that these expectations could falter and could lead to a goodwill reevaluation. These were statements of qualified, cautious optimism rather than efforts to deceive. This, in itself, undermines any inference that the Defendants acted with an intent to deceive.

But because "[t]he strength of an inference cannot be decided in a vacuum," it is worth exploring the full context of the Defendants' alleged intent and motive to deceive. Plaintiffs place the most weight on financial considerations. Between 2003 and 2008, Bohn received over $31 million in compensation and stock options, while Szews earned $9 million. These lofty

32

compensation packages would not have been feasible, Plaintiffs argue, had the company recognized an impairment sooner. In addition, during the class period Bohn and Szews sold some $52 million worth of stock at prices their alleged fraud had helped to inflate. In particular, the amended complaint sets forth in bold print and capital letters the fact that Bohn sold some $5.7 million worth of stock in February 2008: "ALTHOUGH BOHN HAD JUST TOLD THE MARKET AND, IN PARTICULAR, ITS SHAREHOLDERS HE THOUGHT OSHKOSH STOCK WAS UNDERVALUED, APPROXIMATELY TWO WEEKS AFTER THE CONFERENCE CALL AND ANNUAL SHAREHOLDERS MEETING, HE SOLD $5.7 MILLION WORTH OF OSHKOSH STOCK." (Am. Compl., ¶ 458.)

"[B]ecause executives sell stock all the time, stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Pugh v. Tribune Co.,* 521 F.3d 686, 695 (7th Cir. 2008). The timing and magnitude of Bohn's stock sale was suspicious, in Plaintiffs' view, because it occurred just after Bohn had assured stockholders that he believed the company's stock was undervalued. Additionally, it occurred only four months before Oshkosh Corporation announced the impairment to Geesink's goodwill.[3] Bohn netted some $5.7 million from the sale, and Plaintiffs note that he would have received only half of that amount ($2.87 million) if he had waited until the day after the company's impairment disclosure.

A number of reasons undermine the possibility of drawing any "strong" inference of scienter. First, it is impossible to divine an intent to deceive from the facts alleged because the Plaintiffs' story is internally inconsistent, and almost fantastical. They allege a class period dating back to November 2003 (and that date derives from the statute of limitations – they allege the fraud

---

[3]Defendants note that Bohn did not "sell" stock but merely exercised options.

began even earlier). If this pattern of fraud was really carried on until June 2008 – a period of over four and one-half years – one would think that Bohn and Szews would have made out much better than they did. There would be scores of suspicious stock sales, and the Defendants would have cashed in all along the way until the music stopped. Instead, we are asked to believe that Bohn and Szews masterminded a scheme of more than four years only to allow Bohn to save roughly $2.8 million by selling in February 2008 rather than June 2008 and to earn unspecified extra salary and benefits due to the company's inflated stock price.

> [P]laintiffs' allegations about trading relate to an exceedingly long putative class period. The allegedly fraudulent scheme lasted some 46 months (from August 12, 1999, to June 12, 2003). By way of comparison, the Ninth Circuit has considered a class period of just 15 months "unusually long." *See In re The Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092-93 (9th Cir. 2002). Alleging such a lengthy class period weakens any inference of scienter that could be drawn from the timing of defendants' trades. Indeed, the lengthy period strengthens a competing inference that the plaintiffs filed their complaint simply to embark on a fishing expedition with the hope of catching a valid claim.

*Teachers' Retirement System Of LA v. Hunter,* 477 F.3d 162, 185 (4th Cir. 2007).

Just as the lengthy class period requires a stretch of the imagination, so does the relatively modest nature of the Defendants' stock activity. Although Plaintiffs use italics to emphasize that Bohn netted $5.7 *million* from his February 2008 sale, modified typeface is no substitute for factual context. The key context is that Bohn's option exercise in February 2008 amounted to only 13% of his total holdings in Oshkosh Corporation. Had Bohn intended to cash out before the bad news hit, presumably he would have been able to do a lot better. *In re Vantive Corp. Securities Litigation,* 283 F.3d 1079, 1094 (9th Cir. 2002) ("Chief Executive Officer John Luongo sold only 13% of his total number of shares and vested options over the course of a fifteen-month period. Under our precedent, this figure is not suspicious, and does not support a strong inference of

34

fraud.") Given the fact that he retained the vast majority of his stock during the reckoning in 2008, it would be more reasonable to infer that his stock sales during the class period were simply in the normal, responsible course undertaken by any executive who receives stock as part of their compensation packages.[4]

Finally, I conclude that any inference of an intent to deceive is further undermined by the disclosures the company actually made. As noted earlier, the company's disclosures do not suggest cocky insouciance but rather a measured, cautious optimism. Had the executives intended to defraud, they would likely have used stronger language intended to convey more than mere cautious optimism. They would not, for example, have repeatedly warned about the possibility of an impairment charge, and they would not have performed *quarterly* impairment analyses on Geesink's goodwill. Rather than hiding anything, Oshkosh executives teed up the issue and flagged the question of an impairment so that investors could make their own judgments.

Along the same lines, it is important to recall that all of Geesink's earnings numbers were disclosed, and there is no allegation that the Defendants fudged its numbers. That is, the principal allegation is simply that the Defendants failed to draw the requisite accounting *inference* from Geesink's numbers. As such, because the company actually provided all the underlying data required to make the accounting judgment in question, it is difficult to believe that the failure to take an impairment was part of some scheme to deceive. By disclosing that Geesink had lost more than

---

[4]In addition, the amended complaint provides almost no context about the company's stock price during this period. Publicly available records show that Oshkosh was trading in the low 40's during February 2008, but it had been as high as 50 only six weeks earlier and higher than 60 in October 2007. (*See also* Dkt. 91, Ex. B.) It is unclear why Bohn would have selected February 2008 – more than four months before the impairment was announced – to exercise his options as part of an attempt to defraud investors.

$40 million during the class period, the Defendants can hardly be said to have been unjustifiably pumping the company up.

> As the public filings discussed above indicate, the evolving poor performance of Globalstar during 2000 was publicly disclosed. When the impairments became so severe as to require specific accounting charges, and whether the requirements of the accounting principles were satisfied, necessarily involved issues of judgment. *See Thor Power Tool Co. v. Comm'r Internal Revenue,* 439 U.S. 522, 544, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979) (" 'Generally accepted accounting principles' . . . tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management.") The failure to comply with standard accounting practices, without more, does not constitute circumstantial evidence of misconduct or recklessness. "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir. 1999) (quotations omitted). The plaintiffs have failed to allege sufficient facts to show that the failure to take an earlier impairment charge was so clearly required by accounting principles that the failure to take such a charge was fraudulent, particularly in view of the disclosures of the ongoing poor performance of Globalstar.

*In re Loral Space & Communications Ltd. Securities Litigation*, 2004 WL 376442, * 17 (some citations omitted).

Recall in fact that some analysts had begun peppering the executives with questions about an impairment throughout the class period (one asked when they should "throw in the towel"), and this demonstrates that the issue was clearly in the minds of investors and the media rather than being hidden away. The information required to make the accounting judgment was disclosed to investors, and in fact the company's disclosures highlighted the possibility of an impairment in the future. This undermines any notion that the Defendants were attempting to deceive investors by delaying recognizing an impairment to Geesink's goodwill. Had the executives wanted to deceive investors, the course they chose – full disclosure about Geesink's losses and repeated warnings that an impairment charge could ensue – was certainly an odd one.

36

In sum, the competing inferences far outweigh any inference that the Defendants intended to commit fraud. Rather than attributing the course of events to fraud, it is far more reasonable to conclude that although the Geesink acquisition simply didn't work out, the Defendants maintained reasonable (if unrealized) hopes that success could eventually be achieved. These hopes, bolstered by occasional profits, justified a continued belief that Geesink's goodwill was sound. Along the way they couched these hopes in cautionary language and disclosed all of the information investors would have needed to judge the viability of Geesink's business.

## C. Other Allegations of Fraud

Although the failure to write down Geesink's goodwill is the centerpiece of the amended complaint, Plaintiffs also allege generally that the Defendants committed securities fraud by boasting about the company's prowess in integrating its acquisitions, such as Geesink and JLG. For example, during an October 16, 2006 conference call, Bohn stated that: "with our outstanding history of buying and integrating market-leading companies and creating significant shareholder value, we are extremely, extremely confident that our offer to purchase JLG in an all-cash deal will be another positive milestone in our company's history." (Am. Compl., ¶ 312.) The company further stated in one of its 10-K filings that it had "successfully negotiated and integrated fourteen acquisitions since 1996." (Am. Compl., ¶ 333.) Plaintiffs assert these statements are false because the company had not, in fact, successfully integrated its acquisitions, and its history of buying companies was not "outstanding." Confidential sources back up Plaintiffs' claims by suggesting that Oshkosh had overpaid for the acquisitions and had not adequately planned for their integrations.

As Defendants note, however, the company's statements suggesting that it was "successful" in integrating acquisitions are hardly actionable. First, as noted at length above, the fact that things

did not work out in the long run does not mean that the company's claim of success in the short term was fraudulent. Second, the company's statements are simply expressions of confidence that reflect judgments about management's general ability to manage. Such statements cannot be fraudulent because they are matters of opinion incapable of being disproved. *Searls v. Glasser,* 64 F.3d 1061, 1066-67 (7th Cir. 1995). For example, who is to say that, in 2006, when Geesink was earning a profit, the company had *not* successfully integrated its acquisitions? And because such vague statements are unverifiable, they are also immaterial. It is difficult to imagine a putative investor making a decision based on a few stray expressions of competence from the company's CEO. "Statements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification. Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119-20 (10th Cir. 1997).[5]

**D. Claims Against Deloitte & Touche**

The amended complaint alleges that the fraud did not end with the company's executives. According to the Plaintiffs, Oshkosh's auditor, Deloitte & Touche, issued audit opinions regarding the company's financial statements but consistently disregarded the need to take an impairment charge for Geesink's goodwill. But as with their claims against the Oshkosh executives, the amended complaint fails to allege a plausible scenario of fraud and fails to allege *any* suggestion

_____

[5]Defendants also raise the defense that their forward-looking statements were protected by the statutory safe harbor, 15 U.S.C. § 78u-5(c)(1), because they were accompanied by meaningful cautionary language. The briefs do not make clear which statements are at issue, however. In any event, because I conclude the statements are not fraudulent, I need not consider the issue of the statutory safe harbor.

38

of scienter. Most notably, the argument that Geesink's goodwill needed to be written down earlier is simply based on the Plaintiffs' opinion about the reasonableness of that judgment. As Deloitte & Touche explains, however, the impairment analysis is highly subjective and is based on a number of factors, including the company's future prospects. Such factors were, of course, disclosed in the company's filings. The entire complaint is premised on the notion that Deloitte "knew" that an impairment to goodwill existed, but such a premise is simply untenable without some specific evidence that the impairment analysis was no longer a matter of judgment but was so obvious that fraud was involved.

In addition, there is no credible suggestion of scienter. As with the lengthy class period 0Plaintiffs propose, the number of defendants involved in the alleged fraud stretches credibility. Whenever a complaint's fraud allegation is based on a violation of GAAP, the Plaintiffs will be forced to assert (regardless of the evidence) that the third-party auditor was part of the scheme to deceive as well. That is not a happy place to be under the PSLRA. We know that the company's executives had at least some financial incentive to prop up the share price for five years – but what was in it for the auditor? All we are told is that Deloitte earned significant fees during the class period. But of course that would be true for any major accounting firm performing audit services. There has to be something extra, some additional whiff of purposeful deceit, to separate the GAAP claim against this auditor from the boilerplate, obligatory, allegations that would have to be made against *any* auditor in a case like this. Here, we are simply told that Deloitte participated in the fraud but not given any plausible reason why it would have done so. Auditors are people, and people generally do not engage in activities – particularly fraudulent ones – without some reason. Would Deloitte have been replaced as auditor if it failed to go along with the program? Were

threats made? Were auditors' bonuses tied to maintaining good relations with Oshkosh management? Did Bohn imply that he needed cover from Deloitte for five years so he could sell thirteen percent of his stock at inflated prices? Without any plausible motive alleged, it is difficult to draw any inference of intent to deceive.

In addition, as noted above, the data underlying Deloitte's impairment analysis were also disclosed, allowing investors to see clearly when the company was making money and when it wasn't. As Deloitte & Touche notes, had the Defendants intended to deceive shareholders, it would have been "nonsensical" to conduct an impairment test fraudulently while at the same time disclosing accurate financial data and alerting shareholders about the very danger that ultimately ensued, namely, the impairment charge. If a real estate agent is trying to bamboozle a prospective buyer, he would not tell him the house is in great shape and then lead him on a detailed inspection to show off the faulty foundation, leaky roof and termite damage. That is simply not how one goes about committing fraud. The complaint must be dismissed against Deloitte & Touche for the same reasons it must be dismissed against the other Defendants.[6]

**E. Count Two**

The amended complaint also alleges a count based on market manipulation, in violation of Rules 10b-5(a) and (c). "Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Lead Plaintiffs; (ii) artificially inflate the market price of Oshkosh's common stock; and (iii) cause Lead Plaintiffs

---

[6]Because there is no underlying fraud pled, the § 20 claim fails as well. *In re Alpharma Inc. Sec. Litig.,* 372 F.3d 137, 153 (3d Cir. 2004) ("[P]laintiffs must prove not only that one person controlled another person, but also that the 'controlled person' is liable under the Act.") (internal quotation marks omitted.)

40

to purchase Oshkosh's common stock at artificially inflated prices." (Am. Compl., ¶ 570.) The substance of the scheme, according to the complaint, was

> the knowing and/or deliberately reckless suppression and concealment of information regarding the impairment of goodwill with respect to the Company's acquisition of Geesink and JLG, as well as material anticipated writedowns and other charges that rendered Defendants' statements regarding earnings guidance throughout the Class Period, each materially false and misleading when made. Defendants knowingly suppressed and concealed such information to distort the balance of facts available to Oshkosh's investors during the Class Period.

(Am. Compl., ¶ 572.)

Defendants argue that this claim is inextricably intertwined with count one, and as such both must be dismissed for the reasons set forth above. Plaintiffs argue, however, that count two does not require the pleading of any affirmative fraudulent statements. Instead, all that is required is an allegation suggesting the "manipulation of financial results" to the detriment of the Plaintiff class. (Pltf. Br. at 73.)

"To state a claim under Rule 10b-5(a) and (c), Plaintiffs must allege that each defendant (1) committed a deceptive or manipulative act (2) with scienter (3) that affected the market for securities, and further that Defendants' acts caused Plaintiffs' injuries." *Desai v. General Growth Properties, Inc.,* 654 F. Supp.2d 836, 862 (N.D. Ill. 2009). As discussed above, the story told in the amended complaint is not one of market manipulation or fraud. There can be no plausible inference of scienter (intent to deceive or manipulate) when the Defendants disclose accurate financial information and repeatedly highlight the possibility of an impairment charge. Plaintiffs' barebones argument to the contrary does not overcome the story told in the amended complaint and the reasonable inferences to be drawn therefrom. Accordingly, Defendants are correct that the count two must be dismissed for the same reasons as count one.

41

**F. Amendment**

Finally, Plaintiffs argue that if this Court accepts the Defendants' arguments, it should at least allow Plaintiffs to amend the complaint to cure any defects. The Seventh Circuit recently observed that a variety of factors are relevant when a district court decides whether to allow an amendment in a PSLRA case:

> It is true that there are some cases in which courts of appeals have found that it is best to use a dismissal without prejudice for a PSLRA complaint, given the demanding nature of PSLRA pleading standards. *See, e.g., Belizan v. Hershon,* 434 F.3d 579, 583 (D.C. Cir. 2006) (a PSLRA "complaint that omits certain essential facts and thus fails to state a claim warrants dismissal pursuant to Rule 12(b)(6) but not dismissal with prejudice"); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (dismissal with prejudice in PSLRA suit is appropriate only where "it is clear on de novo review that the complaint could not be saved by amendment"). But by the same token, there are other cases in which courts of appeals have upheld dismissals with prejudice of securities complaints at a relatively early stage. *See, e.g., Pugh v. Tribune Co.,* 521 F.3d 686, 698 (7th Cir. 2008) (dismissal of second amended complaint); *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 390-91 (4th Cir. 2005); *In re Alpharma, Inc. Sec. Litig.*, 372 F.3d 137, 153-54 (3d Cir. 2004) (initial individual complaints folded into one consolidated complaint, which was then dismissed with prejudice without an opportunity to amend).

*Fannon v. Guidant Corp.,* 583 F.3d 995, 1002 (7th Cir. 2009).

Defendants have cited case law holding that the PSLRA supercedes Rule 15's otherwise generous provisions for amendments. The statute mandates that "[i]n any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the [pleading] requirements are not met." 15 U.S.C. § 78u-4(b)(3)(A). Some courts have interpreted this as requiring, or at least strongly urging, dismissal *with* prejudice even if the liberal standards of Rule 15 might otherwise counsel in favor of allowing an amendment. *Miller v. Champion Enterprises Inc.,* 346 F.3d 660, 692 (6th Cir. 2003) ("[W]e think it is correct to interpret the PSLRA

42

as restricting the ability of plaintiffs to amend their complaint, and thus as limiting the scope of Rule 15(a) of the Federal Rules of Civil Procedure.") This conclusion is based at least in part on the tremendous expense borne by Defendants in defending such lawsuits, as well as the fact that Plaintiffs usually have ample opportunity for investigation before they file their complaints. (Here, for example, they had multiple confidential witnesses, as well as countless statements from company officials. The docket also reflects the presence of roughly *fifteen* lawyers representing the Plaintiffs.) Given the fact that there is so much opportunity for investigation (and the fact that many Plaintiffs' law firms are experts in the ins and outs of the PSLRA), courts might be inclined to be less forgiving if the first complaint is not up to par.

Other courts, however, have disagreed: "[i]nterpreting the PSLRA as constricting the operation of Rule 15(a) would be contrary to the purposes of the Act.*" ACA Financial Guaranty Corp. v. Advest, Inc.,* 512 F.3d 46, 56 (1st Cir. 2008). Given the fact that the Seventh Circuit's recent guidance on amendments in PSLRA cases failed to mention any additional disfavor of amendments in PSLRA cases, I am reluctant to conclude that the PSLRA trumps the typical considerations involved in a Rule 15 analysis. Even so, however, I am satisfied that an amendment should not be allowed in this case because an amendment would be futile. As noted at length above, this was not a case where the Plaintiffs left something significant out of their pleadings whose inclusion could be expected to cure the defects identified. If facts or allegations were left out, it was not due to oversight or an inability to investigate but because the documents or statements simply did not exist. More importantly, this was a complaint whose own allegations undercut the very conclusions Plaintiffs ask us to draw. It is simply not plausible to infer that any of the Defendants intended to defraud anyone given the true and extensive financial data they did disclose and the

consistent red flags they issued about a potential impairment to goodwill. As such, it is difficult to imagine Plaintiffs adding anything to the 192-page complaint to nullify the implausibility of that inference. Accordingly, there is little reason to allow another round of pleadings and extensive briefing. The amended complaint will therefore be dismissed *with* prejudice.

**III. Conclusion**

For the reasons given above, the motions to dismiss are **GRANTED** and the amended complaint is **DISMISSED** with prejudice.

**SO ORDERED** this ___30th___ day of March, 2010.

 ___s/ William C. Griesbach_____
William C. Griesbach
United States District Judge

44